DAVID B. EZRA, ESQ. (SBN 149779)
dezra@bergerkahn.com
STEVEN A. EHRLICH, ESQ. (SBN 70742)
sehrlich@bergerkahn.com
ANDREW D. WYATT, ESQ. (SBN 316740)
awyatt@bergerkahn.com
BERGER KAHN, A Law Corporation
1 Park Plaza, Suite 340
Irvine, California  92614
Tel:  (949) 474-1880  •  Fax:  (949) 313-5029

Attorneys for Defendant
SENTRY INSURANCE

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| KIMI KOBASHI,<br><br>                    Plaintiff,<br><br>v.<br><br>SENTRY INSURANCE, A MUTUAL COMPANY; and DOES 1 through 100 inclusive,<br><br>                    Defendants. | CASE NO. 8:20-cv-00718-DOC-JDE<br><br>**DEFENDANT SENTRY INSURANCE'S ANSWER TO PLAINTIFF KIMI KOBASHI'S COMPLAINT**<br><br>Complaint Filed: 02/07/2020<br><br>TRIAL DATE:  None Set |

BERGER KAHN
*A Law Corporation*

1    Defendant Sentry Insurance ("Sentry"), through its attorneys, responds to

2    Plaintiff Kimi Kobashi's ("Ms. Kobashi") Complaint as follows:

3                    **RESPONSE TO GENERAL ALLEGATIONS**

4         1.     Sentry admits that Ms. Kobashi was in a car accident on November 7,

5    2014, that Ms. Kobashi was a Sentry employee on November 7, 2014, and that the

6    policy Ms. Kobashi referenced had a $1,000,000 uninsured motorist bodily injury

7    policy limit.  Except as expressly admitted, Sentry is without knowledge or

8    information sufficient to form a belief as to the truth or the falsity of the allegations

9    contained in this Paragraph and, on that basis, denies each and every allegation.

10        2.     Paragraph 2 contains conclusions of law to which no response is

11   required.  Sentry admits, however, that Ms. Kobashi made a first-party uninsured

12   motorist claim under Sentry's commercial policy (policy no. 90-05196-06) (the

13   "Policy") on November 10, 2014.  A true and correct copy of the relevant portions

14   of the policy referenced in Ms. Kobashi's complaint is attached as Exhibit 1.

15   Sentry further admits it promptly paid Ms. Kobashi the full $386,774.84 in

16   uninsured motorist benefits awarded in the arbitrator's Statement of Decision.  A

17   true and correct copy of the payment receipt is attached as Exhibit 2.  To the extent

18   a response is deemed required, except as expressly admitted, Sentry denies each

19   and every allegation contained in Paragraph 2.

20            **RESPONSE TO THE PARTIES/JURISDICTION/VENUE**

21        3.     Sentry admits Ms. Kobashi was driving a vehicle insured under the

22   Policy when the accident happened and that the accident happened in Huntington

23   Beach, Orange County, California.  *See* Exhibit 1.  Sentry admits that Ms. Kobashi

24   was employed by Sentry in its SIU department at the time of the accident.  Except

25   as expressly admitted, Sentry is without knowledge or information sufficient to

26   form a belief as to the truth or falsity of the allegations contained in Paragraph 3.

27

28

BERGER KAHN
*A Law Corporation*

SENTRY INSURANCE'S ANSWER TO KIMI KOBASHI'S COMPLAINT

4.      Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

5.      Sentry admits it is a mutual company duly existing under and by virtue of the laws of the State of Wisconsin and that its principle place of business is in Wisconsin located at 1800 North Point Drive, Stevens Point, Wisconsin. Sentry denies its principle place of business is located in California.

6.      Sentry admits that it is, and at all relevant times was, conducting business under and by virtue of the laws of the State of California.

7.      Sentry admits it is a company engaged in the   business of insurance. Except as expressly admitted, Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

8.      Paragraph 8 contains conclusions of law to which no response is required.  To the extent a response is deemed required, Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

9.      Paragraph 9 contains conclusions of law to which no response is required.  To the extent a response is deemed required, Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

10.     Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

11.     Paragraph 11 contains conclusions of law to which no response is required.  To the extent a response is deemed required, Sentry is without

BERGER KAHN
*A Law Corporation*

1  knowledge or information sufficient to form a belief as to the truth or the falsity of
2  the allegations contained in this Paragraph and, on that basis, denies each and
3  every allegation.

4       12.    Paragraph 12 contains legal conclusions or argument to which no
5  response is required.  To the extent a response is deemed required, Sentry is
6  without knowledge or information sufficient to form a belief as to the truth or the
7  falsity of the allegations contained in this Paragraph and, on that basis, denies each
8  and every allegation.

9       13.    Sentry admits that Ms. Kobashi was in a car accident on November 7,
10 2014, that Ms. Kobashi was a Sentry employee on November 7, 2014, and that the
11 policy Ms. Kobashi referenced had a $1,000,000 uninsured motorist bodily injury
12 policy limit.  Except as expressly admitted, Sentry is without knowledge or
13 information sufficient to form a belief as to the truth or the falsity of the allegations
14 contained in this Paragraph and, on that basis, denies each and every allegation.

15 ## RESPONSE TO FACTUAL ALLEGATIONS

16      14.    Sentry admits that Ms. Kobashi advised Sentry of the accident on
17 November 10, 2014 and made a claim for UM benefits under the Policy.

18      15.    Paragraph 15 contains legal conclusions or argument to which no
19 response is required.  To the extent a response is deemed required, the allegations
20 in this Paragraph appear to reference the Policy.  To the extent the allegations
21 purport to describe the substance of the Policy, Sentry denies any allegation
22 inconsistent with the Policy. *See* Exhibit 1.

23      16.    Paragraph 16 contains legal conclusions or argument to which no
24 response is required.  To the extent a response is deemed required, the allegations
25 in this Paragraph appear to reference the Policy.  To the extent the allegations
26 purport to describe the substance of the Policy, Sentry denies any allegation
27 inconsistent with the Policy. *See* Exhibit 1.  The allegations in this Paragraph
28 appear to reference Ms. Kobashi's medical records.  To the extent the allegations

BERGER KAHN
*A Law Corporation*

3

purport to describe the substance of Ms. Kobashi's medical records, Sentry denies any allegation inconsistent with Ms. Kobashi's medical records.

17.     Paragraph 17 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, the allegations in this Paragraph appear to reference the Huntington Beach Police Department's collision investigation report.  A true and correct copy of the collision investigation report is attached as Exhibit 3.  To the extent the allegations purport to describe the substance of the collision investigation report, Sentry denies any allegation inconsistent with the collision investigation report.  To the extent the allegations do not reference Mr. Do's statement, Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

18.     Paragraph 18 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, the allegations in this Paragraph appear to reference the Policy.  To the extent the allegations purport to describe the substance of the Policy, Sentry denies any allegation inconsistent with the Policy. *See* Exhibit 1.

19.     Paragraph 19 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations contained in this Paragraph and, on that basis, denies each and every allegation.

20.     Paragraph 20 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 20.

21.     Paragraph 21 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 21.

BERGER KAHN
*A Law Corporation*

22.    Paragraph 22 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry admits that on November 3, 2016, Ms. Kobashi initiated a demand for arbitration.  Except as expressly admitted, Sentry denies each and every allegation in Paragraph 22.

23.    Paragraph 23 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry admits that Ms. Kobashi's employment in the Sentry SIU department was terminated. Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations that Ms. Kobashi "was eventually forced to take out a $10,000 personal loan in order to purchase therapeutic items that she needed to manage her constant debilitating pain that she suffers from as a result of the Accident" and, on that basis, denies these allegations.  Except as expressly addressed, Sentry denies each and every allegation in Paragraph 23.

24.    Paragraph 24 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 24.

25.    Paragraph 25 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 25.

26.    Paragraph 26 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry admits the arbitration hearing took place on August 19, 2019, through August 20, 2019. Sentry is without knowledge or information sufficient to form a belief as to the truth or the falsity of the allegations that Ms. Kobashi "incurred tens of thousands of dollars in legal costs and attorneys' fees, including payment of multiple experts that testified on her behalf at the hearing" and, on that basis, denies these allegations.  Except as expressly addressed, Sentry denies each and every allegation in Paragraph 26.

BERGER KAHN
*A Law Corporation*

27.     The allegations contained in this Paragraph appear to reference Ms. Kobashi's Arbitration Brief, Sentry's Arbitration Brief, and the arbitrator's Statement of Decision.  A true and correct copy of Ms. Kobashi's Arbitration Brief is attached as Exhibit 4.  A true and correct copy of Sentry's Arbitration Brief is attached as Exhibit 5.  A true and correct copy of the arbitrator's Statement of Decision is attached as Exhibit 6.  To the extent the allegations purport to describe the substance of these documents, Sentry denies any allegation inconsistent with these documents.

28.     Sentry admits that Ms. Kobashi called Huntington Beach police officer John Elser, Bill Hill, Tracy Remas, Michael Lobatz, M.D., and Liz Holakiewcz to testify at the arbitration hearing.

29.     Paragraph 29 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry admits it reviewed Ms. Kobashi's medical records in its possession prior to the arbitration hearing.  Sentry further admits it retained its own experts and that Ms. Kobashi and her known physicians were deposed.  The allegations in this Paragraph appear to reference Gerald J. Alexander, M.D.'s September 27, 2017 report to Sentry.  A true and correct copy of the report is attached as Exhibit 7.  To the extent the allegations purport to describe the substance of Dr. Alexander's report, Sentry denies any allegation inconsistent with Dr. Alexander's report.  Except as expressly addressed, Sentry denies each and every allegation in Paragraph 29.

30.     The allegations contained in this Paragraph appear to reference the arbitrator's Statement of Decision.  To the extent the allegations purport to describe the substance of the Statement of Decision, Sentry denies any allegation inconsistent with the Statement of Decision. *See* Exhibit 6.

31.     The allegations contained in this Paragraph appear to reference Ms. Kobashi's Arbitration Brief, Sentry's Arbitration Brief, and the arbitrator's Statement of Decision.  To the extent the allegations purport to describe the

BERGER KAHN
*A Law Corporation*

1  substance of these documents, Sentry denies any allegation inconsistent with these
2  documents. *See* Exhibits 4-6.

3      32.   Paragraph 32 contains legal conclusions or argument to which no
4  response is required.  To the extent a response is deemed required, Sentry admits
5  that Ms. Kobashi retained counsel.  Sentry is without knowledge or information
6  sufficient to form a belief as to the truth or the falsity of the allegations that Ms.
7  Kobashi "could not pay for needed medical care or living accommodations because
8  she could not afford many of them" and, on that basis, denies these allegations.
9  Except as expressly addressed, Sentry denies each and every allegation in
10  Paragraph 32.

11  <u>**RESPONSE TO FIRST CAUSE OF ACTION FOR BREACH OF THE**</u>
12  <u>**IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST**</u>
13  <u>**ALL DEFENDANTS**</u>

14      33.   Sentry incorporates by reference its answers to the preceding
15  Paragraphs as if set forth at length here.

16      34.   Paragraph 34 contains legal conclusions or argument to which no
17  response is required.  To the extent a response is deemed required, the allegations
18  in this Paragraph appear to reference the Policy.  To the extent the allegations
19  purport to describe the substance of the Policy, Sentry denies any allegation
20  inconsistent with the Policy. *See* Exhibit 1.  To the extent the allegations do not
21  reference the Policy, Sentry denies each and every allegation in Paragraph 34.

22      35.   Paragraph 35 contains legal conclusions or argument to which no
23  response is required.  To the extent a response is deemed required, Sentry denies
24  each and every allegation in Paragraph 35.

25      36.   The allegations contained in this Paragraph appear to reference the
26  Policy.  To the extent the allegations purport to describe the substance of the
27  Policy, Sentry denies any allegation inconsistent with the Policy. *See* Exhibit 1.
28  Sentry expressly denies that Ms. Kobashi paid any premiums on the Policy.

BERGER KAHN
*A Law Corporation*

7

37.   Paragraph 37 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 37.

38.   Paragraph 38 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 38.

## RESPONSE TO SECOND CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION AGAINST ALL DEFENDANTS

39.   Sentry incorporates by reference its answers to the preceding Paragraphs as if set forth at length here.

40.   Paragraph 40 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 40.

41.   Paragraph 41 contains legal conclusions or argument to which no response is required.  To the extent a response is deemed required, Sentry denies each and every allegation in Paragraph 41.

## RESPONSE TO PRAYER FOR RELIEF

Sentry denies that Plaintiff is entitled to any of the relief requested in the unnumbered "WHEREFORE" clause following Paragraph 41, including subparts (1) through (7), and respectfully requests that the Court dismiss the Complaint in its entirety and enter judgment in Sentry's favor and against Ms. Kobashi.

The final paragraph requires no response.  To the extent a response is deemed required, Sentry denies that Ms. Kobashi is entitled to a jury trial.

///
///
///
///
///

BERGER KAHN
*A Law Corporation*

**SENTRY'S AFFIRMATIVE DEFENSES**

As separate and distinct affirmative defenses, Sentry states as follows:

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Claim)**

1.     The Complaint, and each and every remaining claim for relief against Sentry, fails to state a claim upon which relief may be granted against Sentry, and further fails to entitle Ms. Kobashi to the relief sought or to any relief whatsoever against Sentry.

**SECOND AFFIRMATIVE DEFENSE**

**(Genuine Dispute Doctrine)**

2.     Ms. Kobashi's claims are barred, in whole or in part, by the Genuine Dispute Doctrine.

**THIRD AFFIRMATIVE DEFENSE**

**(Waiver)**

3.     The Complaint is barred, in whole or in part, by the doctrine of waiver.

**FOURTH AFFIRMATIVE DEFENSE**

**(Estoppel)**

4.     The Complaint is barred, in whole or in part, by the doctrine of estoppel.

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

5.     The Complaint is barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate)**

6.     Ms. Kobashi has failed to take reasonable steps to reduce or minimize the damages alleged.

///

BERGER KAHN
*A Law Corporation*

## SEVENTH AFFIRMATIVE DEFENSE

### (Adequate Remedies at Law)

7.     Equitable and injunctive relief is barred because Ms. Kobashi has available remedies at law.

## EIGHTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

8.     The Complaint is barred, in whole or in part, by the doctrine of unclean hands.

## NINTH AFFIRMATIVE DEFENSE

### (Speculative Damages)

9.     Ms. Kobashi's claims are barred, in whole or in part, or alternatively Ms. Kobashi's recovery should be reduced, because the alleged damages, if any, are speculative.

## TENTH AFFIRMATIVE DEFENSE

### (Legitimate Business Conduct)

10.     The Complaint is barred, in whole or in part, because Sentry's actions as alleged in the Complaint were undertaken in good faith, with the absence of malicious intent, and were the result of lawful conduct.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Punitive Damages)

11.     Ms. Kobashi is not entitled to punitive damages because Sentry acted reasonably, and in good faith, at all times mentioned in Ms. Kobashi's Complaint.

## TWELTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

12.     Ms. Kobashi's claims are barred, in whole or in part, by applicable statutes of limitation.

///

///

BERGER KAHN
*A Law Corporation*

1

2

3

4

5

6

7

8

9

10

11

12

13

BERGER KAHN
*A Law Corporation*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Conformity to Industry Standards)

13.　The Complaint is barred, in whole or in part, because Sentry acted reasonably, and in good faith, in conformity with industry standards at all times mentioned in Ms. Kobashi's Complaint.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Good Faith)

14.　Sentry acted reasonably, and in good faith, at all times mentioned in Ms. Kobashi's Complaint and Ms. Kobashi is barred from any recovery.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Release)

15.　Ms. Kobashi's claims are barred, in whole or in part, to the extent Ms. Kobashi released her claims against Sentry.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Reservation to Assert Additional Affirmative Defenses)

16.　Sentry gives notice that it intends to rely upon such other affirmative defenses as may become available or apparent during the course of discovery and reserves the right to amend this Answer to assert such defenses, including defenses asserted by any other defendant.

///

///

///

///

///

///

///

///

///

SENTRY INSURANCE'S ANSWER TO KIMI KOBASHI'S COMPLAINT

## **PRAYER FOR RELIEF**

Sentry prays for the entry of judgment in its favor and against Ms. Kobashi as follows:

1. That this action be dismissed in its entirety and with prejudice;

2. That Ms. Kobashi take nothing by way of the Complaint; and

3. For such other and further relief the Court deems just and proper.


DATED: April 17, 2020                         BERGER KAHN, A Law Corporation


By: _____
      DAVID B. EZRA, Esq.
      STEVEN A. EHRLICH, Esq.
      ANDREW D. WYATT, Esq.
      Attorneys for Defendant SENTRY
      INSURANCE

BERGER KAHN
*A Law Corporation*

12

SENTRY INSURANCE'S ANSWER TO KIMI KOBASHI'S COMPLAINT

# EXHIBIT "1"

SENTRY INSURANCE A MUTUAL COMPANY                    COMMERCIAL AUTO
STEVENS POINT, WISCONSIN                             POLICY
(A PARTICIPATING MUTUAL COMPANY)
A MEMBER OF THE SENTRY FAMILY OF INSURANCE COMPANIES


        DECLARATIONS                          POLICY NUMBER: 90-05196-06



    FIRST NAMED INSURED AND ADDRESS        PRODUCER     90105000

    SENTRY INSURANCE A MUTUAL
    COMPANY

    1800 NORTH POINT DRIVE

    STEVENS POINT                 WI
                                  54481

    REFER TO THE ENCLOSED SCHEDULE FOR ADDITIONAL NAMED INSUREDS.


    Policy Period:  From 02-01-14 To 02-01-15 at 12:01 AM Standard Time.
                    at your mailing address shown above.

    Form of Named Insured's Business:  CORP.


    In return for the payment of the premium, and subject to all the terms of
    this policy, we agree with you to provide the Insurance as stated in this
    policy.




    Forms Applicable to all Coverage Parts:
    IL 00 17 (1198)   80-2313 (0186)


    IL DS 00 04 98


    SEN 90-05196-06                          NON-ASSESSABLE POLICY
    03-03-14

COMMERCIAL AUTO
POLICY

COMMERCIAL AUTO DECLARATIONS                    POLICY NUMBER  90-05196-06

ITEM ONE - Named Insured
          The Named Insured is shown on Declarations IL DS OO.

ITEM TWO - Schedule of Coverages and Covered Autos

This policy provides only those coverages shown below.  Each of these
coverages will apply only to those "autos" shown as covered "autos."
"Autos" are shown as covered "autos" for a particular coverage by the
entry of one or more of the symbols from the COVERED AUTO Section of
the Business Auto Coverage Form next to the name of the coverage.

| COVERAGE | COVERED AUTO SYMBOL | LIMIT The most we will pay for any one loss or accident |
|----------|---------------------|------------------------------------------------------|
| Liability | 01 | $ 5,000,000 Combined Single Limit |
| Personal Injury Protection (No Fault) | 05 | Separately stated in each PIP endorsement, minus deductible as Per Endorsement. |
| Auto Medical Payments | 01 | $ 10,000 |
| Uninsured Motorist | 01 | $ 1,000,000 Combined Single Limit |
| Underinsured Motorist | 01 | $ 1,000,000 Combined Single Limit |

Forms and Endorsements attached to this policy:

SEE SCHEDULE OF FORMS AND ENDORSEMENTS

CA DS 03 03 06

SEN 90-05196-06 00 141
03-03-14
PAGE 001

                                        COMMERCIAL AUTO
                                            POLICY


COMMERCIAL AUTO DECLARATIONS               POLICY NUMBER  90-05196-06

                                        LIMIT
                     COVERED AUTO  The most we will pay for
COVERAGE                SYMBOL     any one loss or accident
--------             ------------  ------------------------




CA DS 03 03 06


SEN 90-05196-06 00 141
03-03-14
PAGE 002

COMMERCIAL AUTO
POLICY

COMMERCIAL AUTO DECLARATIONS                    POLICY NUMBER  90-05196-06

CA DS 03 03 06

COMMERCIAL AUTO
CA 00 01 10 13

# BUSINESS AUTO COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section **V - Definitions**.

## Section I - Covered Autos

Item Two of the Declarations shows the "autos" that are covered "autos" for each of your coverages. The following numerical symbols describe the "autos" that may be covered "autos". The symbols entered next to a coverage on the Declarations designate the only "autos" that are covered "autos".

**A. Description Of Covered Auto Designation Symbols**

| Symbol | Description Of Covered Auto Designation Symbols | |
|---|---|---|
| 1 | Any "Auto" | |
| 2 | Owned "Autos" Only | Only those "autos" you own (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to power units you own).  This includes those "autos" you acquire ownership of after the policy begins. |
| 3 | Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own.  This includes those private passenger "autos" you acquire ownership of after the policy begins. |
| 4 | Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to power units you own).  This includes those "autos" not of the private passenger type you acquire ownership of after the policy begins. |
| 5 | Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged.  This includes those "autos" you acquire ownership of after the policy begins provided they are required to have no- fault benefits in the state where they are licensed or principally garaged. |
| 6 | Owned "Autos" Subject To A Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage.  This includes those "autos" you acquire ownership of after the policy begins provided they are subject to the same state uninsured motorists requirement. |
| 7 | Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown (and for Covered Autos Liability Coverage any "trailers" you don't own while attached to any power units described in Item Three). |
| 8 | Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow.  This does not include any "auto" you lease, hire, rent or borrow from any of your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households. |
| 9 | Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business.  This includes "autos" owned by your "employees", partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |

SAMPLE

© Insurance Services Office, Inc., 2011

| 19 | Mobile Equipment Subject To Compulsory Or Financial Responsibility Or Other Motor Vehicle Insurance Law Only | Only those "autos" that are land vehicles and that would qualify under the definition of "mobile equipment" under this policy if they were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where they are licensed or principally garaged. |

## B. Owned Autos You Acquire After The Policy Begins

1. If Symbols **1**, **2**, **3**, **4**, **5**, **6** or **19** are entered next to a coverage in Item Two of the Declarations, then you have coverage for "autos" that you acquire of the type described for the remainder of the policy period.

2. But, if Symbol **7** is entered next to a coverage in Item Two of the Declarations, an "auto" you acquire will be a covered "auto" for that coverage only if:

   **a.** We already cover all "autos" that you own for that coverage or it replaces an "auto" you previously owned that had that coverage; and

   **b.** You tell us within 30 days after you acquire it that you want us to cover it for that coverage.

## C. Certain Trailers, Mobile Equipment And Temporary Substitute Autos

If Covered Autos Liability Coverage is provided by this Coverage Form, the following types of vehicles are also covered "autos" for Covered Autos Liability Coverage:

1. "Trailers" with a load capacity of 2,000 pounds or less designed primarily for travel on public roads.

2. "Mobile equipment" while being carried or towed by a covered "auto".

3. Any "auto" you do not own while used with the permission of its owner as a temporary substitute for a covered "auto" you own that is out of service because of its:

   **a.** Breakdown;

   **b.** Repair;

   **c.** Servicing;

   **d.** "Loss"; or

   **e.** Destruction.

## Section II - Covered Autos Liability Coverage

### A. Coverage

We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

We will also pay all sums an "insured" legally must pay as a "covered pollution cost or expense" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of covered "autos". However, we will only pay for the "covered pollution cost or expense" if there is either "bodily injury" or "property damage" to which this insurance applies that is caused by the same "accident".

We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Covered Autos Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

1. **Who Is An Insured**

   The following are "insureds":

   **a.** You for any covered "auto".

   **b.** Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

   **(1)** The owner or anyone else from whom you hire or borrow a covered "auto".

   This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

**(2)** Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

**(3)** Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

**(4)** Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company) or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

**(5)** A partner (if you are a partnership) or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

**c.** Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**2. Coverage Extensions**

**a. Supplementary Payments**

We will pay for the "insured":

**(1)** All expenses we incur.

**(2)** Up to $2,000 for cost of bail bonds (including bonds for related traffic law violations) required because of an "accident" we cover. We do not have to furnish these bonds.

**(3)** The cost of bonds to release attachments in any "suit" against the "insured" we defend, but only for bond amounts within our Limit of Insurance.

**(4)** All reasonable expenses incurred by the "insured" at our request, including actual loss of earnings up to $250 a day because of time off from work.

**(5)** All court costs taxed against the "insured" in any "suit" against the "insured" we defend. However, these payments do not include attorneys' fees or attorneys' expenses taxed against the "insured".

**(6)** All interest on the full amount of any judgment that accrues after entry of the judgment in any "suit" against the "insured" we defend, but our duty to pay interest ends when we have paid, offered to pay or deposited in court the part of the judgment that is within our Limit of Insurance.

These payments will not reduce the Limit of Insurance.

**b. Out-of-state Coverage Extensions**

While a covered "auto" is away from the state where it is licensed, we will:

**(1)** Increase the Limit of Insurance for Covered Autos Liability Coverage to meet the limits specified by a compulsory or financial responsibility law of the jurisdiction where the covered "auto" is being used. This extension does not apply to the limit or limits specified by any law governing motor carriers of passengers or property.

**(2)** Provide the minimum amounts and types of other coverages, such as no-fault, required of out-of-state vehicles by the jurisdiction where the covered "auto" is being used.

We will not pay anyone more than once for the same elements of loss because of these extensions.

**B. Exclusions**

This insurance does not apply to any of the following:

**1. Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the "insured".

**2. Contractual**

Liability assumed under any contract or agreement.

But this exclusion does not apply to liability for damages:

**a.** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement; or

**b.** That the "insured" would have in the absence of the contract or agreement.

**3. Workers' Compensation**

Any obligation for which the "insured" or the "insured's" insurer may be held liable under any workers' compensation, disability benefits or unemployment compensation law or any similar law.

© Insurance Services Office, Inc., 2011

**4. Employee Indemnification And Employer's Liability**

"Bodily injury" to:

**a.** An "employee" of the "insured" arising out of and in the course of:

**(1)** Employment by the "insured"; or

**(2)** Performing the duties related to the conduct of the "insured's" business; or

**b.** The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph **a.** above.

This exclusion applies:

**(1)** Whether the "insured" may be liable as an employer or in any other capacity; and

**(2)** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

But this exclusion does not apply to "bodily injury" to domestic "employees" not entitled to workers' compensation benefits or to liability assumed by the "insured" under an "insured contract". For the purposes of the Coverage Form, a domestic "employee" is a person engaged in household or domestic work performed principally in connection with a residence premises.

**5. Fellow Employee**

"Bodily injury" to:

**a.** Any fellow "employee" of the "insured" arising out of and in the course of the fellow "employee's" employment or while performing duties related to the conduct of your business; or

**b.** The spouse, child, parent, brother or sister of that fellow "employee" as a consequence of Paragraph **a.** above.

**6. Care, Custody Or Control**

"Property damage" to or "covered pollution cost or expense" involving property owned or transported by the "insured" or in the "insured's" care, custody or control. But this exclusion does not apply to liability assumed under a sidetrack agreement.

**7. Handling Of Property**

"Bodily injury" or "property damage" resulting from the handling of property:

**a.** Before it is moved from the place where it is accepted by the "insured" for movement into or onto the covered "auto"; or

**b.** After it is moved from the covered "auto" to the place where it is finally delivered by the "insured".

**8. Movement Of Property By Mechanical Device**

"Bodily injury" or "property damage" resulting from the movement of property by a mechanical device (other than a hand truck) unless the device is attached to the covered "auto".

**9. Operations**

"Bodily injury" or "property damage" arising out of the operation of:

**a.** Any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment"; or

**b.** Machinery or equipment that is on, attached to or part of a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

**10. Completed Operations**

"Bodily injury" or "property damage" arising out of your work after that work has been completed or abandoned.

In this exclusion, your work means:

**a.** Work or operations performed by you or on your behalf; and

**b.** Materials, parts or equipment furnished in connection with such work or operations.

Your work includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in Paragraph **a.** or **b.** above.

Your work will be deemed completed at the earliest of the following times:

**(1)** When all of the work called for in your contract has been completed;

**(2)** When all of the work to be done at the site has been completed if your contract calls for work at more than one site; or

**(3)** When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

© Insurance Services Office, Inc., 2011

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**11. Pollution**

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts if:

**(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

**(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraphs **6.b.** and **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above of this exclusion do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

**(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

**(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**12. War**

"Bodily injury" or "property damage" arising directly or indirectly out of:

**a.** War, including undeclared or civil war;

**b.** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**c.** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**13. Racing**

Covered "autos" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. This insurance also does not apply while that covered "auto" is being prepared for such a contest or activity.

**C. Limit Of Insurance**

Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for the total of all damages and "covered pollution cost or expense" combined resulting from any one "accident" is the Limit Of Insurance for Covered Autos Liability Coverage shown in the Declarations.

All "bodily injury", "property damage" and "covered pollution cost or expense" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

No one will be entitled to receive duplicate payments for the same elements of "loss" under this Coverage Form and any Medical Payments Coverage endorsement, Uninsured Motorists Coverage endorsement or Underinsured Motorists Coverage endorsement attached to this Coverage Part.

**Section III - Physical Damage Coverage**

**A. Coverage**

1. We will pay for "loss" to a covered "auto" or its equipment under:

   **a. Comprehensive Coverage**

   From any cause except:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

   **b. Specified Causes Of Loss Coverage**

   Caused by:

   **(1)** Fire, lightning or explosion;

   **(2)** Theft;

   **(3)** Windstorm, hail or earthquake;

   **(4)** Flood;

   **(5)** Mischief or vandalism; or

   **(6)** The sinking, burning, collision or derailment of any conveyance transporting the covered "auto".

   **c. Collision Coverage**

   Caused by:

   **(1)** The covered "auto's" collision with another object; or

   **(2)** The covered "auto's" overturn.

2. **Towing**

   We will pay up to the limit shown in the Declarations for towing and labor costs incurred each time a covered "auto" of the private passenger type is disabled. However, the labor must be performed at the place of disablement.

3. **Glass Breakage - Hitting A Bird Or Animal - Falling Objects Or Missiles**

   If you carry Comprehensive Coverage for the damaged covered "auto", we will pay for the following under Comprehensive Coverage:

   **a.** Glass breakage;

   **b.** "Loss" caused by hitting a bird or animal; and

   **c.** "Loss" caused by falling objects or missiles.

   However, you have the option of having glass breakage caused by a covered "auto's" collision or overturn considered a "loss" under Collision Coverage.

4. **Coverage Extensions**

   **a. Transportation Expenses**

   We will pay up to $20 per day, to a maximum of $600, for temporary transportation expense incurred by you because of the total theft of a covered "auto" of the private passenger type. We will pay only for those covered "autos" for which you carry either Comprehensive or Specified Causes Of Loss Coverage. We will pay for temporary transportation expenses incurred during the period beginning 48 hours after the theft and ending, regardless of the policy's expiration, when the covered "auto" is returned to use or we pay for its "loss".

   **b. Loss Of Use Expenses**

   For Hired Auto Physical Damage, we will pay expenses for which an "insured" becomes legally responsible to pay for loss of use of a vehicle rented or hired without a driver under a written rental contract or agreement. We will pay for loss of use expenses if caused by:

   **(1)** Other than collision only if the Declarations indicates that Comprehensive Coverage is provided for any covered "auto";

   **(2)** Specified Causes Of Loss only if the Declarations indicates that Specified Causes Of Loss Coverage is provided for any covered "auto"; or

**(3)** Collision only if the Declarations indicates that Collision Coverage is provided for any covered "auto".

However, the most we will pay for any expenses for loss of use is $20 per day, to a maximum of $600.

## B. Exclusions

**1.** We will not pay for "loss" caused by or resulting from any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss".

### a. Nuclear Hazard

**(1)** The explosion of any weapon employing atomic fission or fusion; or

**(2)** Nuclear reaction or radiation, or radioactive contamination, however caused.

### b. War Or Military Action

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power or action taken by governmental authority in hindering or defending against any of these.

**2.** We will not pay for "loss" to any covered "auto" while used in any professional or organized racing or demolition contest or stunting activity, or while practicing for such contest or activity. We will also not pay for "loss" to a covered "auto" while that covered "auto" is being prepared for such a contest or activity.

**3.** We will not pay for "loss" due and confined to:

**a.** Wear and tear, freezing, mechanical or electrical breakdown.

**b.** Blowouts, punctures or other road damage to tires.

This exclusion does not apply to such "loss" resulting from the total theft of a covered "auto".

**4.** We will not pay for "loss" to any of the following:

**a.** Tapes, records, discs or other similar audio, visual or data electronic devices designed for use with audio, visual or data electronic equipment.

**b.** Any device designed or used to detect speed-measuring equipment, such as radar or laser detectors, and any jamming apparatus intended to elude or disrupt speed-measuring equipment.

**c.** Any electronic equipment, without regard to whether this equipment is permanently installed, that reproduces, receives or transmits audio, visual or data signals.

**d.** Any accessories used with the electronic equipment described in Paragraph **c.** above.

**5.** Exclusions **4.c.** and **4.d.** do not apply to equipment designed to be operated solely by use of the power from the "auto's" electrical system that, at the time of "loss", is:

**a.** Permanently installed in or upon the covered "auto";

**b.** Removable from a housing unit which is permanently installed in or upon the covered "auto";

**c.** An integral part of the same unit housing any electronic equipment described in Paragraphs **a.** and **b.** above; or

**d.** Necessary for the normal operation of the covered "auto" or the monitoring of the covered "auto's" operating system.

**6.** We will not pay for "loss" to a covered "auto" due to "diminution in value".

## C. Limits Of Insurance

**1.** The most we will pay for:

**a.** "Loss" to any one covered "auto" is the lesser of:

**(1)** The actual cash value of the damaged or stolen property as of the time of the "loss"; or

**(2)** The cost of repairing or replacing the damaged or stolen property with other property of like kind and quality.

**b.** All electronic equipment that reproduces, receives or transmits audio, visual or data signals in any one "loss" is $1,000, if, at the time of "loss", such electronic equipment is:

**(1)** Permanently installed in or upon the covered "auto" in a housing, opening or other location that is not normally used by the "auto" manufacturer for the installation of such equipment;

© Insurance Services Office, Inc., 2011

**(2)** Removable from a permanently installed housing unit as described in Paragraph **b.(1)** above; or

**(3)** An integral part of such equipment as described in Paragraphs **b.(1)** and **b.(2)** above.

**2.** An adjustment for depreciation and physical condition will be made in determining actual cash value in the event of a total "loss".

**3.** If a repair or replacement results in better than like kind or quality, we will not pay for the amount of the betterment.

**D. Deductible**

For each covered "auto", our obligation to pay for, repair, return or replace damaged or stolen property will be reduced by the applicable deductible shown in the Declarations. Any Comprehensive Coverage Deductible shown in the Declarations does not apply to "loss" caused by fire or lightning.

**Section IV - Business Auto Conditions**

The following conditions apply in addition to the Common Policy Conditions:

**A. Loss Conditions**

**1. Appraisal For Physical Damage Loss**

If you and we disagree on the amount of "loss", either may demand an appraisal of the "loss". In this event, each party will select a competent appraiser. The two appraisers will select a competent and impartial umpire. The appraisers will state separately the actual cash value and amount of "loss". If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If we submit to an appraisal, we will still retain our right to deny the claim.

**2. Duties In The Event Of Accident, Claim, Suit Or Loss**

We have no duty to provide coverage under this policy unless there has been full compliance with the following duties:

**a.** In the event of "accident", claim, "suit" or "loss", you must give us or our authorized representative prompt notice of the "accident" or "loss". Include:

**(1)** How, when and where the "accident" or "loss" occurred;

**(2)** The "insured's" name and address; and

**(3)** To the extent possible, the names and addresses of any injured persons and witnesses.

**b.** Additionally, you and any other involved "insured" must:

**(1)** Assume no obligation, make no payment or incur no expense without our consent, except at the "insured's" own cost.

**(2)** Immediately send us copies of any request, demand, order, notice, summons or legal paper received concerning the claim or "suit".

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit".

**(4)** Authorize us to obtain medical records or other pertinent information.

**(5)** Submit to examination, at our expense, by physicians of our choice, as often as we reasonably require.

**c.** If there is "loss" to a covered "auto" or its equipment, you must also do the following:

**(1)** Promptly notify the police if the covered "auto" or any of its equipment is stolen.

**(2)** Take all reasonable steps to protect the covered "auto" from further damage. Also keep a record of your expenses for consideration in the settlement of the claim.

**(3)** Permit us to inspect the covered "auto" and records proving the "loss" before its repair or disposition.

**(4)** Agree to examinations under oath at our request and give us a signed statement of your answers.

**3. Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form until:

**a.** There has been full compliance with all the terms of this Coverage Form; and

**b.** Under Covered Autos Liability Coverage, we agree in writing that the "insured" has an obligation to pay or until the amount of that obligation has finally been determined by judgment after trial. No one has the right under this policy to bring us into an action to determine the "insured's" liability.

**4. Loss Payment - Physical Damage Coverages**

At our option, we may:

**a.** Pay for, repair or replace damaged or stolen property;

**b.** Return the stolen property, at our expense. We will pay for any damage that results to the "auto" from the theft; or

**c.** Take all or any part of the damaged or stolen property at an agreed or appraised value.

If we pay for the "loss", our payment will include the applicable sales tax for the damaged or stolen property.

**5. Transfer Of Rights Of Recovery Against Others To Us**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us. That person or organization must do everything necessary to secure our rights and must do nothing after "accident" or "loss" to impair them.

**B. General Conditions**

**1. Bankruptcy**

Bankruptcy or insolvency of the "insured" or the "insured's" estate will not relieve us of any obligations under this Coverage Form.

**2. Concealment, Misrepresentation Or Fraud**

This Coverage Form is void in any case of fraud by you at any time as it relates to this Coverage Form. It is also void if you or any other "insured", at any time, intentionally conceals or misrepresents a material fact concerning:

**a.** This Coverage Form;

**b.** The covered "auto";

**c.** Your interest in the covered "auto"; or

**d.** A claim under this Coverage Form.

**3. Liberalization**

If we revise this Coverage Form to provide more coverage without additional premium charge, your policy will automatically provide the additional coverage as of the day the revision is effective in your state.

**4. No Benefit To Bailee - Physical Damage Coverages**

We will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of this Coverage Form.

**5. Other Insurance**

**a.** For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance. However, while a covered "auto" which is a "trailer" is connected to another vehicle, the Covered Autos Liability Coverage this Coverage Form provides for the "trailer" is:

**(1)** Excess while it is connected to a motor vehicle you do not own; or

**(2)** Primary while it is connected to a covered "auto" you own.

**b.** For Hired Auto Physical Damage Coverage, any covered "auto" you lease, hire, rent or borrow is deemed to be a covered "auto" you own. However, any "auto" that is leased, hired, rented or borrowed with a driver is not a covered "auto".

**c.** Regardless of the provisions of Paragraph **a.** above, this Coverage Form's Covered Autos Liability Coverage is primary for any liability assumed under an "insured contract".

**d.** When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

**6. Premium Audit**

**a.** The estimated premium for this Coverage Form is based on the exposures you told us you would have when this policy began. We will compute the final premium due when we determine your actual exposures. The estimated total premium will be credited against the final premium due and the first Named Insured will be billed for the balance, if any. The due date for the final premium or retrospective premium is the date shown as the due date on the bill. If the estimated total premium exceeds the final premium due, the first Named Insured will get a refund.

**b.** If this policy is issued for more than one year, the premium for this Coverage Form will be computed annually based on our rates or premiums in effect at the beginning of each year of the policy.

**7. Policy Period, Coverage Territory**

Under this Coverage Form, we cover "accidents" and "losses" occurring:

**a.** During the policy period shown in the Declarations; and

**b.** Within the coverage territory.

The coverage territory is:

**(1)** The United States of America;

**(2)** The territories and possessions of the United States of America;

**(3)** Puerto Rico;

**(4)** Canada; and

**(5)** Anywhere in the world if a covered "auto" of the private passenger type is leased, hired, rented or borrowed without a driver for a period of 30 days or less,

provided that the "insured's" responsibility to pay damages is determined in a "suit" on the merits, in the United States of America, the territories and possessions of the United States of America, Puerto Rico or Canada, or in a settlement we agree to.

We also cover "loss" to, or "accidents" involving, a covered "auto" while being transported between any of these places.

**8. Two Or More Coverage Forms Or Policies Issued By Us**

If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us applies to the same "accident", the aggregate maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy. This condition does not apply to any Coverage Form or policy issued by us or an affiliated company specifically to apply as excess insurance over this Coverage Form.

**Section V - Definitions**

**A.** "Accident" includes continuous or repeated exposure to the same conditions resulting in "bodily injury" or "property damage".

**B.** "Auto" means:

**1.** A land motor vehicle, "trailer" or semitrailer designed for travel on public roads; or

**2.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

**C.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these.

**D.** "Covered pollution cost or expense" means any cost or expense arising out of:

**1.** Any request, demand, order or statutory or regulatory requirement that any "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**2.** Any claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

"Covered pollution cost or expense" does not include any cost or expense arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

**a.** That are, or that are contained in any property that is:

**(1)** Being transported or towed by, handled or handled for movement into, onto or from the covered "auto";

**(2)** Otherwise in the course of transit by or on behalf of the "insured"; or

**(3)** Being stored, disposed of, treated or processed in or upon the covered "auto";

**b.** Before the "pollutants" or any property in which the "pollutants" are contained are moved from the place where they are accepted by the "insured" for movement into or onto the covered "auto"; or

**c.** After the "pollutants" or any property in which the "pollutants" are contained are moved from the covered "auto" to the place where they are finally delivered, disposed of or abandoned by the "insured".

SPECIMEN

 © Insurance Services Office, Inc., 2011 CA 00 01 10 13

Paragraph **a.** above does not apply to fuels, lubricants, fluids, exhaust gases or other similar "pollutants" that are needed for or result from the normal electrical, hydraulic or mechanical functioning of the covered "auto" or its parts, if:

    **(1)** The "pollutants" escape, seep, migrate or are discharged, dispersed or released directly from an "auto" part designed by its manufacturer to hold, store, receive or dispose of such "pollutants"; and

    **(2)** The "bodily injury", "property damage" or "covered pollution cost or expense" does not arise out of the operation of any equipment listed in Paragraph **6.b.** or **6.c.** of the definition of "mobile equipment".

Paragraphs **b.** and **c.** above do not apply to "accidents" that occur away from premises owned by or rented to an "insured" with respect to "pollutants" not in or upon a covered "auto" if:

    **(a)** The "pollutants" or any property in which the "pollutants" are contained are upset, overturned or damaged as a result of the maintenance or use of a covered "auto"; and

    **(b)** The discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused directly by such upset, overturn or damage.

**E.** "Diminution in value" means the actual or perceived loss in market value or resale value which results from a direct and accidental "loss".

**F.** "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

**G.** "Insured" means any person or organization qualifying as an insured in the Who Is An Insured provision of the applicable coverage. Except with respect to the Limit of Insurance, the coverage afforded applies separately to each insured who is seeking coverage or against whom a claim or "suit" is brought.

**H.** "Insured contract" means:

    **1.** A lease of premises;

    **2.** A sidetrack agreement;

    **3.** Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

    **4.** An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

    **5.** That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another to pay for "bodily injury" or "property damage" to a third party or organization. Tort Liability means a liability that would be imposed by law in the absence of any contract or agreement; or

    **6.** That part of any contract or agreement entered into, as part of your business, pertaining to the rental or lease, by you or any of your "employees", of any "auto". However, such contract or agreement shall not be considered an "insured contract" to the extent that it obligates you or any of your "employees" to pay for "property damage" to any "auto" rented or leased by you or any of your "employees".

An "insured contract" does not include that part of any contract or agreement:

    **a.** That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

    **b.** That pertains to the loan, lease or rental of an "auto" to you or any of your "employees", if the "auto" is loaned, leased or rented with a driver; or

    **c.** That holds a person or organization engaged in the business of transporting property by "auto" for hire harmless for your use of a covered "auto" over a route or territory that person or organization is authorized to serve by public authority.

**I.** "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

**J.** "Loss" means direct and accidental loss or damage.

**K.** "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

    **1.** Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

    **2.** Vehicles maintained for use solely on or next to premises you own or rent;

    **3.** Vehicles that travel on crawler treads;

**4.** Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   **a.** Power cranes, shovels, loaders, diggers or drills; or

   **b.** Road construction or resurfacing equipment such as graders, scrapers or rollers;

**5.** Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   **a.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well-servicing equipment; or

   **b.** Cherry pickers and similar devices used to raise or lower workers; or

**6.** Vehicles not described in Paragraph **1.**, **2.**, **3.** or **4.** above maintained primarily for purposes other than the transportation of persons or cargo. However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

   **a.** Equipment designed primarily for:

     **(1)** Snow removal;

     **(2)** Road maintenance, but not construction or resurfacing; or

     **(3)** Street cleaning;

   **b.** Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

   **c.** Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting or well-servicing equipment.

However, "mobile equipment" does not include land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

**L.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

**M.** "Property damage" means damage to or loss of use of tangible property.

**N.** "Suit" means a civil proceeding in which:

   **1.** Damages because of "bodily injury" or "property damage"; or

   **2.** A "covered pollution cost or expense";

to which this insurance applies, are alleged.

"Suit" includes:

   **a.** An arbitration proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the "insured" must submit or does submit with our consent; or

   **b.** Any other alternative dispute resolution proceeding in which such damages or "covered pollution costs or expenses" are claimed and to which the insured submits with our consent.

**O.** "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

**P.** "Trailer" includes semitrailer.

© Insurance Services Office, Inc., 2011
CA 00 01 10 13

COMMERCIAL AUTO
CA 21 54 09 09

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY

For a covered "auto" licensed or principally garaged in or "garage operations" conducted in California, this endorsement modifies insurance provided under the following:

BUSINESS AUTO COVERAGE FORM
GARAGE COVERAGE FORM
MOTOR CARRIER COVERAGE FORM
TRUCKERS COVERAGE FORM

With respect to coverage provided by this endorsement, the provisions of the Coverage Form apply unless modified by the endorsement.

This endorsement changes the policy effective on the inception date of the policy unless another date is indicated below.



SCHEDULE

| LIMIT OF INSURANCE:  $ | EACH "ACCIDENT" |
|---|---|

Information required to complete this Schedule, if not shown above, will be shown in the Declarations.

A.  COVERAGE

1.  We will pay all sums the "insured" is legally entitled to recover as compensatory damages from the owner or driver of an "uninsured motor vehicle".  The damages must result from "bodily injury" sustained by the "insured" caused by an "accident".  The owner's or driver's liability for these damages must result from the ownership, maintenance or use of the "uninsured motor vehicle".

2.  We will pay only after the limits of liability under any liability bonds or policies have been exhausted by payment of judgments or settlements.

3.  Any judgment for damages arising out of a "suit" brought without our written consent is not binding on us.

B.  WHO IS AN INSURED

If the Named Insured is designated in the Declarations as:

1.  An individual, then the following are "insureds":

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY – CONTINUED

    a. The Named Insured and any "family members".

    b. Anyone else "occupying" a covered "auto" or a temporary substitute for a covered "auto".  The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

    c. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

2. A partnership, limited liability company, corporation or any other form of organization, then the following are "insureds":

    a. Anyone "occupying" a covered "auto" or a temporary substitute for a covered "auto".  The covered "auto" must be out of service because of its breakdown, repair, servicing, "loss" or destruction.

    b. Anyone for damages he or she is entitled to recover because of "bodily injury" sustained by another "insured".

C. EXCLUSIONS

This insurance does not apply to any of the following:

1. Punitive or exemplary damages.

2. Any claim settled without our consent.  However, this exclusion does not apply to a settlement made with the insurer of a vehicle described in Paragraph b. of the definition of "uninsured motor vehicle".

3. The direct or indirect benefit of any insurer or self-insurer under any workers' compensation, disability benefits or similar law or to the direct benefit of the United States, a state or its political subdivisions.

4. "Bodily injury" sustained by:

    a. An individual Named Insured while "occupying" or when struck by any vehicle owned by that Named Insured that is not a covered "auto" for Uninsured Motorists Coverage under this coverage form;

    b. Any "family member" while "occupying" or when struck by any vehicle owned by that "family member" that is not a covered "auto" for Uninsured Motorists Coverage under this coverage form; or

    c. Any "family member" while "occupying" or when struck by any vehicle owned by the Named Insured that is insured for Uninsured Motorists Coverage on a primary basis under any other coverage form or policy.

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE —
BODILY INJURY — CONTINUED

However, Exclusion 4. shall not apply to "bodily injury" sustained by an individual Named Insured or "family member" when struck by a vehicle owned by that "insured" and operated or caused to be operated by a person without that "insured's" consent in connection with criminal activity that has been documented in a police report and to which that "insured" is not a party to.

5. "Bodily injury" sustained by an individual Named Insured or any "family member" while "occupying" any vehicle leased by that Named Insured or any "family member" under a written contract for a period of six months or more that is not a covered "auto".

6. Anyone using a vehicle without a reasonable belief that the person is entitled to do so.

7. "Bodily injury" sustained by an "insured" while "occupying" any "auto" that is rented or leased to that "insured" for use as a public or livery conveyance. However, this exclusion does not apply if the "insured" is in the business of providing public or livery conveyance.

8. "Bodily injury" arising directly or indirectly out of:

   a. War, including undeclared or civil war;

   b. Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

   c. Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

D. LIMIT OF INSURANCE

1. Regardless of the number of covered "autos", "insureds", premiums paid, claims made or vehicles involved in the "accident", the most we will pay for all damages resulting from any one "accident" is the Limit of Insurance for Uninsured Motorists Coverage shown in the Schedule or Declarations.

2. For a vehicle described in Paragraph b. of the definition of "uninsured motor vehicle", our Limit of Insurance shall be reduced by all sums paid because of "bodily injury" by or for anyone who is legally responsible, including all sums paid or payable under this policy's Liability Coverage.

3. No one will be entitled to receive duplicate payments for the same elements of "loss" under this coverage and any Liability Coverage form or Medical Payments Coverage endorsement attached to this Coverage Part.

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY – CONTINUED

We will not make a duplicate payment under this coverage for any element of "loss" for which payment has been made by or for anyone who is legally responsible.

We will not pay for any element of "loss" if a person is entitled to receive payment for the same element of "loss" under any workers' compensation, disability benefits or similar law.

E.   CHANGES IN CONDITIONS

The CONDITIONS are changed for California Uninsured Motorists Coverage – Bodily Injury as follows:

1.   DUTIES IN THE EVENT OF ACCIDENT, CLAIM, SUIT OR LOSS is changed by adding the following:

   a.   Promptly notify the police if a hit-and-run driver is involved; and

   b.   Send us copies of the legal papers if a "suit" is brought. In addition, a person seeking coverage under Paragraph b. of the definition of "uninsured motor vehicle" must:

      (1)   Provide us with a copy of the complaint by personal service or certified mail if the "insured" brings an action against the owner or operator of such "uninsured motor vehicle";

      (2)   Within a reasonable time, make all pleadings and depositions available for copying by us or furnish us copies at our expense; and

      (3)   Provide us with proof that the limits of insurance under any applicable liability bonds or policies have been exhausted by payment of judgments or settlements.

2.   LEGAL ACTION AGAINST US is replaced by the following:

No legal action may be brought against us under this coverage form until there has been full compliance with all the terms of this coverage form and with respect to Paragraphs a., c. and d. of the definition of "uninsured motor vehicle" unless within two years from the date of the "accident":

   a.   Agreement as to the amount due under this insurance has been concluded;

   b.   The "insured" has formally instituted arbitration proceedings against us.  In the event that the "insured" decides to arbitrate, the "insured" must formally begin arbitration proceedings by notifying us in writing, sent by certified mail, return receipt requested; or

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COM CO-MDOCS-02 50 921
06-10-10
PAGE 004 of 007

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY – CONTINUED

c.  "Suit" for "bodily injury" has been filed against the
uninsured motorist in a court of competent jurisdiction.

Written notice of the "suit" must be given to us within a
reasonable time after the "insured" knew, or should have
known, that the other motorist is uninsured.  In no event
will such notice be required before two years from the date
of the accident.  Failure of the "insured" or his or her
representative to give us such notice of the "suit" will
relieve us of our obligations under this coverage form only
if the failure to give notice prejudices our rights.

3.  TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US is replaced
by the following:

a.  With respect to Paragraphs a., c. and d. of the definition of
"uninsured motor vehicle", if we make any payment, we are
entitled to recover what we paid from other parties.  Any
person to or for whom we make payment must transfer to us his
or her rights of recovery against any other party.  This
person must do everything necessary to secure these rights
and must do nothing that would jeopardize them.

b.  With respect to Paragraph b. of the definition of "uninsured
motor vehicle", if we make any payment and the "insured"
recovers from another party, the "insured" shall hold the
proceeds in trust for us and pay us back the amount we have
paid.

4.  OTHER INSURANCE in the Business Auto and Garage Coverage Forms
and OTHER INSURANCE – PRIMARY AND EXCESS INSURANCE PROVISIONS in
the Truckers and Motor Carrier Coverage Forms are replaced by the
following:

If there is other applicable insurance available under one or
more policies or provisions of coverage:

a.  The maximum recovery under all coverage forms or policies
combined may equal but not exceed the highest applicable
limit for any one vehicle under any coverage form or policy
providing coverage on either a primary or excess basis.

b.  Any insurance we provide with respect to a vehicle the Named
Insured does not own shall be excess over any other
collectible uninsured motorists insurance providing coverage
on a primary basis.

c.  If the coverage under this coverage form is provided:

(1) On a primary basis, we will pay only our share of the
"loss" that must be paid under insurance providing
coverage on a primary basis.  Our share is the proportion
that our limit of liability bears to the total of all
applicable limits of liability for coverage on a primary
basis.

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COM CO-MDOCS-02 50 921
06-10-10
PAGE 005 of 007

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY – CONTINUED

(2) On an excess basis, we will pay only our share of the "loss" that must be paid under insurance providing coverage on an excess basis. Our share is the proportion that our limit of liability bears to the total of all applicable limits of liability for coverage on an excess basis.

5. The following Condition is added:

ARBITRATION

a. If we and an "insured" disagree whether the "insured" is legally entitled to recover damages from the owner or driver of an "uninsured motor vehicle" or do not agree as to the amount of damages that are recoverable by that "insured", the disagreement will be settled by arbitration. Such arbitration may be initiated by a written demand for arbitration made by either party. The arbitration shall be conducted by a single neutral arbitrator. However, disputes concerning coverage under this endorsement may not be arbitrated. Each party will bear the expenses of the arbitrator equally.

b. Unless both parties agree otherwise, arbitration will take place in the county in which the "insured" lives. Local rules of law as to arbitration procedures and evidence will apply. The decision of the arbitrator will be binding.

F. ADDITIONAL DEFINITIONS

The following are added to the DEFINITIONS section:

1. "Family member" means the individual Named Insured's spouse, whether or not a resident of the individual Named Insured's household, and any other person related to such Named Insured by blood, adoption, marriage or registered domestic partnership under California law, who is a resident of such Named Insured's household, including a ward or foster child.

2. "Occupying" means in, upon, getting in, on, out or off.

3. "Uninsured motor vehicle" means a land motor vehicle or trailer:

a. For which no liability bond or policy at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged;

b. That is an underinsured motor vehicle. An underinsured motor vehicle is a land motor vehicle or "trailer" for which the sum of all liability bonds or policies at the time of an "accident" provides at least the amounts required by the applicable law where a covered "auto" is principally garaged but that sum is less than the Limit of Insurance for this coverage;

SPECIMEN

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COMMERCIAL AUTO

CALIFORNIA UNINSURED MOTORISTS COVERAGE –
BODILY INJURY – CONTINUED

c.  For which an insuring or bonding company denies coverage or
    refuses to admit coverage except conditionally or with
    reservation or becomes insolvent;

d.  That is a hit-and-run vehicle and neither the driver nor
    owner can be identified.  The vehicle must make physical
    contact with an "insured", a covered "auto" or a vehicle an
    "insured" is "occupying"; or

e.  That is owned by an individual Named Insured or "family
    member" and operated or caused to be operated by a person
    without the owner's consent in connection with criminal
    activity that has been documented in a police report.

However, "uninsured motor vehicle" does not include any vehicle:

a.  Owned or operated by a self-insurer under any applicable
    motor vehicle law except a self-insurer who is or becomes
    insolvent and cannot provide the amounts required by that
    motor vehicle law;

b.  Owned by the United States of America, Canada, a state or
    political subdivision of any of those governments or an
    agency of any of the foregoing; or

c.  Designed or modified for use primarily off public roads while
    not on public roads.

SPECIMEN

CA 21 54 09 09

Copyright, Insurance Services Office, Inc., 2009

COM CO-MDOCS-02 50 921
06-10-10
PAGE 007 of 007

EXHIBIT "2"

**Financial Log Results**

**Found: 1 Displaying: 1 - 1 Pages: 1**

◄ ◄ 1 ► ►

**Currency for Show Totals** | USD

**Search Results - 53A211523**

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Financial Type:** | Payment | **Issue Date:** 9/16/2019 | | | **Total Amount:** 386,774.84 USD |
| | **Group Status:** | Posted | **SSN/TIN:** 46-2659911 | **Check #:** 27346888 | | **Payable to:** Kimi Kobashi |

| 1099 | Allocation | Fin. Category | Claimant / Line | Srv/Ben Type | Start Dt | End Dt | Amount | Posted Dt | Posted Rsn |
|---|---|---|---|---|---|---|---|---|---|
| Y | N/A | LOSS PAID | B) Kimi Kobashi / L | UM BI | | | 386,774.84 | 9/16/2019 | Posted |

  Special Handling Updated 5/18/2017   Modify Search   Show Totals

Export Data

1/1

EXHIBIT "3"

**No. 45265919**

Please retain for your records.

1  1   1,094   14315   BCLM.F2T/USEN
0027020043589915579264800707B

BP SPECCLMS LIAB
PO BOX: 8026
STEVENS POINT, WI 54481

REFERENCE NO.   106865282

14-010673

CITY OF HUNTINGTON BEACH
HUNTINGTON BEACH POLICE/ATTN RECORDS
PO BOX 70
HUNTINGTON BEACH CA  92648-0070

PLEASE RETURN CHECK STUB WITH THE REPORT IN THE ENCLOSED PREPAID
ENVELOPE.
INSURED NAME: SENTRY INSURANCE A MUTUAL COMPANY
INSURED DRIVER: KIMI KOBASHI
CLAIMANT NAME: WINSON DO
DATE OF LOSS: 11/7/2014
ACCIDENT LOCATION: BEACH AND GARFIELD
ACCIDENT CITY: HUNTINGTON BEACH
REPORT NUMBER: UNKNOWN
INSURED WAS AT A COMPLETE STOP AT TRAFFIC SIGNAL AND WAS REAR ENDED BY
CLAIMANT 1. CLAIMANT 1 WAS REAR ENDED BY CLAIMANT 2, CAUSING CLAIMANT
1 TO REAR END INSURED VEHICLE.

CL NO.   53A211523

NOT NEGOTIABLE
$********3.50

THIS PAYMENT COVERS--POLICE REPORT REQUEST
► Detach Here ►

20-656B

STATE OF CALIFORNIA
# TRAFFIC COLLISION REPORT
CHP 555 Page 1 (Rev.7-03)  OPI 061

[ ] LOGGED   [ ] COMPLAINT   [ ] ARREST M/F   [X] CROSSROADS

Page 1 of 6

| SPECIAL CONDITIONS | NUMBER INJURED: 1 | CITY: HUNTINGTON BEACH | JUDICIAL DISTRICT: WJC | LOCAL REPORT NUMBER |
|---|---|---|---|---|
| | NUMBER KILLED: 0   HIT & RUN MISDEMEANOR [ ]   HIT & RUN FELONY [ ] | COUNTY: ORANGE | REPORTING DISTRICT: 422   BEAT: 5 | 2014-016673 |

## LOCATION

| COLLISION OCCURRED ON: SR-39 NORTH BOUND | MO. 11  DAY 7  YEAR 14 | TIME (2400): 0903 | NCIC #: 3010 | OFFICER I.D.: 2143 |
|---|---|---|---|---|

MILEPOST INFORMATION
FEET/MILES ___ OF ___

DAY OF WEEK: S M T W T (F) S

TOW AWAY: [ ] YES  [X] NO

PHOTOGRAPHS BY: [X] NONE

[ ] AT INTERSECTION WITH ___
[X] OR: 330 FEET/MILES S OF GARFIELD

STATE HWY REL: [X] YES [ ] NO

---

| PARTY 1 | DRIVER'S LICENSE NUMBER: F15734734(I.D.) | STATE: CA | CLASS: U | AIR BAG: M | SAFETY EQUIP.: G | VEH. YEAR: 02 | MAKE/MODEL/COLOR: ACURA / RSX / BLUE 2-DR | LICENSE NUMBER: 573XFB | STATE: WA |
|---|---|---|---|---|---|---|---|---|---|

DRIVER [X]
NAME (FIRST, MIDDLE, LAST): WINSON DO

PEDESTRIAN [ ]
STREET ADDRESS: 8651 GLORIA AVE AC

PARKED VEHICLE [X]
CITY/STATE/ZIP: GARDEN GROVE, CA, 92844

OWNER'S NAME: [X] SAME AS DRIVER
OWNER'S ADDRESS: [X] SAME AS DRIVER

DISPOSITION OF VEHICLE ON ORDERS OF: [ ] OFFICER [X] DRIVER [ ] OTHER  PARKED

BICYCLIST [ ]
| SEX: M | HAIR: BLK | EYES: BRO | HEIGHT: 5-7 | WEIGHT: 145 | BIRTHDATE: Mo. 11 Day 11 Year 96 | RACE: A |

PRIOR MECHANICAL DEFECTS: [X] NONE APPARENT [ ] REFER TO NARRATIVE

OTHER [ ]
HOME PHONE: 714-757-0464
BUSINESS PHONE:

VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER: NONE
POLICY NUMBER:

| VEHICLE TYPE: 01 | DESCRIBE VEHICLE DAMAGE: [ ] UNK. [ ] NONE [ ] MINOR [X] MOD. [ ] MAJOR [ ] ROLL-OVER | SHADE IN DAMAGED AREA |

DIR OF TRAVEL: N   ON STREET OR HIGHWAY: SR-39   SPEED LIMIT: 50

CA ___ DOT ___
CAL-T ___ TCP/PSC ___ MC/MX ___

---

| PARTY 2 | DRIVER'S LICENSE NUMBER: L3506B063127 | STATE: IL | CLASS: F | AIR BAG: M | SAFETY EQUIP.: G | VEH. YEAR: 2014 | MAKE/MODEL/COLOR: CHEV / MALIBU / BLUE 4-DR | LICENSE NUMBER: EPH7786 | STATE: NY |
|---|---|---|---|---|---|---|---|---|---|

DRIVER [X]
NAME (FIRST, MIDDLE, LAST): PAUL FREDERICK LYDON

PEDESTRIAN [ ]
STREET ADDRESS: 967 DEARBORN CIR.

PARKED VEHICLE [ ]
CITY/STATE/ZIP: CAROL STREAM, IL, 60188

OWNER'S NAME: [ ] SAME AS DRIVER  EAN HOLDINGS LLC
OWNER'S ADDRESS: [ ] SAME AS DRIVER  10929 N. LAKEWOOD, TULSA, OK, 74117

DISPOSITION OF VEHICLE ON ORDERS OF: [ ] OFFICER [X] DRIVER [ ] OTHER  RETAINED

BICYCLIST [ ]
| SEX: M | HAIR: BRN | EYES: BLUE | HEIGHT: 5'10" | WEIGHT: 185 | BIRTHDATE: Mo. 5 Day 3 Year 63 | RACE: W |

PRIOR MECHANICAL DEFECTS: [X] NONE APPARENT [ ] REFER TO NARRATIVE

OTHER [ ]
HOME PHONE: 630-752-0137
BUSINESS PHONE:

VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER: ALLSTATE
POLICY NUMBER: 022276032

| VEHICLE TYPE: 01 | DESCRIBE VEHICLE DAMAGE: [ ] UNK. [ ] NONE [X] MINOR [ ] MOD. [ ] MAJOR [ ] ROLL-OVER | SHADE IN DAMAGED AREA > |

DIR OF TRAVEL: N   ON STREET OR HIGHWAY: SR-39   SPEED LIMIT: 50

CA ___ DOT ___
CAL-T ___ TCP/PSC ___ MC/MX ___

---

| PARTY 3 | DRIVER'S LICENSE NUMBER: C5805958 | STATE: CA | CLASS: C | AIR BAG: M | SAFETY EQUIP.: G | VEH. YEAR: 14 | MAKE/MODEL/COLOR: FORD / FUSION / BLACK 4-DR | LICENSE NUMBER: 7DZG659 | STATE: CA |
|---|---|---|---|---|---|---|---|---|---|

DRIVER [X]
NAME (FIRST, MIDDLE, LAST): KIMI SUE KOBASHI

PEDESTRIAN [ ]
STREET ADDRESS: 9733 BICKLEY DR

PARKED VEHICLE [ ]
CITY/STATE/ZIP: HUNTINGTON BEACH, CA, 92646

OWNER'S NAME: [ ] SAME AS DRIVER  GELCO FLEET TRUST
OWNER'S ADDRESS: [ ] SAME AS DRIVER  1682 N. MODOC, ORANGE, CA, 92667

DISPOSITION OF VEHICLE ON ORDERS OF: [ ] OFFICER [X] DRIVER [ ] OTHER

BICYCLIST [ ]
| SEX: F | HAIR: BRN | EYES: BRN | HEIGHT: 5-5 | WEIGHT: 145 | BIRTHDATE: Mo. 7 Day 13 Year 65 | RACE: W |

PRIOR MECHANICAL DEFECTS: [X] NONE APPARENT [ ] REFER TO NARRATIVE

OTHER [ ]
HOME PHONE: 714-916-8041
BUSINESS PHONE:

VEHICLE IDENTIFICATION NUMBER:

INSURANCE CARRIER: SENTRY INS.
POLICY NUMBER: 90-05196-06-00

| VEHICLE TYPE: 01 | DESCRIBE VEHICLE DAMAGE: [ ] UNK. [X] NONE [ ] MINOR [ ] MOD. [ ] MAJOR [ ] ROLL-OVER | SHADE IN DAMAGED AREA > |

DIR OF TRAVEL: N   ON STREET OR HIGHWAY: SR-39   SPEED LIMIT: 50

CA ___ DOT ___
CAL-T ___ TCP/PSC ___ MC/MX ___

---

| PREPARER'S NAME: ELSER | DISPATCH NOTIFIED: [ ] YES [ ] NO [X] N/A | REVIEWER'S NAME: DV #1085 | DATE REVIEWED: 12-2-14 |
|---|---|---|---|

c555 7c

STATE OF CALIFORNIA
# TRAFFIC COLLISION CODING
CHP 555 Page 2 (Rev. 7-03) OPI 061                      Page 2 of 6

| DATE OF COLLISION (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11 7 14 | 0903 | 3010 | 2143 | 2014-016073 |

**PROPERTY DAMAGE**

| OWNER'S NAME | OWNER'S ADDRESS | NOTIFIED ☐ YES ☐ NO |
|---|---|---|
| DESCRIPTION OF DAMAGE | | |

## SEATING POSITION

```
    /\
 1  2  3
 4  5  6
    7
```

1 - DRIVER
2 TO 6 - PASSENGERS
7 - STATION WAGON REAR
8 - REAR OCC. TRK. OR VAN
9 - POSITION UNKNOWN
0 - OTHER

### OCCUPANTS
A - NONE IN VEHICLE
B - UNKNOWN
C - LAP BELT USED
D - LAP BELT NOT USED
E - SHOULDER HARNESS USED
F - SHOULDER HARNESS NOT USED
G - LAP/SHOULDER HARNESS USED
H - LAP/SHOULDER HARNESS NOT USED
J - PASSIVE RESTRAINT USED
K - PASSIVE RESTRAINT NOT USED

### SAFETY EQUIPMENT
L - AIR BAG DEPLOYED
M - AIR BAG NOT DEPLOYED
N - OTHER
P - NOT REQUIRED

### CHILD RESTRAINT
Q - IN VEHICLE USED
R - IN VEHICLE NOT USED
S - IN VEHICLE USE UNKNOWN
T - IN VEHICLE IMPROPER USE
U - NONE IN VEHICLE

### M / C BICYCLE - HELMET
DRIVER        PASSENGER
V - NO        X - NO
W - YES       Y - YES

### EJECTED FROM VEHICLE
0 - NOT EJECTED
1 - FULLY EJECTED
2 - PARTIALLY EJECTED
3 - UNKNOWN

### INATTENTION CODES
A - CELLPHONE HANDHELD
B - CELLPHONE HANDSFREE
C - ELECTRONIC EQUIPMENT
D - RADIO / CD
E - SMOKING
F - EATING
G - CHILDREN
H - ANIMALS
I - PERSONAL HYGIENE
J - READING
K - OTHER

**ITEMS MARKED BELOW FOLLOWED BY AN ASTERISK (*) SHOULD BE EXPLAINED IN THE NARRATIVE.**

### PRIMARY COLLISION FACTOR
LIST NUMBER (#) OF PARTY AT FAULT

1  VC SECTION VIOLATED  CITED
A  CVC 22350(a)  ☐ YES ☑ NO
B  OTHER IMPROPER DRIVING*
C  OTHER THAN DRIVER*
D  UNKNOWN*

### WEATHER (MARK 1 TO 2 ITEMS)
☒ A  CLEAR
B  CLOUDY
C  RAINING
D  SNOWING
E  FOG / VISIBILITY ____ FT.
F  OTHER*
G  WIND

### LIGHTING
☒ A  DAYLIGHT
B  DUSK - DAWN
C  DARK - STREET LIGHTS
D  DARK - NO STREET LIGHTS
E  DARK - STREET LIGHTS NOT FUNCTIONING*

### ROADWAY SURFACE
☒ A  DRY
B  WET
C  SNOWY - ICY
D  SLIPPERY (MUDDY, OILY, ETC.)

### ROADWAY CONDITION(S) (MARK 1 TO 2 ITEMS)
A  HOLES, DEEP RUT*
B  LOOSE MATERIAL ON ROADWAY*
C  OBSTRUCTION ON ROADWAY*
D  CONSTRUCTION - REPAIR ZONE
E  REDUCED ROADWAY WIDTH
F  FLOODED*
G  OTHER*
☒ H  NO UNUSUAL CONDITIONS

### TRAFFIC CONTROL DEVICES
☒ A  CONTROLS FUNCTIONING
B  CONTROLS NOT FUNCTIONING*
C  CONTROLS OBSCURED*
D  NO CONTROLS PRESENT / FACTOR*

### TYPE OF COLLISION
A  HEAD - ON
B  SIDE SWIPE
☒ C  REAR END
D  BROADSIDE
E  HIT OBJECT
F  OVERTURNED
G  VEHICLE / PEDESTRIAN
H  OTHER*

### MOTOR VEHICLE INVOLVED WITH
A  NON - COLLISION
B  PEDESTRIAN
☒ C  OTHER MOTOR VEHICLE
D  MOTOR VEHICLE ON OTHER ROADWAY
E  PARKED MOTOR VEHICLE
F  TRAIN
G  BICYCLE
H  ANIMAL:
I  FIXED OBJECT:
J  OTHER OBJECT:

### PEDESTRIAN'S ACTIONS
☒ A  NO PEDESTRIANS INVOLVED
B  CROSSING IN CROSSWALK - AT INTERSECTION
C  CROSSING IN CROSSWALK - NOT AT INTERSECTION
D  CROSSING - NOT IN CROSSWALK
E  IN ROAD - INCLUDES SHOULDER
F  NOT IN ROAD
G  APPROACHING / LEAVING SCHOOL BUS

### SPECIAL INFORMATION

| | 1 | 2 | 3 |
|---|---|---|---|
| A  HAZARDOUS MATERIAL | | | |
| B  CELL PHONE HANDHELD IN USE | ☒ | | |
| C  CELL PHONE HANDSFREE IN USE | | | |
| D  CELL PHONE NOT IN USE | | | |
| E  SCHOOL BUS RELATED | | | |
| F  75 FT MOTORTRUCK COMBO | | | |
| G  32 FT TRAILER COMBO | | | |
| H  N/A | ☒ | ☒ | ☒ |
| I | | | |
| J | | | |
| K | | | |
| L | | | |
| M | | | |
| N | | | |
| O | | | |

### MOVEMENT PRECEDING COLLISION

| | 1 | 2 | 3 |
|---|---|---|---|
| A  STOPPED | | ☒ | ☒ |
| B  PROCEEDING STRAIGHT | ☒ | | |
| C  RAN OFF ROAD | | | |
| D  MAKING RIGHT TURN | | | |
| E  MAKING LEFT TURN | | | |
| F  MAKING U TURN | | | |
| G  BACKING | | | |
| H  SLOWING / STOPPING | | | |
| I  PASSING OTHER VEHICLE | | | |
| J  CHANGING LANES | | | |
| K  PARKING MANEUVER | | | |
| L  ENTERING TRAFFIC | | | |
| M  OTHER UNSAFE TURNING* | | | |
| N  XING INTO OPPOSING LANE | | | |
| O  PARKED | | | |
| P  MERGING | | | |
| Q  TRAVELING WRONG WAY | | | |
| R  OTHER* : | | | |

### OTHER ASSOCIATED FACTOR(S) (MARK 1 TO 2 ITEMS)

| | 1 | 2 | 3 |
|---|---|---|---|
| A  VC SECTION VIOLATION: CITED ☐ YES ☐ NO | | | |
| B  VC SECTION VIOLATION: CITED ☐ YES ☐ NO | | | |
| C  VC SECTION VIOLATION: CITED ☐ YES ☐ NO | | | |
| D  INATTENTION* : | ☒ | ☒ | ☒ |
| E  VISION OBSCUREMENT* : | | | |
| F  INATTENTION* : | | | |
| G  STOP & GO TRAFFIC | | | |
| H  ENTERING / LEAVING RAMP | | | |
| I  PREVIOUS COLLISION | | | |
| J  UNFAMILIAR WITH ROAD | | | |
| K  DEFECTIVE VEH. EQUIP. CITED ☐ YES ☐ NO | | | |
| L  UNINVOLVED VEHICLE | | | |
| M  OTHER* | | | |
| N  NONE APPARENT | | | |
| O  RUNAWAY VEHICLE | | | |

### SOBRIETY - DRUG PHYSICAL (MARK 1 TO 2 ITEMS)

| | 1 | 2 | 3 |
|---|---|---|---|
| A  HAD NOT BEEN DRINKING | ☒ | ☒ | ☒ |
| B  HBD - UNDER INFLUENCE | | | |
| C  HBD - NOT UNDER INFLUENCE* | | | |
| D  HBD - IMPAIRMENT UNKNOWN* | | | |
| E  UNDER DRUG INFLUENCE* | | | |
| F  IMPAIRMENT - PHYSICAL* | | | |
| G  IMPAIRMENT NOT KNOWN | | | |
| H  NOT APPLICABLE | | | |
| I  SLEEPY / FATIGUED* | | | |

### SKETCH



N/B SR-39
(BEACH BLVD)

GARFIELD

V-3 — AOI #2
V-2 — AOI #1
V-1

### MISCELLANEOUS

V-2 AND V-3 STOPPED AT RED LIGHT. V-1 REAR-ENDED V-2, PUSHING V-2 TO REAR-END V-3.

AOI #1: 18 FT W OF E CL OF SR-39; 330 FT S OF S CL GARFIELD

AOI #2: 18 FT W OF E CL OF SR-39

310 FT S OF S CL OF GARFIELD

OSP 03 79147

STATE OF CALIFORNIA
# INJURED / WITNESS / PASSENGERS
CHP 555 Page 3 (Rev. 1-03)  OPI 061

Page 3 of 6

| DATE OF COLLISION (MO. DAY YEAR) | TIME (2400) | NCIC # | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11-7-14 | 0936 | 3010 | 1158 | 14-016673 |

| | | | | EXTENT OF INJURY ("X" ONE) | | | | INJURED WAS ("X" ONE) | | | | | | | | |
| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | FATAL INJURY | SEVERE INJURY | OTHER VISIBLE INJURY | COMPLAINT OF PAIN | DRIVER | PASS. | PED. | BICYCLIST | OTHER | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐# | ☒ | 62 | F | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | 2 | 3 | M | G | ☒ |

NAME / D. O. B. / ADDRESS
UMBERGER , MARY BETH / 5-14-52 / 572 WILLIAMSBURG RG. GLEN ELLYN  IL 60137
TELEPHONE  630-664-5288

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES
NONE

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| ☐# | ☐ | 49 | F | ☐ | ☐ | ☐ | ☒ | ☒ | ☐ | ☐ | ☐ | ☐ | 3 | 1 | M | G | ∅ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

NAME / D. O. B. / ADDRESS
KIMI SUE KOBASHI 2-13-65 9733 BECKLEY  HB CA 92648  PH. 916-8011
TELEPHONE

(INJURED ONLY) TRANSPORTED BY:  ET46       TAKEN TO: HOB

DESCRIBE INJURIES
COMPLAINT OF PAIN TO NECK

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| ☐# | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

NAME / D. O. B. / ADDRESS                    TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| ☐# | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

NAME / D. O. B. / ADDRESS                    TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| ☐# | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

NAME / D. O. B. / ADDRESS                    TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| ☐# | ☐ | | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

NAME / D. O. B. / ADDRESS                    TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                    TAKEN TO:

DESCRIBE INJURIES

VICTIM OF VIOLENT CRIME NOTIFIED ☐

| PREPARER'S NAME | I.D. NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|
| GRANNES | 1158 | 11-7-14 | JD#1085 | 12-2-14 |

STATE OF CALIFORNIA
# INJURED / WITNESS / PASSENGERS
CHP 555 Page 3 (Rev. 1-03) OPI 061

Page ___ of ___

| DATE OF COLLISION (MO. DAY YEAR) | TIME (2400) | NCIC # 3010 | OFFICER I.D. | NUMBER |
|---|---|---|---|---|

| WITNESS ONLY | PASSENGER ONLY | AGE | SEX | EXTENT OF INJURY ("X" ONE) | | | | | INJURED WAS ("X" ONE) | | | | | PARTY NUMBER | SEAT POS. | AIR BAG | SAFETY EQUIP. | EJECTED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | FATAL INJURY | SEVERE INJURY | OTHER VISIBLE INJURY | | COMPLAINT OF PAIN | DRIVER | PASS. | PED. | BICYCLIST | OTHER | | | | | |
| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| ☐ # | ☐ | | | ☐ | ☐ | ☐ | | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | | | | |

NAME / D. O. B. / ADDRESS                                                                 TELEPHONE

(INJURED ONLY) TRANSPORTED BY:                                TAKEN TO:

DESCRIBE INJURIES

☐ VICTIM OF VIOLENT CRIME NOTIFIED

| PREPARER'S NAME | I.D. NUMBER | MO. DAY YEAR | REVIEWER'S NAME | MO. DAY YEAR |
|---|---|---|---|---|

# HUNTINGTON BEACH POLICE DEPARTMENT

## COLLISION INVESTIGATION

DR # 14-016673

ASSOCIATED DR # _____

| | |
|---|---|
| **NOTIFICATION** | TIME REPORTED: 0903   DISPATCHED: 0900   ARRIVAL: 0909 Hours<br>RESPONDED FROM: BEACH AND ADAMS |
| **ARRIVAL** | INVESTIGATING OFFICER: ELSER   ☒ ENGINE CO: ~~TE 46~~   ☒ AMBULANCE: E7 46<br>ASSISTING OFFICER(S): GRANNIS / REYNOLDS |

## ROADWAY DESCRIPTION

**PRIMARY STREET:** SR-39   **DIRECTION:** ☒ N/S   ☐ E/W

**CONTROLS:**

☐ 2-LN  ☐ 4-LN  ☒ 6-LN  ☐ OTHER ____   ☒ BIKE LN   ☒ Signals   ☐ Yield Sign(s)

**AREA:**   ☐ Residential   ☐ School

☐ TWO-WAY RES. STREET   ☐ Stop Sign(s)   ☐ None   ☒ Business   ☐ Open

☒ LEFT TURN LANE   ☐ RIGHT TURN LANE   **ROADWAY DIVIDED BY:**   **ROADWAY SURFACE:**

☐ Two left Turn lanes   ☐ Protective Permissive   ☒ Raised Median   ☐ Double Yellow Line   ☒ Asphalt   ☐ Dirt

☒ Arrow Controlled   ☐ Uncontrolled   ☐ Painted Median   ☐ Single Yellow Line   ☐ Cement   ☐ Other ____

Miscellaneous ____   ☐ No Lines   ☐ Two-Way Turn Lane

**SECONDARY STREET:** GARFIELD   **DIRECTION:** ☐ N/S   ☒ E/W   ☐ NONE INVOLVED

**CONTROLS:**

☐ 2-LN  ☒ 4-LN  ☐ 6-LN  ☐ OTHER ____   ☒ BIKE LN   ☐ Signals   ☐ Yield Sign(s)

**AREA:**   ☐ Residential   ☐ School

☐ TWO-WAY RES. STREET   ☐ Stop Sign(s)   ☐ None   ☐ Business   ☐ Open

☒ LEFT TURN LANE   ☐ RIGHT TURN LANE   **ROADWAY DIVIDED BY:**   **ROADWAY SURFACE:**

☐ Two left Turn lanes   ☐ Protective Permissive   ☐ Raised Median   ☐ Double Yellow Line   ☒ Asphalt   ☐ Dirt

☒ Arrow Controlled   ☐ Uncontrolled   ☒ Painted Median   ☐ Single Yellow Line   ☐ Cement   ☐ Other ____

Miscellaneous ____   ☐ No Lines   ☐ Two-Way Turn Lane

## AREA OF IMPACT

MEASUREMENTS: ☐ ROLL-A-TAPE  ☐ STEEL TAPE  ☒ STEP PACE  ☐ LASER # ____  ☐ OTHER ____  ☐ VISUAL ESTIMATION  ☐ NONE TAKEN

**AOI #1** 180 ft  W  of the  E  ☒ C/Line  ☐ C/Prolongation of  SR-39 , and

330 ft  W  of the  S  ☒ C/Line  ☐ C/Prolongation of  GARFIELD .

**AOI #2** 185 ft  W  of the  E  ☒ C/Line  ☐ C/Prolongation of  SR-39 , and

310 ft  S  of the  S  ☒ C/Line  ☐ C/Prolongation of  GARFIELD .

**AOI #3** ____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____ , and

____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____ .

ESTABLISHED:  ☐ Skids  ☒ Damage  ☒ Statements  ☐ Area of Rest  ☐ Debris ____

## SKIDS

**PRIOR TO IMPACT** ☒ None Visible

V-1 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

V-2 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

V-3 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

**AFTER IMPACT**

V-1 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

V-2 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

V-3 ____ L/F ____ R/F ____ R/R ____ L/R<br>☐ Locked  ☐ Side  ☐ Centrifugal  ☒ None Apparent

## Area of Rest Center of Wheelbase (optional)

ESTABLISHED BY:  Vehicle At Rest Facing: N  E  W  S   Laying on its ____ Side ☐ Chalk Marks  ☐ Moved Prior to Arrival

Vehicle #1 ____ ____ of the ____  ☒ C/Line  ☐ C/Prolongation of ____ , and

____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____

ESTABLISHED BY:  Vehicle At Rest Facing: N  E  W  S   Laying on its ____ Side ☐ Chalk Marks  ☐ Moved Prior to Arrival

Vehicle #2 ____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____ , and

____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____

ESTABLISHED BY:  Vehicle At Rest Facing: N  E  W  S   Laying on its ____ Side ☐ Chalk Marks  ☐ Moved Prior to Arrival

Vehicle #3 ____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____ , and

____ ____ of the ____  ☐ C/Line  ☐ C/Prolongation of ____

## MISCELLANEOUS

☐ **ADDITIONAL AOI'S ON BACK PAGE**

1 ____
2 ____
3 ____
4 ____
5 ____

| PREPARER'S NAME | ID NUMBER | DATE | REVIEWER'S NAME | DATE | Revised<br>BARR 1/05 |
|---|---|---|---|---|---|
| GRANNIS/REYNOLDS | 1158/1239 | 11.7.14 | N4108 | 12.2.14 | |

# HUNTINGTON BEACH POLICE DEPARTMENT
## *TRAFFIC COLLISION INVESTIGATION*

DR # _____

ASSOCIATED DR # _____

**AREA OF IMPACT**

**AOI #4** _____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ , and _____

_____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ .

**AOI #5** _____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ , and _____

_____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ .

**AOI #6** _____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ , and _____

_____ of the _____ ☐ C/Line   ☐ C/Prolongation of _____ .

**ESTABLISHED:**  ☐ Skids   ☐ Damage   ☐ Statements   ☐ Area of Rest   ☐ Debris _____

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |

| PREPARER'S NAME | ID NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| | | | | |

Revised
BARR 1/05

CITY OF HUNTINGTON BEACH
**NARRATIVE/SUPPLEMENTAL**

PAGE **5** OF **6**

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11-07-14 | 0903 | 3010 | 2143 | 2014-016673 |

## NOTIFICATIONS:

On 11/7/14, at approximately 0903 hours, I was working uniform patrol for the City of Huntington Beach. I was dispatched to the intersection of Beach Boulevard (SR-39) and Garfield Avenue regarding a traffic collision with injuries. Upon arriving on scene I found three vehicles stopped in the number 2 lane of northbound SR-39, south of Garfield Avenue.

## STATEMENTS:

Party-1, was contacted at the scene and identified by his California Identification card as Winson DO. P-1 said he was proceeding northbound in the number 2 lane of SR-39, south of Garfield Avenue. P-1 said he was travelling at about 40 miles per hour and noticed cars stopped in the number 2 lane in front of him. P-1 said he applied his brakes, but his brakes felt "squishy". P-1 said his vehicle did not stop in time and he rear-ended P-2. P-1 told me there were no prior mechanic defects to his vehicle and he does not know why his vehicle's brakes did not react as usual.

Party-2, was contacted at the scene and identified by his Illinois Drivers License as Paul LYDON. P-2 said he was behind P-3 and was at a stop for a red light in the northbound number 2 lane of SR-39, south of Garfield Avenue. P-2 stated the light for northbound SR-39 had just turned green. Suddenly, P-2 was rear-ended by P-1. This collision caused P-2's vehicle to move forward, subsequently rear-ending P-3.

Party-3 was contacted on scene and identified by her California Drivers License as Kimi KOBASHI. P-3 said she was stopped for the red light in the number 2 lane of northbound SR-39, south of Garfield Avenue. The light had just turned green and the vehicles in front of her were now slowly beginning to accelerate. Suddenly, P-3 was rear-ended by P-2. This impact forced her car forward. P-3 applied her brakes and her vehicle came to a stop.

## OPINIONS AND CONCLUSIONS:

Based upon involved parties statements, and evidence at the scene, it is my opinion that P-3 and P-2 were stopped in the number 2 lane of northbound SR-39, south of Garfield Avenue. There were other vehicles in front of P-3, waiting for the light to change from red to green. P-1 was travelling northbound SR-39 in the number 2 lane.

P-1 failed to stop in sufficient time and rear-ended P-2. Due to the collision from P-1, P-2's vehicle was pushed forward, hitting P-3. I was unable to locate any significant skid marks in the roadway.

| PREPARER'S NAME | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ELSER | 2143 | 11-07-14 | #1095 | 12-2-14 |

CITY OF HUNTINGTON BEACH
**NARRATIVE/SUPPLEMENTAL**                                              PAGE _lo_ OF _6_

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11·07·14 | 0903 | 3010 | 2143 | 2014-016673 |

1
2       I concluded the primary collision factor to be P-1's unsafe speed, in violation of CVC
3 22350(a). Because of P-1's unsafe speed for the current road conditions, P-1 was unable to bring his
4 vehicle to a complete stop in sufficient time to avoid impacting P-2.
5
6
7 **RECOMMENDATIONS:**
8
9       None.
10

| PREPARER'S NAME | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ELSER | 2143 | 11·07·14 | WALE 1085 | 12-2-14 |



**CASH RECEIPT**
CITY OF HUNTINGTON BEACH
P.O. BOX 711
HUNTINGTON BEACH, CALIFORNIA 92648-0
www.huntingtonbeachca.gov/payments

DATE 12/3/14   Issuing Dept.   POLICE RECORDS

Dept. Phone # ( 714 ) 534 - 5641  X

FUNDS RECEIVED FROM  BP Claims/Sentry In

ADDRESS  PO Box 8026
Stevens Point, WI 54481   Phone # : (   ) -

FOR  14.016673

| AMOUNT RECEIVED | ☐ Cash | ☐ Check # 4526519 | ☐ Credit Card | $ 3.50 |
|---|---|---|---|---|

| Prepared By NT1806 | Received By NT1806 | Finance Approval |
|---|---|---|
| IF OBJECT = 50000 THRU 90000, FINANCE APPROVAL REQUIRED | | Approval Date |

| Business Unit | Object | Subs | Sub-Ledger | Type | |
|---|---|---|---|---|---|
| 10000108 | 47445 | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

TOTAL $ 3.50

Stamped Validation Only
Please do not write in the box below

No. 1280229

CUSTOMER COPY

# EXHIBIT "4"

**ERIC B. STRONGIN, ESQ. (SBN: 216561)**
**WILLIAM D. BURGER, JR., ESQ. (SBN 234915)**
**SMITH|HALL|STRONGIN LLP**

999 Corporate Drive, Suite 220
Ladera Ranch, CA 92694
Telephone: (949) 529-2250
estrongin@s-hlawyers.com
wburger@s-hlawyers.com

Attorneys for Claimant, KIMI KOBASHI

## BINDING UNINSURED/UNDERINSURED ARBITRATION

## JUDICATE WEST

| | |
|---|---|
| KIMI KOBASHI,<br><br>　　　　　Claimant,<br><br>　　vs.<br><br>SENTRY INSURANCE, A MUTUAL COMPANY; a Wisconsin Corporation; and SAFECO INSURANCE COMPANY OF AMERICA, a New Hampshire Corporation,<br><br>　　　　　Respondents. | CASE NO. A243442-46<br><br>**CLAIMANT'S ARBITRATION BRIEF**<br><br>DATE:　　August 19, 2019<br>TIME:　　9:30 a.m.<br>PLACE:　Judicate West – Santa Ana<br><br>Arbitrator: Darrell A. Forgey, Esq. |

    Plaintiff, KIMI KOBASHI, through her attorneys of record, Smith | Hall |Strongin, LLP, submits the following Arbitration Brief.

## I.　　FACTUAL BACKGROUND

### A.　　Overview

    Winson Do, an uninsured, 23-year-old driver caused a multi-car collision that has debilitated Kimi Kobashi for life. Do rear-ended Kimi in a three-car auto crash. At the time, Kimi was working for the Respondent, Sentry Insurance as an insurance SIU investigator and driving a company car. The incident left her disabled to such an extent that normal tasks, such as buttoning her pants, became difficult as did many other things. She is

1  in constant pain despite the implantation of a spinal cord stimulator following the crash and

2  daily pain medications prescribed to her by her pain management doctor.

3      Kimi was insured by Sentry Insurance at the time of the crash.  The Sentry policy

4  has a $1,000,000 UM/UIM limit.  Ms. Kobashi is entitled to the full $1M limits in light of

5  the harm that Do's actions caused her when he caused the crash.

6      **B.    The November 7, 2014, Car Crash Changes Kimi's Life Forever**

7      Prior to the November 7, 2014, collision at issue in this matter, Ms. Kobashi had had

8  spinal fusion surgery in 2010 and 2011.  The first surgery "failed" but the second one was a

9  success.  As of the accident at issue in this matter, Ms. Kobashi was feeling fit and was

10  quite active.  She was weaning off her pain medication and was able to play tennis, go to

11  the beach, garden, clean her home, travel, etc.  In short, it appeared she had a good

12  prognosis just prior to the subject incident.

13      On the morning of November 7, 2014, Winson Do was driving a 2002 blue Acura

14  sports car, Washington plates, and outfitted with a large spoiler.  He was headed

15  northbound on Beach Boulevard (CA S.R. 39) in Huntington Beach, California.  He was

16  driving at least 40 mile per hour (by his own estimate) before he noticed several vehicles at

17  a complete stop, at a red light in front of him.  By that time, it was too late for him to avoid

18  the stopped vehicles.

19      Winson Do slammed into the rear of the 2014 blue Chevrolet Malibu that was driven

20  by Paul Lydon.  Paul Lydon was stopped directly behind Kimi Kobashi, who was first at

21  the red light, also stopped.  Do came crashing into the rear of the Lydon vehicle which

22  crashed forward into the rear of Kimi Kobashi's four-door Ford Fusion.  There were no skid

23  marks.  Do told the CHP that he was not able to brake at all before hitting Lydon and

24  causing Lydon to crash into Kobashi.  He explained that his brakes were "squishy" and that

25

26

27

28

**CLAIMANT'S ARBITRATION BRIEF**

SMITH|HALL|STRONGIN LLP

1    they must have malfunctioned.

CITY OF HUNTINGTON BEACH
**NARRATIVE/SUPPLEMENTAL**                                          PAGE  5  OF  6

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 11-03-14 | 0903 | 3010 | 2143 | 2014-016673 |

Party-1, was contacted at the scene and identified by his California Identification card as Winson DO. P-1 said he was proceeding northbound in the number 2 lane of SR-39, south of Garfield Avenue. P-1 said he was travelling at about 40 miles per hour and noticed cars stopped in the number 2 lane in front of him. P-1 said he applied his brakes, but his brakes felt "squishy". P-1 said his vehicle did not stop in time and he rear-ended P-2. P-1 told me there were no prior mechanic defects to his vehicle and he does not know why his vehicle's brakes did not react as usual.

9    The Huntington Beach Police Department responded to the scene and determined

10   that Do failed to stop in sufficient time and rear-ended Mr. Lydon's vehicle which hit Ms.

11   Kobashi's vehicle.  Of note, the officer found no skid marks in the roadway.

P-1 failed to stop in sufficient time and rear-ended P-2. Due to the collision from P-1, P-2's vehicle was pushed forward, hitting P-3. I was unable to locate any significant skid marks in the roadway.

14   The officer concluded that the primary collision factor was Mr. Do's unsafe speed,

15   in violation of California Vehicle Code Section 22350(a).

16   At the time of the collision, Kimi Kobashi, an SIU investigator for Sentry Insurance,

17   was stopped in her company vehicle, a 2014 Ford Fusion, License No. 7DZG659 on the

18   northbound Highway 39 (Beach Boulevard) at the intersection of Beach Boulevard and

19   Garfield in the City of Huntington Beach, County of Orange.  She had just retrieved her

20   friends and was traveling to Los Angeles International Airport and was headed to a work

21   appointment.  While she was stopped at the light, Ms. Kobashi was stunned when she felt

22   the impact of a vehicle slamming into the rear of her automobile.  There were no sounds of

23   braking or skidding prior to impact.  Do, in striking the vehicle driven by Lydon, had hit the

24   Lydon vehicle so hard that it pushed it into the Kobashi vehicle and the second impact

25   caused the Kobashi vehicle to move from a standstill, three feet into the intersection.

26   The Huntington Beach Police Department responded to the scene.  At the scene of

27   the collision, Mr. Do stated that he was traveling ***40 miles per hour*** **when he noticed the**

28

-3-
**CLAIMANT'S ARBITRATION BRIEF**

1  *cars in front of him stopped at the intersection.  **When he went to apply his brakes, they***

2  ***malfunctioned.*** The absence of skid marks, as previously noted, confirmed that Do's

3  brakes did not work or he failed to apply them.



19  (*The Winson Do Vehicle Immediately Following the Crash, Arb. Exh. #5*)

20       Immediately following the collision, and due to the sheer force of impact of Mr.

21  Do's vehicle traveling at 40 miles per hour when he collided into the vehicles, Ms.

22  Kobashi's body was violently jolted---sending intense pain in her neck and back with

23  shooting pain up the middle of her neck up to her head.  Ms. Kobashi was transported by

24  ambulance from the scene of the collision to Hoag Memorial Hospital.

25      Ms. Kobashi was only 49 years old at the time of the crash.  And, although she had

26  preexisting back and neck surgeries, as the evidence at arbitration will demonstrate, the

27  issues she was dealing with preincident were underwhelming compared with the severe

28  pain and debilitating nature of her postincident condition.  There is no doubt that her prior

1    spinal surgeries left her in a weakened state that left her more susceptible to severe injury

2    from November 7, 2014 collision that was caused by Winson Do.

3        As a direct consequence of Do's negligence which caused this multi-car crash, and

4    even apportioning her prior medical condition by 50%, Kobashi has economic losses in

5    excess of $1M—the policy limits at issue in this UM arbitration.  Her noneconomic harms

6    are far greater.

7        To date, Ms. Kobashi has been paid nothing in underinsured benefits from her

8    insurer, and former employer, Sentry.  It has been nearly 5 years since the accident, and Ms.

9    Kobashi has a right be compensated and paid her UM benefits.  She has spent many

10    thousands of dollars on medical care, struggled to keep working and spent years in

11    litigation against Sentry.

12        Ms. Kobashi is not pursuing arbitration for sympathy.  The time for sympathy has

13    passed.  Sentry has forced Kimi to come to this arbitration to obtain the full amount of her

14    policy benefits of $1 million. If awarded, the policy's limits will only partially compensate

15    Kimi for her losses and harms.  Anything short of that amount would be an injustice given

16    her economic losses and noneconomic harms; that she is at the brink of unemployment

17    again because of her debilitating injuries which are severely impacting her ability to meet

18    work expectations; and that her future care will be expensive.  All of the UM money, that

19    she should have already been paid, will go to pay other people for her care — care that she

20    has received—care that she will need in the future.  In light of the UM policy limits, she is

21    unlikely to receive any compensation for her non-economic harms—her constant pain,

22    suffering, diminished capacity to work and to live.  Nonetheless, payment of her UM

23    benefits would help her to pay for her medical debts, future care and costs necessitated by a

24    modified way of living.

25    **C.**      **Litigation Against Lydon and Do**

26        On November 2, 2016, Kimi Kobashi filed a Complaint for Personal Injury in the

27    Orange County Superior Court against the drivers involved in the incident, Winson Do and

28    Paul Lydon.  Liability was clear as against Winson Do but unfortunately, Mr. Do was

**CLAIMANT'S ARBITRATION BRIEF**

SMITH|HALL|STRONGIN LLP

1   uninsured.  Ultimately, on March 15, 2017, Kimi Kobashi filed a Request for Dismissal

2   with prejudice as to both Mr. Do and Mr. Lydon after May 9, 2018, when attorney Douglas

3   Greer, counsel for Sentry at Selman Breitman accepted that UM coverage was triggered

4   under the Sentry policy because DO, the at-fault driver, was uninsured at the time of the

5   incident.  As such, the sole source of compensation for the harm that DO caused to Kimi

6   are the Sentry UM benefit

7   **D.   Uninsured Motorist Arbitration Against Sentry Insurance**

8          At the time of the incident, Ms. Kobashi's company owned automobile was covered

9   under Sentry Insurance Commercial Policy Number 90-05196-06. The policy included

10  uninsured motorist coverage with limits of $1M per occurrence.

11         Pursuant to Section B.1.b of the "California Uninsured Motorists Coverage"

12  Endorsement in Sentry's Commercial Automobile Policy, Ms. Kobashi qualifies as an

13  Insured for the purposes of the incident at issue.  As such, under California law, Sentry

14  owed and owes Ms. Kobashi certain duties of care in the handling of her claim.

15         Sentry does not dispute that Ms. Kobashi was an insured under the policy at the time

16  of the incident or that she was injured and required medical treatment as a result of the

17  November 7, 2014 incident.  Sentry does not dispute that the incident is a covered

18  occurrence under the policy.  Sentry also acknowledges that the policy provides up to $1

19  million in coverage per occurrence to Ms. Kobashi in connection with the incident.  On

20  November 3, 2016 Ms. Kobashi initiated a demand for UM arbitration against Sentry.

21         Sentry stands in the shoes of Winson Do for purposes of this UM arbitration.

22  Winson Do was, by his own admission, the at fault driver who confessed to driving 40

23  miles per hour, and a total inability to stop his vehicle due to a brake malfunction.  Whether

24  the brakes malfunctioned is irrelevant.  Do's statement against interest to the CHP is an

25  admission of his speed and his failure to brake, and an admission that Sentry must accept

26  since Sentry "stands in the shoes" of Do.  The CHP officer, who will testify at the

27  arbitration, will testify that he found no skid marks at the scene of the collision—thereby

28  corroborating Do's statement that he was unable to brake (or did not brake) prior to striking

-6-

**CLAIMANT'S ARBITRATION BRIEF**

the Lydon vehicle which subsequently crashed into the Kobashi vehicle.

Pursuant to the aforementioned quoted policy of insurance, Ms. Kobashi is entitled to recovery for her life-altering injuries due to the negligence of the uninsured driver Mr. Do.

As will be presented more fully below, Ms. Kobashi has been irreparably impaired due to significant injuries sustained as a result of the automobile collision on November 7, 2014.  She lives with debilitating pain on a daily basis and has been forced to seek extensive medical treatment including a spinal stimulator implant.  This condition has affected her ability to work full-time and every day is a struggle to maintain an appropriate caseload to fulfill the requirements of her job.  Simple tasks, such as buttoning her pants or changing the sheets on her bed are nearly impossible to accomplish.  It is crystal clear that the harm caused by the subject incident not only aggravated her previous condition, it devastatingly altered her health and well-being for the rest of her life.

### E.    Prior Cervical Fusion

Ms. Kobashi had a cervical fusion in 2010 with a revision in 2011 and recovered well from the surgery—although still under the care of a pain management doctor.  She had resumed her job duties without restrictions and was able to participate in recreational activities that included taking walks or using a treadmill in her home as well as performing light exercise in a gym. She was able to travel for her work without limits and had taken a vacation to Italy. Ms. Kobashi performed activities of daily living including washing her windows and mirrors, vacuuming, cleaning her house, doing laundry and moving furniture as needed.

Sentry argues that the November 7, 2014 incident was merely an exacerbation of Ms. Kobashi's pre-existing condition warranting no more than 6 months of treatment for soft tissue injuries.  However, the objective medical evidence, as outlined by her doctors over the years paints a vastly different picture.

Ms. Kobashi is a 53-year-old female with a background history of degenerative cervical spondylosis and degenerative cervical joint disease who underwent complex cervical

spine surgery both anteriorly and posteriorly in 2010-2011.  She was 49 years old at the time of the November 7, 2014 crash involving Do and Lydon.

She has a history of pain management prior to the subject accident.  It is clear however, that she was improving and had a lower level of pain following her corrective surgery which was considered highly successful. After the corrective surgery, Dr. Dobkin, her pain management doctor, noted that she was pain free and that she was intent on lowering and discontinuing her opiate medication.

However, when the November 2014 crash happened, Kimi's pain immediately worsened and was associated with radicular symptoms, severe spinal pain centralized toward her left side, shoulder pain, knee pain which included loose bodies in her knee, a positive Hoffman's sign indicating the existence of spinal cord compression,  a positive Spurling's Test indicating cervical compression with radicular pain, a positive Subacromial Impingement Test indicating shoulder injury,  loss of strength with electric pain with any gripping or grasping movement, numbness in her left arm and fingers, that were not previously described in her pre-November 7, 2014 incident medical records.  Pain remained an issue longer term, culminating ultimately in the placement of a cervical spinal cord level neurostimulator, which no prior medical care provider had suggested or discussed with her prior to the November 7, 2014 collision.

Given the temporal relationship between the second collision and the worsening pain with radicular symptoms, the medical evidence leads to the inescapable conclusion that the 2014 motor vehicle collision was the cause of the worsening pain and required additional medical treatment.   Post-incident medical treatment included surgical intervention with placement of a spinal cord stimulator.  She will also require further interventional treatment with maintenance of the spinal cord stimulator at a cost of $58,919 every 5-7 years to replace the pulse generator.  Additionally, she will require the use of modalities and heavy pain medications to make her life more bearable with the constant pain that she currently suffers.

**F.**   **The Objective Medical Evidence in This Case Makes It Clear That Kimi Sustained A Severe Exacerbation of Her Preexisting Orthopaedic Condition and New Injuries.**

Evidence at arbitration will show, as more specifically illustrated below by the medical evidence below that Ms. Kobashi suffered a permanent exacerbation of her pre-existing pain and injuries and suffered new and different injuries as a result of the November 2014 collision which are well documented.

The following table illustrates the marked contrast between her pre-existing injuries and those that have occurred as a result of the collision at issue.

| PRE-11/7/14 MEDICAL EVIDENCE |
|---|
| **March 9, 2010:** 3-level anterior cervical disc fusion at C5-6, C6-7 and C7-T1 due to cervical pain. |
| **April 4, 2011:** The surgery is largely unsuccessful. Following surgery, she had increased symptoms in both upper extremities including painful paresthesias in her right arm, decreased strength in her right hand and tremulousness in her left upper extremity. |
| **September 2011**: Re-do anterior and posterior fusion from about C3 to T1 with a complex long posterior wire.  The surgery is successful this time. |
| **October 6, 2011:**  Patient is a few weeks following posterior cervical fusion of C2 down to the previous fusion for severe osteoarthritis.  <u>She is dramatically better</u> since the surgery. (Dr. William Dobkin, neurosurgeon) |
| **November 3, 2011:** Patient is making adequate progress.  <u>Much of the pain is relieved</u>. (Dr. Dobkin and Dr. Carlson) |
| **December 29, 2011:** The further extension of her fusion posteriorly in the areas where she had significant arthritis has resulted in resolution of almost all of her previous pain. (Dr. Dobkin, Dr. Carlson) |
| **February 14, 2012:** She had a posterior cervical fusion up to C2.  <u>She is now essentially</u> |

Smith|Hall|Strongin LLP

**CLAIMANT'S ARBITRATION BRIEF**

pain-free.  She is still on some pain medications, which he was on before surgery and is going to taper off.  (Dr. Dobkins, Dr. Carlson)

**APRIL 5, 2012 AUTO COLLISION (PRE-INCIDENT)**

**April 12, 2012:**  Patient is doing fairly well from previous extension of fusion posteriorly. Unfortunately, she was in a car accident. Neck, left side and left shoulder pain.  She has no neurological deficits.  X-rays show her to be stable.

**September 4, 2012:**  Patient has localized neck pain following the accident.  All instrumentation is intact.  She continues to receive pain medications through pain management as needed.  (Dr. Dobkin)

**December 11, 2012:** Her pain is currently managed by Morphine ER 30 mg in the morning, 15 mg mid-day and 30 mg evening. She is not using short acting narcotic for breakthrough pain due to history of sedation with these medications. She is also taking venlafaxine ER 150 mg daily for situational depression associated with ongoing neck pain. (Dr. Dobkin)

**March 7, 2013:**  Patient has noted improvement and would like to decrease her morphine.  She has chronic neck pain with minimal radiation into the upper extremities.  She reports her pain at a 3-4/10.  (Dr. Kenneth Grabow, pain management)

**May 1, 2013:**  Patient reports no difficulty with reduction of Morphine ER to 15 mg twice daily.  She reports pain at 4/10.  (Dr. Grabow)

**May 28, 2013:** She did some gardening and yard work over the weekend which has increased her symptoms.  (Dr. Grabow)

**July 10, 2013:**  Current complaints include constant neck pain that radiates to her shoulders with tingling in the left hand.  Do not recommend any further surgical interventions.

    Cervical Spine Examination: Range of motion:

    Forward flexion normal extension 10 degrees (normal is 30 degrees)

    Right lateral bending 15 (45)

SMITH|HALL|STRONGIN LLP

Left lateral bending 15 (45)

Right rotation 35 (45)

Left rotation 35 (45)

**All orthopedic tests are negative, no neurological deficits. (Romberg, Spurling, Babinski, Cranial Nerves, etc.)**

(Dr. Kamran Aflatoon, orthopedic surgeon)

**August 14, 2013:** There is moderate stiffness in the cervical spine on palpation. **Spurling's is negative bilaterally. Adson's test is negative bilaterally. Neurologically alert and oriented with no deficits. All neurological tests are normal.** (Dr. Aflatoon)

**August 15, 2013: She has been trying to reduce her pain medication and has not received any pain medication since her last visit. She is no longer using Morphine ER 30 mg tablets. She uses Morphine ER 15 mg once per day and occasionally Percocet for breakthrough pain.** This is not providing her adequate pain control. Pain at 4/10**. Negative Spurling's** (Dr. Grabow)

**November 12, 2013:** Patient has been participating in acupuncture which she has found beneficial. Medications are beneficial. Remain symptomatic with neck pain and numbness in upper extremities. She rates her pain at 4/10. (Dr. Grabow)

**November 20, 2013**: She continues to experience neck pain and stiffness but is **negative on all neurological exams. Cranial nerves are intact, she has 5 out of 5 strength throughout.** (Dr. Aflatoon)

**January 15, 2014:** Some neck pain with moderate stiffness. Spurling's is negative bilaterally. Adson's test is negative bilaterally. Neurologically alert and oriented, no deficits in general fund of knowledge or concentration. Cranial Nerves ll — XII intact. Romberg negative. **5/5 strength throughout.** Babinski produces plantar flexion bilaterally (negative). (Dr. Aflatoon)

**February 27, 2014**: Slight increase in neck and shoulder stiffness. Symptomatic with neck and upper extremity pain. Pain at 4/10. **Negative on all neurological tests.**

SMITH|HALL|STRONGIN LLP

Forward flexion 20°

Extension 5°

Right Lateral Bending 5°

Left Lateral Bending 5°

Right Rotation 35°

Left Rotation 30°

(Dr. Grabow).

**April 2, 2014:** Moderate stiffness and cervical spine. **No neurological deficits and all neurological tests are negative. 5 out of 5 strength throughout**. The fusion appears to be solid. (Dr. Aflatoon)

**April 30, 2014:** She is being released from care in this office. She has **reached maximum medical improvement.** She is neurologically alert and oriented with no deficits and all **neurological tests are negative. She has 5 out of 5 strength** throughout. (Dr. Aflatoon).

**July 16, 2014:** Patient remain symptomatic with neck, upper extremity and shoulder pain. Pain is at a 4/10. **She has responded well to acupuncture. Neurological tests are all negative.**

### POST-11/7/14 MEDICAL EVIDENCE

**November 7, 2014**: Patient arrives in the emergency room in an ambulance complaining of neck and mid to lower back pain. She was ambulated at the scene. Cervical collar is in place and patient is on backboard. (ER record) (010-020 to 010-024)

**November 25, 2014**: Patient seen for motor vehicle accident when she was rear-ended on November 7, 2014. She has neck and left upper extremity pain. November 7, 2014 accident has aggravated point cervical condition where she had baseline neck pain. She had some baseline "bother" and sees pain management for this. **The effects of the accident on November 7, 2014 made her fragile neck flareup with increased pain beyond baseline.**

(Dr. Claveria, orthopedic surgeon) (011-022 to 011-023)

**December 15, 2014:**  Patient reports painful stiffness in neck.  Patient reports **<u>limiting her activities due to pain</u>**.  (Dr. Richard Bien, PT, Acupuncture) (012-002)

**December 30, 2014**: Patient involved in a rear end accident on November 7, 2014 that has increased pain.  Her pain is now rated at a 7 -8/10.  Pain previously was with both sides but since the accident it has been more left-sided.  She has left greater than right upper trapezius pain and pain that moves up the neck, left hand tingling.  Upper shoulder, upper trapezius pain is burning, neck pain is sharp and nagging.  (Dr. Slater, Physical Therapy) (013-087 to 013-090)

**January 13, 2015:**  Orthopedic evaluation.  Patient notes that her last surgery made a big difference for her.  (Dr. Claveria) (011-013 and 011-016)

**February 26, 2015**: Patient visits for increased pain as a result of a rear end accident on November 7, 2014.  Prior to this accident she was having moderate pain in her neck.  Now she rates pain at 7-8/10.  Pain was previously bilateral but since the accident and has been more left-sided.  (Lyndel Anunciado, PTA, Bryan J. Strople, PT, DPT) (013-054 to 013-058)

**April 13, 2015:** Patient tries to control her residual pain with medication, a neck brace, careful computer station and avoiding fast movements. (Dr. Claveria) (011-002)

**June 9, 2015**: Pain is now at a 7-8/10 at her neck since the accident.  She began having increased symptoms in her upper trapezius and cervical spine high up in her skull. (Shayna Slater, PT) (013-023 to 013-025)

**June 30, 2015: <u>Patient has developed radicular pain in left upper extremity with stiffness the cervical spine.  Electric pain with any gripping/grasping movement</u>.** (Lyndel Anunciad, PT, Shayna Slater, PT) (013-017 to 013-018)

**July 7, 2015**: Complains of **<u>numbness throughout her hands, more left than right</u>**, particularly in the 2nd, 3rd, 4th and 5th digits.  She has some tightness over biceps.  Treatments have not really helped.  Her symptoms appear to be an aggravation of the underlying disease.  (Dr. Dobkin) (015-001)

**July 21, 2015**: Patient continues to report increased pain in her upper trapezius and neck as well as arm symptoms increased restriction with increased sitting at work. (Lyndel Anunciad, PT, Shayna Slater, PT) (013-015 to 013-016)

**November 11, 2015**: Pain is severe and is seeing a spine surgeon.  Out of work secondary to ventricular tachycardia, cardiac dysfunction and chronic neck pain. (Dr. Bassil Aish) (014-054 to 014-056)

**November 12, 2015**: She is having increased symptoms in her left hand, 4th and 5th digits, left shoulder and left arm.  Physical exam reveals mild weakness of grasp in the left hand. (**Dr. Dobkin**) (015-002)

**November 23, 2015**: Patient complains of neck pain with radicular pain and tightness of left shoulder and left-handed tingling and numbness.  (Melissa J. Hourihan, DPT)

**FEBRUARY 23, 2016**: Patient seen for pain that radiates down the left arm to the ring and small fingers.  She complains of significant radicular pain to the left-hand especially the 3rd and 4th fingers.  Positive weakness in the left arm.  Very limited range of motion to cervical spine including extension rotation.  Pain is severe at times causing diminished quality of life and decreased activities of daily living.  Pain is aggravated by increased activities of any kind.   She did not achieve relief with cervical epidurals and radiofrequency ablation.  She has failed medication management.  **Discussed spinal cord stimulation.**   She complained of difficulty sleeping.   Joint pain and neck pain, anxiety/stress.  She states the chronic pain syndrome with cervical radiculopathy onset 2016.

**Painful gait.  Cervical facet joints and cervical paraspinals tender to palpation. Decreased cervical extension, flexion and rotation.  Sperling's test is positive.  Loss of strength 3/5  Decreased sensation over lateral upper arm (C5), middle finger (C7) and ring and little finger (C8);** (Ryan Gilbreth, PA) (019-007 to 019-012)

**March 24, 2016:**  Left deltoid and supraspinatus which are 4/5. Acromioclavicular joint tenderness. **Subacromial impingement test positive** for pain. (Dr. Jacob Amrani, Spine

SMITH|HALL|STRONGIN LLP

surgeon) (019-021)

**April 13, 2016: <span style="color:red">Suspect 4 mm x 8 chondral loose body in bicipital tendon sheath. Vertical split in extra articular segment of long head of biceps. Mild subacromial sub deltoid bursitis.</span>** (Dr. Michael Rosellini, Orthopaedist)

**April 21, 2016**: After reviewing the MRI with Dr. Amrani, we concluded spinal cord stimulation for her cervical spine is her best option. (Dr. Adam Wuollet) (019-022 and 019-026)

**April 21, 2016**: Profile may suggest **<span style="color:red">stoic individual who is enduring an objective medical condition that procedures a diffuse pattern of disabling pain</span>**. (Dr. Adam Wuollett, AZ Pain Management)

**May 19, 2016**: Noted **<span style="color:red">decreased strength</span>** in bicep flexion, tricep extension, **<span style="color:red">decreased C5 sensation</span>** lateral upper arm, C7 middle finger and C8 ring and small finger. (Ryan Gilbreth, PA) (019-030)

**June 7, 2016: <span style="color:red">MRI of left shoulder shows loose body in biceps tendon and tendinopathy.</span>** (Dr. Jacob R. Ehteshami) (022-002)

**July 1, 2016**: Spinal cord stimulator trial scheduled. (Dr. Ehteshami; Ryan Gilbreth, PA) (019-040)

**July 19, 2016**: Spinal cord stimulator trial. Patient reports greater than 50% relief of cervical spine pain with spinal cord stimulator. She reports significant improvements of quality of life and activities of daily living. She reports needing to take less medication during this procedure. She would like to proceed with permanent implant. (019-044)

**August 30, 2016**: **<span style="color:red">She has failed physical therapy</span>**. Patient is scheduled for permanent implant of spinal cord stimulator on October 10, 2016. Current pain is 6/10. (Ryan Gilbreth, PA) (019-050 to 019-054)

**October 5, 2016:** Patient complains of severe neck pain. Pain is 7/10. Pain is on the left side of her neck. She also has 7/10 pain at her left knee. **<span style="color:red">Spurling's positive</span>**. <span style="color:red">She has decreased strength in bicep flexion, triceps extension. Decreased C5 sensation lateral</span>

1  upper arm, C7 middle finger and C8 ring and small finger. (Michelle Armijo, PA) (019-
2  056 to 019-061)

3  **October 10, 2016:** She had spinal cord stimulator trial experience 40 to 50% pain relief
4  decreasing her pain from a 7-8/10 to a 4-5/10.  She reports pain in bilateral cervical
5  paraspinous regions, left greater than right, traveling to the left lower extremity.  She
6  describes squeezing of left bicep and tingling in the 4th and 5th digits.  Pain is rated a 6-
7  8/10. **Positive left Hoffman's.** (Dr. Randall W. Porter, Spine surgeon; Julie Supple, ANP-
8  BC, CNOR, RNFA) (024-013 to 024-019)

9  **10/31/2016:**  Spinal cord stimulator is permanently implanted.  C7-T-1 open cervical
10  laminectomy with use of operative microscope for placement of stimulator. (Dr. Porter)
11  (023-003)

12  **November 3, 2016:** Patient reports pain at 7, 8 and 9/10 located in the neck on the left
13  side, left knee pain and thoracic and low back pain.  (Ryan Gilbreth, PA)

14  November 15, 2016: Pain, upper back pain, left numbness in arm, tingling and pain, left
15  leg pain, headache, imbalance, confusion, fatigue, constipation, anxiety and depression.
16  Poorly controlled postoperative pain.  Neurologically intact.  **Left Hoffman's positive.**
17  (Julie Supple, Dr. Porter) (019-062 to 019-068)

18  **December 14, 2016: She is able to decrease her morphine usage from 30 mg to 15 mg**
19  **on tablet daily.**  Has neck pain, upper back pain, left arm numbness, pain and tingling,
20  left leg pain, she reports imbalance, headaches and confusion, fatigue, constipation
21  anxiety and depression.  **Left Hoffman's positive.** (024-001 to 024-006)

22

23         As is borne out in the extensive medical history of Ms. Kobashi, on the date of the
24  incident, though her pre-existing neck condition and had been managed down to a 2-4/10,
25  she was in a fragile state and the November 7, 2014 collision brought on new symptoms that
26  she did not have prior to the incident.  Specifically, she is experiencing significant cervical
27  radicular pain to the left arm down to her fingers.  After November 7, 2014, her pain
28

SMITH|HALL|STRONGIN LLP

-16-
**CLAIMANT'S ARBITRATION BRIEF**

immediately worsened and was associated with radicular symptoms, severe spinal pain centralized toward her left side, shoulder pain, knee pain which included loose bodies in her knee. She also sustained injuries that were previously undocumented prior to the November 2014 accident as detailed above.

Prior to the November 7, 2014 collision, at every examination, Ms. Kobashi tested negative for every neurological exam that was administered to her.  Following the collision, she tested positive, on more than one occasion, for Hoffman's Sign, indicating the existence of spinal cord compression; she had a positive Spurling's Test indicating cervical compression with radicular pain, a positive Subacromial Impingement Test indicating shoulder injury,  loss of strength with electric pain with <u>any</u> gripping or grasping movement, numbness in her left arm and fingers (digit specific and linked to cervical level impairment), that were not previously described in her pre-November 7, 2014 collision medical records. Pain remained more severe and more disruptive that anything she had previously experienced and managed post-cervical extension surgery in October of 2011.  These issues resulted in the recommendation, for the first time, that she have a spinal cord stimulator surgically implanted in her spine.  This recommendation culminated in the placement of a cervical **spinal cord level neurostimulator**, which **no prior medical care provider had discussed with her prior to the November 7, 2014 collision.**

Specifically, On November 25, 2014, Ms. Kobashi presented to Orthopedist Richard J. Claveria, M.D. for cervical pain.  Dr. Claveria notes:

> "Ms. Patient is a 49-year-old female involved in a motor vehicle accident
> when she was rear ended November 7, 2014. She feels it has aggravated her
> baseline cervical condition where she had baseline neck pain. She had an
> anterior cervical discectomy and fusion in 2010 with Dr. Carlson. In 2011 she had a
> re-do anterior and posterior fusion from about C3 to T1 with a complex long
> posterior wire. She has some baseline "bother" and sees pain management for
> this. The effects of the accident on November 7, 2014 made her fragile neck
> flare up with increased pain beyond baseline. Pain is to the neck and at times in the

**CLAIMANT'S ARBITRATION BRIEF**

SMITH|HALL|STRONGIN LLP

left arm."

Further, in the Huntington Beach Physical Therapy notation on June 30, 2015, eight months post-incident, Ms. Kobashi had developed radicular pain in left upper extremity with stiffness to cervical spine. Electric pain with any gripping / grasping movement.

Ms. Kobashi's fragile cervical condition was dramatically impacted by the subject incident resulting in symptoms and pain for which she had not suffered prior to the collision.

## II.   AS MS. KOBASHI'S UM INSURER, SENTRY STANDS IN THE SHOES OF THE AT-FAULT DRIVER AND SHOULD PAY UP TO POLICY LIMITS TO THE EXTENT OF HER INJURIES AND LOSSES.

Sentry must accept its position in this arbitration, which is that it stands in the shoes of Winson Do, the at fault driver who confessed to driving 40 miles per hour, and a total inability to stop his vehicle due to a brake malfunction.

Insureds must be covered, within limits of the policy "for all sums … which they may be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle." (Ins.C. § 11580.2(a)(1).)   The effect is that insureds recover from their own insurer, up to specified limits, whatever damages for bodily injury or wrongful death they would be entitled to recover from the owner or operator of an "uninsured motor vehicle."

"[T]he purpose of the uninsured motorist statute is not to make all drivers whole from accidents with uninsured drivers, but to make sure that … [they] are protected to the extent that they would have been protected had the driver at fault carried the statutory minimum of liability insurance." (*Hartford Cas. Ins. Co. v. Cancilla* (1994) 28 Cal.App. 4th 1305, 1311.)

## III.   KIMI KOBASHI'S DAMAGES

### A.      Medical Treatment and Specials

**Medical Specials Post-Collision**

| PROVIDER | TOTAL PAID BY INS OR "ALLOWED" | TOTAL OUT OF POCKET BY KIMI |
|---|---|---|
| Hoag Hospital (11/7/14 and 8/26/15) | $2000 | |

SMITH|HALL|STRONGIN LLP

| Richard J. Claveria, M.D. | $309.38 This is a partial amount. | $1,235.62 |
|---|---|---|
| West Star Physical Therapy | $338.00 | |
| Elite Pain Management | $3,096.50 | $797.56 |
| Huntington Beach Physical Therapy (12/30/14 – 7/21/15) | $8,351.00 | |
| Bien Physical Therapy | $338.00 | |
| Basil Aish, M.D. (Physicians Medical Group) | $1,176.72 | $20.23 |
| Exclusively Spine Physical Therapy (11/23/15 – 2/26/16) | $1,264.61 | $45.87 |
| SMI Imaging | $710.39 | $585.19 |
| William R. Dobkin, M.D. | $600 | |
| Simon Med, Sun City | $70.22 | $76.26 |
| Cervical Spine Centers John R. Ehteshami, M.D. | $144.28 | $32.35 |
| Arizona Pain | $49,832.03 (Total all payments) | |
| Dr. Wuollet (placement of temporary spinal stimulator) | $1,898.00 | |
| Anesthesiologist (placement of temporary spinal stimulator) | $2,000.00 | |
| Limb Compression device for use with spinal stimulator | $950.00 | |
| Barrow Brain & Spine | $3,111.10 | |
| St. Joseph's Outpatient Surgery Center | $33,312.89 | |
| Mountain View Surgery Center of Glendale | $5,521.01 | $1,496.80 |
| E Novack, M.D. (Orthopedic Surgery) | | $292.12 |
| **TOTAL** | **$115,024.13** | **$4582** |

GRAND TOTAL: $124,188.13

**B.      Expert Testimony Re: Damages**

**Neurologist Expert, Michael A. Lobatz, M.D.:**

Ms. Kobashi was examined by Michael A. Lobatz, M.D., a Board-Certified Neurologist with 35 years of practice in Neurology and Neuro-Rehabilitation medicine. Dr. Lobatz will testify on behalf of plaintiff at arbitration.

Dr. Lobatz noted Ms. Kobashi's background history of degenerative cervical spondylosis and degenerative cervical joint disease who underwent complex cervical spine surgery both anteriorly and posteriorly in 2010-2011. She has a history of chronic pain and regular opiate use before and after her procedures. Dr. Lobatz indicated that it is clear however that Ms. Kobashi was improving and had a lower level of pain following her second surgery which was considered highly successful. At one point post her second surgery, Dr. Dobkin noted that she was pain free and that she was intent on lowering and discontinuing her opiate medication.

Upon Dr. Lobatz's examination of Ms. Kobashi, she notes her pain is on the left neck that goes down to shoulders left more than right. Pain ranges from 6-9/10. Pain is constant and present 24/7/365. It worsens during the day when at the computer. She works from home and notes that pain is worse when using her keyboard. The pain is fatiguing. She feels her work is affected by the pain and fatigue which stresses her and in turn worsens her pain. She is able to work full time but has to take breaks.

As a result of the motor vehicle crash in 2014, Dr. Lobatz' opinion is that Ms. Kobashi's pain immediately worsened and was associated with radicular symptoms that were not previously indicated in with her prior condition. Pain remained an issue longer term, culminating ultimately in the placement of a cervical spinal cord level neurostimulator which has been helpful, reducing her discomfort.

Dr. Lobatz concluded that given the temporal relationship between the second incident in November 2014 and the worsening pain with radicular symptoms, he thought it is ***inescapable to conclude*** **that the 2014 motor vehicle collision was the cause of the worsening pain requiring additional interventional treatment** including the placement of the spinal cord stimulator.

Although Dr. Alexander, the defense neurological examiner, concluded that Ms.

-20-
**CLAIMANT'S ARBITRATION BRIEF**

Kobashi would ordinarily have been back to her baseline within 3 to 6 months.  Dr. Lobatz disagrees with this contention because it is not supported by the medical evidence as illustrated above.  Further, Dr. Lobatz states that the defense doctor, Dr. Alexander's conclusion that Ms. Kobashi sustain anything other than a normal cervical strain/whiplash as a result of the November 2014 crash ignores her "eggshell" condition at the time of that incident, and is a totally implausible conclusion based on the medical evidence.  While most patients with either no cervical disc disease, mild or even moderate cervical disc disease may improve within this timeframe, he would not expect patients who have severe disease post-anterior and posterior surgery to follow a similar pattern.  Thus, he concluded that **Ms. Kobashi was clearly an at-risk patient going into the 2014 motor vehicle collision**, and that her medical records clearly define the immediate worsening of her symptoms, ineffective pain management and ultimately the culmination of placement of a neurostimulator.  **Thus, he concludes, to a reasonable degree of medical certainty, were it not for the 2014 collision, the pulse generator (spinal cord stimulator) was not planned nor likely to be required for Ms. Kobashi.**

Finally, although Dr. Lobatz originally attempted to apportion the need for medical management between pre-existing pain and the pain experienced by Ms. Kobashi secondary to the 2014 motor vehicle collision, by providing a figure of 20% attributable to the 2014 motor vehicle collision, after reviewing the additional reports of Dr. Standiford Helm, the pain management doctor, who apportioned the need for medical management and care between the pre-existing conditions and the exacerbation and addition of new conditions from the 2014 collision as 50-50.

**Pain Management Specialist Expert, Standiford Helm, M.D.:**

Standiford Helm, M.D. evaluated Ms. Kobashi's claims and noted that Ms. Kobashi's severe limitations as a result of debilitating pain.  She states that if she sits 30 minutes, she needs to get up and lying down for about 30 minutes before she can sit again.  She states when she flies, she sits on the aisle and walks around. "I feel like sitting causes pressure on my spine, which causes extreme pain."

Smith|Hall|Strongin LLP

Before the November 2014 incident, Ms. Kobashi was able to work fully. Since the incident, work has been difficult, and she was ultimately terminated from Sentry Insurance. As a direct result of the incident, she had to move from California to Arizona.

Dr. Helm believes that Ms. Kobashi had an aggravation of her pain as a result of the motor vehicle incident on November 7, 2014 and had to increase her use of narcotic medication. He noted she had a spinal cord stimulator implanted and that she was unable to continue working for Sentry Insurance. She returned to work with Great American but has difficulty maintaining the pace of her work.

With respect to whether the spinal cord stimulator was necessitated as a result of the November 2014 incident, it became more apparent than it was recently, when the device malfunctioned. Ms. Kobashi was asked to, and at various times did put a percentage on the relief she thought was directly related to the spinal cord stimulator, she had no real way of knowing the percentage of pain that was being masked by the stimulator. In addition, quantification of a percent reduction of pain by a patient where there are multiple variables in play including life factors, pain medications types and dosing, etc. make any estimate by Ms. Kobashi speculative. However, she was able to identify noticeable relief with the spinal cord stimulator immediately after it was placed, and then again when it stopped working.

After Ms. Kobashi became accustomed to the relief the stimulator was providing, she began to believe it was not providing any relief until she was without it once again because the device stopped working—at which point she reported extreme pain—the levels of which she never experienced pre the November 2014 crash or pre-use of the spinal cord stimulator.

To illustrate, on July 19, 2016, Ms. Kobashi reported 50% or greater relief from the use of a spinal cord stimulator during the spinal cord stimulator trial period. In October 2016, she reported 40 to 50% improvement with the spinal cord stimulator. Later, she reported relief of 30%. At no point in time did the stimulator take Ms. Kobashi back to her pre-incident baseline pain according to her doctors. After having the spinal cord stimulator surgically implanted, she was supposed to have the stimulator reprogrammed, was behind schedule and the spinal cord stimulator representative did not show up to do the

**CLAIMANT'S ARBITRATION BRIEF**

reprogramming.   The reprogramming was scheduled because the pain was gradually increasing.  The pain reportedly started to increase after Ms. Kobashi returned to work in February 2016.

On August 24, 2017, Ms. Kobashi was examined by pain management doctor, Standiford Helm.  At that time, she told Dr. Helm that she did not believe that the spinal cord stimulator was providing her with relief anymore, and she saw no benefit to it.  However, since that time, the spinal cord stimulator briefly malfunctioned so that she was not getting any stimulation.  During that time, she was "on the floor," returning to function only after the problem with the device was identified and corrected, at which point she was able to function again.  Based on that experience, at her re-examination by Dr. Helm in January 2019, she reported that based on that experience, she thought the spinal cord stimulator was providing her with as much as 75% relief.  Based on his examination and discussion with Ms. Kobashi, Dr. Helm is of the opinion that maintenance of the spinal cord stimulator is an integral and important part of her future medical care.

Apportionment does apply to the spinal cord stimulator.  However, because of her previous history of extensive cervical surgery, while noting that both her pain level and her opioid use have doubled, Dr. Helm apportions 50% of her current cervical complaints to the November 2014 motor vehicle incident and 50% to her pre-existing cervical spondylosis and surgery.

**Sentry's Retained Expert, Dr. Alexander, Concedes Kimi Was Injured Because of the 11/7/14 Collision; Concedes Permanent Losses**

Sentry's retained expert witness, Gerald J. Alexander, M.D., concedes that Ms. Kobashi was injured as a result of the motor-vehicle incident, and that all of the care she received for 3-6 months after the November 10, 2014, incident was caused by that incident. He also agreed that it was reasonable for Ms. Kobashi to have missed work for 3-6 months afterward.  In addition, Dr. Alexander recognizes that Kimi has severe, lifelong injuries that permanently restrict her movement and leave her with pain and numbness in her extremities.

SMITH|HALL|STRONGIN LLP

Dr. Alexander issued his report to Sentry on September 27, 2017.  Nevertheless, despite this consensus among the experts, no UM benefits have been paid to Kimi to date.

### C.      Future Medical Treatment

Dr. Lobatz believes that Ms. Kobashi will need to treat injuries sustained as a result of the incident for the rest of her life.  This includes cervical neurostimulator management, stimulator management by pain physician, pulse generator replacement as needed and medical pain management follow up.  Ms. Kobashi's previous surgeon, Dr. Dobkin, had indicated that Ms. Kobashi could very well require surgical decompression if her pain symptoms are not adequately controlled by medication and the spinal cord stimulator.

**Life Care Planner Expert, Liz Holakiewicz, RN, BSN, CCM, CNLCP®:**

Liz Holakiewicz reviewed the matter and recommended a Life Care Plan for anticipated costs for physician services, physical therapy, medications, diagnostic testing, hospitalization procedures, equipment and supplies, as well as assistance for tasks around her home that Ms. Kobashi is unable to perform.

Ms. Holakiewicz's estimates that, assuming 10 years of continued narcotic use or narcotic use back to her pre-injury baseline, with a 30.6-year life expectancy, the total for Ms. Kobashi's future care (life care plan) is **$800,037.74.**

### D.      Loss of Earnings and Lost Earning Capacity

**Employment/Education History:**

Ms. Kobashi graduated from Washington High School in Phoenix in 1983. She attended Glendale Community College and Central Arizona College and was pursuing an Associate of Science Degree and Criminal Justice.  Other education included Burkes Pacific Training through the Insurance Education Association and National Insurance Crime Bureau. She became a Certified Fraud Claims Law Specialist in 2008 and has completed basic courses to work as an Insurance Investigator.

Ms. Kobashi started her career in 1994 as a Contract Special Investigator with International Claims Specialists.  She then worked for Liberty Mutual Insurance Company from 2002 to 2014 as a Contract Special Investigator.  As exemplified by Ms. Kobashi's

tenure with Liberty Mutual, she was a stellar employee and received exemplary reviews, merit increases and bonuses.  Ms. Kobashi desired to maximize her earnings and left her position with Liberty to pursue employment with Sentry Insurance.

**Employment with Sentry Insurance**:

Ms. Kobashi began her employment with Sentry Insurance in June of 2014 as a Special Investigator with a salary at $73,500.00/year.  At the time of the collision, Ms. Kobashi worked for Sentry Insurance as an Insurance Investigator.  As a result of her injuries and difficulty to complete her work assignments after the November 2014 incident, Ms. Kobashi went out on short term disability.  Ultimately, Ms. Kobashi wished to continue with long term disability and Sentry Insurance subsequently terminated her employment.

While working for Sentry prior to the incident, Ms. Kobashi was praised for her excellent work performance, that she exceeded all expectations and her supervisors indicated they were "quite happy" with her work.  One of the higher up managers referred to Ms. Kobashi as a "rock star!"  All indications pointed to the fact that Ms. Kobashi was a valuable employee, was able to keep up with the work requirements of her position at Sentry and there were no impediments to her performing her job satisfactorily before the November 2014 collision.

It is curious that Sentry has refused to produce any employment records regarding Ms. Kobashi's tenure at Sentry.  One can only assume that these records bode favorably to Ms. Kobashi while employed at Sentry.  This is consistent with the claim that Ms. Kobashi's prior cervical issues did not hinder upon her ability to perform beyond expectations on the job and it was only until after the injuries sustained as a result of the November, 2014 collision that her work performance suffered and continues to suffer to this day.

**Current Employment with Great American Insurance Company:**

Ms. Kobashi is currently employed by Great American Insurance Group and is working as an insurance investigator. With this company she has more flexibility and can take frequent breaks; however, even with these accommodations Ms. Kobashi finds it difficult to perform her job tasks. Her current salary is $73,400.00 per year. She anticipates

SMITH|HALL|STRONGIN LLP

1  continuing in this position as long as she is able to tolerate the work and is able to complete
2  her job tasks.

3      As recently as last month, Kimi has come under serious fire for her inability to perform
4  her job and live up to expectations as a result of her medical limitations. Her deficiencies
5  have been pointed out to her on several occasions, and her job is at immediate risk because
6  of her inability to perform as expected, despite her prior success at her job.

7      **E.      Future Loss of Earnings**

8  **Vocational Rehabilitation Expert, Mark Remas, MA, CRC, ABVE:**

9      In thoroughly evaluating Ms. Kobashi's work life history and looking to the future
10 based upon her injuries and current difficulties while performing her job, vocational expert,
11 Mark Remas made the following conclusions:

12     With regard to work life expectancy, prior to the motor vehicle incident of November
13 7, 2014, Ms. Kobashi planned on working through her retirement. She is single and must
14 generate sufficient income to meet her cost of living. She had a stable work history and had
15 developed specialized skills as an insurance investigator. The work life expectancy for a 49-
16 year old female with some college but no degree would be 13.3 to 14.2 years.  However, Ms.
17 Kobashi did have pre-existing medical conditions and had cervical surgery in 2010 and 2011.
18 She had a good result from the surgery and was able to work without restrictions. Given this
19 information, her work life expectancy prior to the November 7, 2014 rear-end collision would
20 be adjusted to 12 years.

21     Ms. Kobashi is 53 years of age and has built a career as an insurance investigator. In
22 this occupation she is able to maximize her skills and earnings. If she were to change
23 occupations, she would experience a substantial reduction in pay with fewer options for
24 flexibility in her daily job tasks. Therefore, it is more probable than not that she will continue
25 to work as an insurance investigator until her pain symptoms prevent her from functioning
26 effectively in her job.

27     As a consequence of the motor vehicle collision on November 7, 2014, Ms. Kobashi
28 has a chronic pain condition, required the implantation of a spinal cord stimulator and

-26-

SMITH|HALL|STRONGIN LLP

requires ongoing pain management services. Because of the increased pain symptoms Ms. Kobashi had to increase her medication intake and is prescribed Morphine, Percocet, Robaxin, and Effexor. Despite the medications and spinal cord stimulator implant, she continues to experience significant pain symptoms and must take breaks regularly during the day. She will also assign certain job tasks to contract agents in lieu of traveling for her job.

Given the facts of the case, it is more probable than not that Ms. Kobashi will continue to work as an insurance investigator for the immediate future. However, as a result of the November 2014 motor vehicle collision, **Ms. Kobashi will have a reduction in her pre-injury worklife expectancy by 4.7 years due to disruptions in her ability to sustain work, absences for medical treatment, periods of unemployment and an earlier separation from the labor force. This will result in a total loss of her pre-injury earning capacity for 4.7 years.**

Secondly, due to the reduction in Ms. Kobashi's work life expectancy, she will lose her employer provided benefits. The value of employer provided benefits varies but would be equivalent to a minimum of 18% and up to 31.8% of her salary, which would be a loss of $13,212.00 to $23,241.00 per year.

Based on the facts of the case. Ms. Kobashi suffered a cervical injury as a result of a rear-end collision on November 7, 2014. Treatment for the rear-end collision included the implantation of a spinal cord stimulator and an increased use of prescription medication. Despite the treatment, Ms. Kobashi has a chronic pain condition that is not expected to improve, and she will require continued pain management services.

According to Mr. Remas, as a consequence of the November 7, 2014 motor vehicle collision it is more probable than not that Ms. Kobashi will be unable to sustain her employment and will experience a loss of income due to disruptions in her work, periods of unemployment for medical treatment or job change and it is more probable than not that she will have to withdraw from the labor force at an earlier age.

Ms. Kobashi will experience a long-term loss of income equivalent to (not reduced to present value):

1.      Loss due to reduced work life expectancy: $73,400.00 x 4.7 years = Loss of **$344,980.00.**

2.      Loss due to discontinuation of employer sponsored benefits: From 18%: $13,212.00 x 4.7 years = Loss of $62,096.00 To 31.8%: $23,241.00 x 4.7 years = **Loss of $109,233.00.**

### F.      Past Lost Earnings

Mr. Remas also points out that Ms. Kobashi lost work of approximately 6 months for which she was not compensated.  Thus, based on the salary she was earning at the time of $73,000, her past lost earnings total approximately **$36,700**.

**Total Loss of Earning Capacity/Future Earnings:  $490,913**

### G.      General Damages – Impact of Injuries on Quality of Life

In addition to past and future damages for lost earnings and medical expenses, a personal injury claimant recovers compensatory damage for her pain and suffering.

Pain and suffering damages is premised on the idea that a victim who has been through a harrowing experience has lost more than her earnings and medical bills.  Pain is physical: tissue damage stimulates a person's nerves. Suffering described the way a person processes or perceives pain; suffering can take several forms, among them, grief, bereavement, fear, and frustration.

All of the money for medical treatment goes to other people to pay for Ms. Kobashi's care.  Not one cent of this goes to Ms. Kobashi for the greatest harm to her, which is what this incident did to her life.  Her human losses are many times greater than the medical bills and lost wages.  In order to compensate her, to balance the scales, justice requires that she be provided many times more than the available $1 million in policy limits under Sentry's policy, but the $1M is all that is available to her given Do's uninsured status.

While Ms. Kobashi has incurred and will incur significant financial losses, pain is the worst harm in this case.  Knowing she can't care and support herself like she used to is extremely frustrating to her.  She has struggled to get back to work despite severe pain. Watching others participate in activities from which she is now excluded is also frustrating.

-28-

Smith|Hall|Strongin llp

Ms. Kobashi testified at her deposition that simple tasks such as buttoning her pants are impossible – that it is a chore to simply turn her head.  During her deposition, Ms. Kobashi was quite emotional while she testified about the toll this pain and suffering has taken on her life:

"Q    Just a few more questions on these lines, ma'am.  How has the accident affected your daily living?

A    Well, to answer your question about dressing myself, for example, the paints that I'm wearing, it has those little clasps where you have to do two of them, and it's hard for me.  I can't see it to line it up.  It's difficult.

Going to get my haircut, it's extremely painful to have to put your head back to get it washed, when I go to the dentist and sit in a chair. ***When I say everything, it's everything.***

Q    In the year before the accident, were you having similar types of issues caring for yourself?

A    No.

Q    Has this impacted your social life, social activities?

A    Yes.

Q    Can you describe that for us?

A    I don't have very good stamina.  I don't have a lot of energy to do things.  I just try and put up a brave face to try and keep up.  I just – I kind of isolate myself because I know that I can't do a lot of things."

Kimi will testify regarding her life just prior to the November 2014 car crash and after as follows:

| Before 11/7/14 Crash | After 11/7/14 Crash |
| --- | --- |
| Able to travel internationally (long flights were okay) | Not able to sit for extended periods of time. International travel is impossible. |
| Able to carry luggage on and off planes, trains and in and out of vehicles, etc. | Not able to lift luggage. |

SMITH|HALL|STRONGIN LLP

| | |
|---|---|
| Could perform household chores. | Must hire help as household chores result in severe pain |
| Able to do yard work. | Must hire help.  Yard work causes debilitating pain. |
| Able to lift more than 30 to 40 pounds. | Can lift lighter items at appx. 5 pounds |
| Little to no trouble with concentration | Difficulty concentrating because of constant pain and heavy medications |
| Able to work 7 ½ to 8 hours daily with normal effort. | Unable to sit at computer and work for more than an hour without having to stand up walk around and stretch. |
| No issues holding a typing position for 7 ½ to 8 hours daily. | Unable to type and hold position without severe pain for longer than 30 minutes |
| No issues with sleeping a full, uncompromised 8 or 9 hours a night. | Waking every two to three or four hours, changing positions because of pain. |
| Could exercise at a gym or elsewhere. | Can take short walks or easy swims; Unable to participate in any high impact activities, no running or jumping. |
| Some pain medication | 8 pills a day for pain in the morning |
| Able to arise and begin normal day | Instead of getting up and starting my day, now I ease into the day by supporting my head against the couch waiting for the pain pills to kick in. |
| Could participate in activities such as amusement park rides or horseback riding | Unable to participate in jarring activities, i.e., horseback riding, go kart riding, paintball, laser tag, amusement park rides. |
| Could attend the movies without worry | Must avoid movie theaters without back support. |
| No difficulty | Difficulty making the bed, doing laundry, bending at waist to vacuum, clean floors, dust at a lower level, raking leaves, bathing her two small dogs. |
| No issues | Intimacy is compromised. |
| | Pain level has substantially increased after accident, from pain level of 4/5 to 7/8, up to 9/10 |
| 1 Percocet daily for pain | Medications have increased from 1 Percocet a day to 3 a day. |
| 1 morphine dose | Increased morphine dosage from 1 to 2 a day. |
| 2-3 muscle relaxers | Increase in muscle relaxers from 2 to 3 a day to now taking to muscle relaxers 3 times a day, for a total of 6. |
| | Increase in blood pressure medication was stressful and poor job performance. |

SMITH|HALL|STRONGIN LLP

| | |
|---|---|
| | Posture has been compromised with increased pain. |
| | Frequent comments, when out in public, about posture.  People asking whether I have a stiff neck or if in pain. |
| | Constant need to self-massage back of neck to relieve pressure and cervical spine. |
| | Feeling of downward pressure and compression on cervical spine that never goes away. |

The value of each of these items of non-economic harm should be determined using the following three factors:

- How bad is the harm?

- How long does it last?

- How interfering is it?

Here, all of these factors militate in favor of a substantial general damages award. Her physical injuries are demonstrable; she will never be the healthy woman she was before the collision. The psychological effects are equally devastating.

It is clear that many things have been radically altered in Ms. Kobashi's life since this incident occurred. She has lost the full use and mobility of her body as it was prior to the collision.  Life has become a chore just to do normal things without pain.

Ms. Kobashi has endured months of almost constant pain, numbness, loss of function, and emotional distress which has taken a toll on her and her family who has had to care for her.  She had to relocate from California to Arizona to be close to family.  She has endured innumerable medical examinations (some invasive, and many painful), tests, treatments, and procedures.  Sadly, her near chronic pain and mental anguish persist to this date and are likely to plague her for the rest of her life.

## IV.    ARBITRATION DEMAND

Based on her losses and harms, Kimi is entitled to her full UM policy benefits.  The following make up Kimi's harms as a result of the crash:

**Medical Specials:**                          **$124,188.13**

SMITH|HALL|STRONGIN LLP

**Future Medical Treatment/Modalities/Life Care: $432,000.00**

(apportioning 50% of treatment to pre-existing conditions except for the Spinal Cord Stimulator which is 100% because of the 11/2014 incident)

| | |
|---|---|
| **Loss of Earnings (Past)** | **$36,700** |
| **Loss of Earning Capacity (Future):** | **$454,213** |
| **SUBTOTAL:** | **$1,047,101.13** |

(Using lowest figures where range was given)

| | |
|---|---|
| Non-Economic Damages: | **$3M** |
| **TOTAL ARBITRATION AWARD:** | **Capped at Policy Limits of $1M** |

## V.   CONCLUSION

Claimant, Kimi Kobashi is an independent, strong, capable, intelligent, accomplished and resilient 53-year-old woman who is a breast cancer survivor.  Despite her prior cervical surgeries, she had made significant strides toward recovery, especially after the corrective surgery on September 11, 2011.  Ms. Kobashi's medical records are replete with notations that reference her desire to be completely off narcotic pain medication – her goal was to be whole and healthy.  Ms. Kobashi is not a malingerer.  The defense medical examiner, Dr. Alexander, acknowledges, very frankly, that her pain and limitations are no exaggeration. Her own physicians described her as "stoic" in response to real and objective medical conditions.

Unfortunately, on November 7, 2014 while she was enjoying the company of friends by taking them to the airport, Ms. Kobashi had the misfortune of having her automobile struck by uninsured driver Winson Do at 40 miles per hour when his brakes failed, or he failed to apply them.  Ms. Kobashi's life was forever altered on this fateful day and she has been living with debilitating pain on a daily basis and will be forced to endure this pain on some level for the rest of her life.

The law is clear that Sentry Insurance is required to fulfill its obligation to compensate Ms. Kobashi under the policy of insurance covering Ms. Kobashi's November

7, 2014 car crash because Sentry stands in the shoes of Winson Do, the at-fault driver. Sentry will assert that Ms. Kobashi's preexisting cervical condition prevents her from fully recovering damages in this matter.  Ms. Kobashi is entitled to the portion of damages for the pain and suffering attributable to the aggravation of the pre-existing injury – those damages are significant. As the medical records clearly state, Ms. Kobashi had reached a manageable and maximal recovery plateau following the 2011 auto accident and her prior cervical surgery and surgical revision.  The November 7, 2014 automobile collision irreparably harmed Ms. Kobashi, and Kimi should be provided with the full amount of her overdue policy benefits under the Sentry policy.

Dated: August 16, 2019                          SMITH|HALL|STRONGIN LLP

_____

Eric B. Strongin, Esq.
William D. Burger, Jr., Esq.
Attorneys for Claimant, Kimi Kobashi

**CLAIMANT'S ARBITRATION BRIEF**

EXHIBIT "5"

Alan B. Yuter (SBN CA 101534)
ayuter@selmanlaw.com
N. Asir Fiola (SBN CA 222833)
afiola@selmanlaw.com
SELMAN BREITMAN LLP
6 Hutton Centre Drive, Suite 1100
Santa Ana, CA 92707-5755
Telephone:    714.647.9700
Facsimile:    714.647.9200

Attorneys for Respondent SENTRY INSURANCE

UNINSURED/UNDERINSURED ARBITRATION

JUDICATE WEST

| | |
|---|---|
| KIMI KOBASHI,<br><br>             Claimant,<br><br>      v.<br><br>SENTRY INSURANCE, A MUTUAL COMPANY, a Wisconsin corporation,<br><br>             Respondent. | Case No. A243442-46<br><br>RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF<br><br>Date:               August 19 - 20, 2019<br>Time:               9:30 a.m.<br>Judicate West – Darrell Forgey, Esq. |

## I.    FACTUAL BACKGROUND

This uninsured motorist ("UM") claim arises from a three-car accident that happened on November 7, 2014 in Huntington Beach, California.  Claimant Kimi Kobashi ("Kobashi"), 49-years-old at the time of the accident [DOB 7/13/65], was on her way to Los Angeles International Airport to drop off two passengers, her friends Michelle Gromacki and Marcelle Moses.  Ms. Kobashi testified that while her Ford Fusion was stopped at a red light, in the center lane, she felt an impact from the rear.  Ms. Kobashi was told at the scene that the car directly behind her, a Chevrolet Malibu driven by Paul Lydon, was rear-ended by an Acura driven by Winson Do, and the Malibu was pushed into Ms. Kobashi's Fusion.

Ms. Kobashi did not see the Malibu behind her before impact, and does not know the speed of the Malibu at impact.  See deposition transcript of Ms. Kobashi, dated September 26,

1

133890.1 138.42072

2017 ("Kobashi transcript"), p. 78, lines 18 to 25 and p. 79, lines 8 to 10, attached as Ex. 1.  She does not have personal knowledge of the sequence of impacts behind her.  Kobashi transcript, p. 82, line 23 to p. 83, line 15, attached as Ex. 2.

With her cell phone, Ms. Kobashi took four photographs of the cars at the scene of the accident, attached collectively as Ex. 3.  Exhibit 3-1 shows the rear of Ms. Kobashi's Fusion. The rear of the Malibu, which was purportedly rear-ended by the Acura, is depicted in Ex. 3-2. The front-end of the Acura is depicted in Ex. 3-3, and the rear of the Acura is shown in Ex. 3-4. Ms. Kobashi did not take any photographs of the front of the Malibu, and does not recall seeing any damage to the front of the Malibu.  Kobashi transcript, p. 89, lines 20 to 22,  and p. 90, lines 5 to 7, attached collectively as Ex. 4.

On or about November 12, 2014, a repair estimate for the damage to Ms. Kobashi's Fusion was prepared by Gustafson Brothers in Huntington Beach.  The repair estimate totals **$1,433.70**, and a copy of the estimate is attached as Ex. 5.

The third driver in the sequence, Winson Do, did not have automobile insurance. There is no fault on Ms. Kobashi for this accident, in which she was rear-ended.  At the time of the accident, Ms. Kobashi had UM coverage through respondent Sentry Insurance ("Sentry"). As previously disclosed to the arbitrator by Ms. Kobashi's counsel, the UM coverage through the Sentry insurance policy has a limit of $1 million per occurrence.

A.      **Any Use and/or Reference to the Traffic Collision Report, Other than to Refresh Recollection, Should be Excluded from this Arbitration**

The police arrived at the scene, and a traffic collision report was prepared sometime after the accident.  Sentry objects to the introduction of the police report, or any portion thereof, into evidence at the arbitration of this matter.

Vehicle Code section 20012 provides that, "[a]ll required accident reports, and supplemental reports, shall be without prejudice to the individual so reporting and shall be for the confidential use of the Department of Motor Vehicles and the Department of the California Highway Patrol, . . ." with the exception that the contents of the reports shall be disclosed to persons having a proper interest in the contents, such as the drivers involved and the injured

2

Selman Breitman LLP
ATTORNEYS AT LAW

133890.1 138.42072

persons.

Vehicle Code section 20013 provides,   "[n]o such accident report shall be used as evidence in any trial, civil or criminal, arising out of an accident, except that the department shall furnish upon demand of any person who has, or claims to have, made such a report or upon demand of any court, a certificate showing that a specified accident report has or has not been made to the department solely to prove a compliance or failure to comply with the requirement that such a report be made to the department."

Although a party may use a traffic accident report to refresh a witness' recollection under Evidence Code 771, the traffic accident report, including the diagram portion of the report, is not admissible into evidence.  As stated in *Box v. California Date Growers Assn.* (1976) 57 Cal. App. 3d 266, 270-271 [129 Cal. Rptr. 146] "it is well established that traffic accident reports are not admissible in evidence."

The information and statements contained in the traffic collision report are inadmissible pursuant to the above-stated authorities.  However, if the arbitrator is inclined to consider the traffic collision report, the statements contained therein, including estimates of speed of the vehicles, should be carefully scrutinized in light of the objective physical evidence, namely the photographs of the cars, which show little damage to the rear of Ms. Kobashi's Fusion.  Further, there is no evidence about any significant damage to the front of the Malibu that made contact with the rear of the Fusion.

**B.     The Investigating Police Officer Should Not Be Allowed to Offer Expert Opinion Testimony**

The investigating police officer, Officer Elser, has not been deposed in this matter, and he is not expected to testify at the arbitration.  However, if Officer Elser does testify, he should not be allowed to testify as an expert.  Further, he should not be allowed to offer opinions about the speeds of the vehicles, and the ultimate cause of the accident, because he has not been designated as an expert witness, either retained or non-retained, by Ms. Kobashi.

To introduce expert opinions, a party must list in his or her expert designation the name and address of any such witness.  Code of Civil Procedure section 2034.260(b)(1).   A non-

3

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

retained expert may still offer opinions, but only if that non-retained expert has been specifically named in a party's designation of expert witnesses.  See *Kalaba v. Gray* (2002) 95 Cal. App. 4th 1416 [116 Cal. Rptr. 2d 570].  An arbitrator acts within his or her discretion when a witness who is not listed as either a retained or non-retained expert is precluded from offering expert opinion testimony.  *Id.*

## II.   SCOPE OF ISSUES TO BE DECIDED IN THIS UM ARBITRATION

Based on the applicable UM coverage through the Sentry insurance policy, Ms. Kobashi's counsel made a demand for arbitration.  Insurance Code section 11580.2 governs UM claims, and subsection (a)(1) sets forth the allowable recovery in such claims as follows:

> "No policy of bodily injury liability insurance covering liability arising out of the ownership, maintenance, or use of any motor vehicle, except for policies that provide insurance in the Republic of Mexico issued or delivered in this state by nonadmitted Mexican insurers, shall be issued or delivered in this state to the owner or operator of a motor vehicle, or shall be issued or delivered by any insurer licensed in this state upon any motor vehicle then principally used or principally garaged in this state, unless the policy contains, or has added to it by endorsement, a provision with coverage limits at least equal to the limits specified in subdivision (m) and in no case less than the financial responsibility requirements specified in Section 16056 of the Vehicle Code insuring the insured, the insured's heirs or legal representative *for all sums within the limits that he, she, or they, as the case may be, shall be legally entitled to recover as damages for bodily injury or wrongful death from the owner or operator of an uninsured motor vehicle*."  (Emphasis added.)

As stated in *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal. 3d 473, 480: "Cases which have analyzed and construed [section 11580.2] have pointed out that the word 'damages' in this section means the damages which the insured is entitled to recover from the uninsured motorist, and that the statute, read literally, *requires arbitration of two issues only: (1) whether the insured is entitled to recover against the uninsured motorist and (2) if so, the amount of the damages*."  (Emphasis added.)

As discussed at the Case Management Conference with the arbitrator and Ms. Kobashi's counsel, the only issue to be adjudicated at this arbitration is the amount of damages that Ms. Kobashi is entitled to as a result of the UM accident on 11/7/14.  The arbitration will not decide

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

any purported wrongful termination claim against Sentry, any purported "bad faith" claim, or any claim for punitive damages.   See *California State Automobile Association Inter-Insurance Bureau v. Carter* (1985) 164 Cal.App.3d 257.

## III.   MS. KOBASHI'S CURRENT NECK COMPLAINTS RELATED TO PRE-EXISTING CONDITIONS

Ms. Kobashi has a long-standing, pre-accident history of cervical spine issues.  She contends that this accident caused her severe, chronic neck pain, for which she received extensive medical treatment, including implantation of a spinal cord stimulator.  She also claims past and future lost earnings as a result of the subject accident.

However, the evidence in the attached medical records show that in April 2015, Ms. Kobashi admitted to Dr. Claveria that her pain level was essentially back to her pre-accident baseline level.  In that same time period, she reported to her physical therapists "minimal pain and reduced tightness" and that she was "feeling pretty good overall."

Unfortunately, sometime in May or June 2015, the progression of her pre-accident degenerative disease took hold, causing increased pain and radicular symptoms.  It is clear based on the medical evidence that Ms. Kobashi sustained a cervical sprain / strain as a result of the subject accident, which exacerbated her neck pain for a period of time; she returned to pre-accident baseline in April 2015; and then her underlying degenerative spinal pathology, including documented stenosis, drove her further medical treatment until the present day.

Ms. Kobashi has the burden of proof to show that her post-accident medical treatment was necessitated by the subject accident.  CACI 430 regarding causation is instructive:

> "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.
>
> *Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct*."  (Emphasis added.)

The second paragraph of CACI 430 is critical.  Here, the evidence will show that Ms. Kobashi's treatment after a certain time period, approximately July 2015, would have occurred

Selman Breitman LLP
ATTORNEYS AT LAW

1   even if this accident had not happened.  Therefore, this accident was not a substantial factor in

2   causing the need for treatment after July 2015.

3           Further, CACI 3927 provides that a plaintiff or claimant is not entitled to damages for

4   any physical condition that she had before the defendant's conduct occurred, and provides that if

5   a claimant had a preexisting physical condition that was made worse by a defendant's conduct,

6   that claimant will be awarded only those damages that will compensate her for the effect on that

7   condition. Thus, because Ms. Kobashi had preexisting cervical degenerative disease, resulting in

8   neck pain for which she was in active treatment, Sentry is responsible only for any treatment

9   related to any *worsening or aggravation* of that preexisting spinal condition, rather than the

10  entirety of Ms. Kobashi's post-accident treatment.  See *Sanchez v. Kern Emergency Medical*

11  *Transportation Corp.* (2017) 8 Cal.App.5th 146, 168 [213 Cal.Rptr.3d 830] [finding that "a

12  tortfeasor may be held liable in an action for damages where the effect of his negligence is to

13  aggravate a preexisting condition or disease. Plaintiff may recover to the full extent that his

14  condition has worsened as a result of defendant's tortious act]."

15          Ms. Kobashi's pre-accident medical records show degenerative changes in the cervical

16  spine dating as far back as 2008.  For example, a July 25, 2008 cervical MRI taken at Huntington

17  Beach Diagnostic Imaging and Breast Center shows disc herniations from C2-3 through C6-7,

18  and a large 6 mm disc extrusion at C7-T1. There was severe neural foraminal stenosis at the

19  latter level of the cervical spine.   See Cervical MRI report dated 7/25/08, attached as Ex. 6.  A

20  series of three cervical steroid epidural injections were administered to Ms. Kobashi in 2008 by

21  John L. Brazil, M.D.  See Procedure Notes for injections administered by Dr. Brazil in 2008,

22  collectively attached as Ex. 7.

23      **A.      2010 Spinal Surgery**

24          On February 22, 2010, Ms. Kobashi was evaluated for spinal surgery by Gregory D.

25  Carlson, M.D.  The evaluation report notes that Ms. Kobashi "has had 2 years of neck pain,

26  which has been unremitting."  She also had numbness and tingling into her left arm, and had

27  difficulty finding a position of comfort.  Ms. Kobashi exhibited "very limited range of motion

28  particularly with rotation to the left or extension, which she cannot do past 10 degrees."  She was

Selman Breitman LLP
ATTORNEYS AT LAW

6

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

1   diagnosed with cervical spondylitic stenosis, C5-6, C6-7, C7-T1, and cervical radiculopathy.  Dr.

2   Carlson recommended a three-level anterior cervical discectomy and fusion at C5-6 through C7-

3   T1. See 2/22/10 report from Dr. Carlson, attached as Ex. 8.

4        Ms. Kobashi underwent the above surgery on March 9, 2010.  Unfortunately, she had

5   continuing symptoms after surgery into 2011, leading up to a second surgery.

6   **B.    2011 Neck Problems and Further Surgery**

7        Records from Ms. Kobashi's primary care physician, Bassil Aish, M.D., of Beach

8   Physicians Medical Group show that in April 2011, Ms. Kobashi was walking when she stepped

9   in a pothole, her "neck snapped," and she hit the ground.   See progress notes from Dr. Aish

10   dated 4/6/11, attached as Ex. 9. On August 23, 2011, Ms. Kobashi visited neurosurgeon, William

11   Dobkin, M.D. and reported that she experienced "marked increase in her neck pain" following an

12   incident in in April 2011 in which "she had a severe twisting while getting out of her car …."  At

13   that time, she had "advanced arthritic changes, some bone spurring at the C4-5 and C3-4 levels."

14   See report from Dr. Dobkin dated 8/23/11, attached as Ex. 10.  On September 21, 2011, Ms.

15   Kobashi underwent a posterior spinal fusion extension surgery from levels C2 through T1, due to

16   severe neck pain and severe osteoarthritis at several levels.  See operative report dated 9/21/11,

17   attached as Ex. 11.

18        On December 29, 2011, Dr. Dobkin noted that the extension of the fusion "resulted in

19   resolution of almost all of her previous pain."  See report from Dr. Dobkin dated 12/29/11,

20   attached as Ex. 12.  Unfortunately, due to a separate accident in 2012, and progression of

21   arthritis, Ms. Kobashi did not remain pain free, and in fact remained symptomatic in her neck up

22   until the time of the subject accident.

23   **C.    2012 Rear-End Automotive Collision**

24        On April 5, 2012, Ms. Kobashi was involved in a rear-end automobile collision.

25   Emergency room records indicate that she was the restrained driver of a vehicle that was rear-

26   ended.  An x-ray of the cervical spine was taken.  She was diagnosed with "cervical sprain/strain;

27   MVA."  See Emergency Physician Record MVA from Hoag dated 4/5/12, attached as Ex. 12.

28        On April 12, 2012, Ms. Kobashi returned to Dr. Dobkin following the above-described

Selman Breitman LLP
ATTORNEYS AT LAW

1  accident, which aggravated her neck and left shoulder.  She was referred for physical therapy,

2  and remained on pain medications and muscle relaxers.  See report from Dr. Dobkin dated

3  4/12/12, attached as Ex. 13.

4        **D.**       **Neck Problems Up Until the Time of the Accident**

5        Ms. Kobashi started seeing a pain management physician, Dr. Grabow, for "chronic neck

6  pain" on December 11, 2012.  At that time, she was taking 30 mg of morphine in the morning, 15

7  mg midday, and 30 mg in the evening.  She was also taking venlaflexine (150 mg daily) for

8  "situational depression associated with her ongoing chronic pain."  A history of breast cancer, in

9  remission, was noted.  She rated her neck pain as a 3 to 4 of 10.  She also exhibited cervical

10  radicular pain.  At that time, the plan was to continue with the above medications.  See report

11  from Dr. Grabow dated 12/11/12, attached as Ex. 14.

12        As of February 6, 2013, Ms. Kobashi complained of increased pain in her neck, which

13  she rated as a 4 of 10 with medications, due to a recent illness.  Her "mood/affect" was described

14  as "depressed."  See report from Dr. Grabow dated 2/6/13, attached as Ex. 15.

15        Ms. Kobashi did report an improvement on March 7, 2013, and her morphine dosage was

16  decreased to 30 mg, twice per day (down from three times per day).  Her anti-depressant dosage

17  remained the same.  See report from Dr. Grabow dated 3/7/13, attached as Ex. 16.

18        As of May 28, 2013, Ms. Kobashi reported increased pain with increased activity, and

19  noted difficulty with pain control.  Her pain level was noted to be 5 of 10.  She felt like she

20  needed long-acting morphine.  The revised treatment plan included morphine, 30 mg per day;

21  extended release morphine, 15 mg twice per day; Percocet [opioid pain reliever] 10/325, as

22  needed; and continued venlafaxine. See report from Dr. Grabow dated 5/28/13, attached as Ex.

23  17.

24        Ms. Kobashi was examined by Kamran Aflatoon, D.O., on July 10, 2013, as she was still

25  having "constant neck pain that radiates to her shoulders and it is associated with tingling of the

26  left hand" as a result  of the April 2012 accident.  She also had muscle spasms, and any physical

27  therapy, stress and cold weather increased her pain.  The pain was rated as a 4 of 10, but

28  increasing to 7 of 10 when aggravated.  The prior incident in which she re-injured her neck while

8

Selman Breitman LLP
ATTORNEYS AT LAW

stepping into a pothole was also noted, and "[s]he never fully recovered." At that time, Ms. Kobashi was taking aromasin [breast cancer]; morphine, 30 mg; venlaflaxine; and Percocet, 10/325 mg.

She denied participating in sports, and admitted that she had gained 30 pounds within the last year. Dr. Aflatoon recommended acupuncture treatment, and further pain management evaluations. See report from Dr. Aflatoon dated 7/10/13, attached as Ex. 18.

On August 14, 2013, Ms. Kobashi returned to Dr. Aflatoon, experiencing "constant neck pain with radiation to the left arm" with "moderate muscle spasms in the cervical spine." Dr. Aflatoon determined that Ms. Kobashi was "dependent on morphine to be able to function," and recommended a cervical CT scan. See report from Dr. Aflatoon dated 8/14/13, attached as Ex. 19.

The very next day, August 15, 2013, Ms. Kobashi reported to Dr. Grabow that her current pain medication regimen was not providing adequate pain control. She rated her pain level a 4 of 10 with medications. Dr. Grabow advised Ms. Kobashi to continue morphine, *15 mg twice per day*; Percocet 10/325, as needed; and venlafaxine. She was also placed on a trial of a gabapentin / lidocaine compound rub for localized pain. See report from Dr. Grabow dated 8/15/13, attached as Ex. 20.

Ms. Kobashi had another visit with Dr. Aflatoon on November 20, 2013, at which time she was continuing "to have pain and stiffness in the neck" which "has been limiting her from normal activities." Again, it was noted that Ms. Kobashi was "dependent on morphine intake to be able to function…" See report from Dr. Aflatoon dated 11/20/13, attached as Ex. 21.

During a February 12, 2014 visit with Dr. Aflatoon, Ms. Kobashi admitted that "she was taking less pain medication prior to her accident [4/5/12 accident] and is now taking higher dosage more frequently." See report from Dr. Aflatoon dated 2/12/14, attached as Ex. 22.

She returned to pain management physician Dr. Grabow on February 27, 2014. She reported "slight increase in neck and shoulder stiffness over the last month." Her pain level was reported a 4 of 10, with the use of medications. At that time, she was taking 30 mg of morphine, once per day; she was also taking Percocet 10/325 mg, twice per day; and venlaflexine [anti-

depressant], 150 mg daily.  See report from Dr. Grabow dated 2/27/14, attached as Ex. 23.

At an acupuncture session on March 4, 2014, about eight months before the subject accident, she received acupuncture treatment for neck and shoulder pain.  She indicated that neck and shoulder movement caused pain, *and her pain level at that time was a 9 of 10.*  See report from CJ Acupuncture dated 3/4/14, attached as Ex. 24.

On April 13, 2014, Ms. Kobashi reported to the acupuncturist that she experienced "frequent" neck and shoulder pain at a level 6 of 10.  See report from CJ Acupuncture dated 4/13/14, attached as Ex. 25.

Ms. Kobashi reported "no dramatic change in symptoms" to Dr. Grabow on May 1, 2014.  She remained symptomatic with pain in her neck and shoulder.  At that time, she was taking the same medications that she was taking in February '14.  See report from Dr. Grabow dated 5/1/14, attached as Ex. 26.

She reported no change in her symptoms to Dr. Grabow on July 16, 2014.  She told Dr. Grabow that she was looking for a different pain management doctor, because Dr. Grabow was outside of her insurance network.  The level of pain in her neck was reported to be a 4 of 10, with the use of medications, which were the same that she was taking as of May 1st.  She was to continue taking those same medications [30 mg of morphine, once per day; Percocet 10/325 mg, twice per day; and venlaflexine, 150 mg daily].  See report from Dr. Grabow dated 7/16/14, attached as Ex. 27.

It appears that Ms. Kobashi stopped seeing Dr. Grabow while she sought to identify a different pain management physician.  However, she did not stop receiving medical treatment for her chronic pain, as she had visits with Dr. Aish leading up to the subject accident.

During her visit with Dr. Aish on September 12, 2014, Ms. Kobashi was advised to continue taking 30 mg of morphine per day, and venlaflexine.  See report from Dr. Aish dated 9/12/14, attached as Ex. 28.

On November 6, 2014, one day before the subject accident, Ms. Kobashi had a pain medication follow-up visit with Dr. Aish.  At that time, it was noted that she was taking morphine, 30 mg per day; aromasin [breast cancer]; and venlaflaxine.  The assessment was neck

Selman Breitman LLP
ATTORNEYS AT LAW

10

1  pain and major depressive disorder, and the treatment plan was chronic pain management.  See

2  report from Dr. Aish dated 11/6/14, attached as Ex. 29.

3       It is believed that Ms. Kobashi's dosages of pain medication, including morphine, did not

4  change in the six months leading up to the subject accident.  In other words, her intake of pain

5  medication was not decreasing leading up to the subject accident.

6  **IV.**   **MS. KOBASHI'S MEDICAL COURSE FOLLOWING THE SUBJECT**

7          **ACCIDENT**

8       **A.**    **Past Medical Damages Attributable to the Subject Accident**

9       Ms. Kobashi sustained a strain/sprain of the paravertebral muscles in her neck as a result

10  of this low-impact accident.  As will be explained in detail below, the evidence shows that Ms.

11  Kobashi returned to pre-accident baseline within six months, more or less, of the accident.  Her

12  baseline level of neck pain, with medications, when she last saw Dr. Grabow on July 16, 2014

13  was a 4 of 10 [an objective pain level was not recorded by Dr. Aish the day before the accident].

14  Ms. Kobashi testified that in the year before the accident, she had a consistent level of pain

15  without morphine, which was a 4 of 10.  *With morphine*, it was about a 3 of 10.  Kobashi

16  transcript, p. 118, line 18 to 119, line 3, attached as Ex. 30.

17       On November 7, 2014, the date of the subject accident, Ms. Kobashi was transported by

18  ambulance to the emergency room at Hoag Hospital in Newport Beach, California. Ms. Kobashi

19  reported "moderate pain" of 5 of 10, while her "baseline for chronic pain is moderate."  See ED

20  Disposition Note from Hoag dated 11/7/14, attached as Ex. 31.  The emergency room report

21  indicates that she was taking morphine, Percocet and effector.  Ms. Kobashi was complaining of

22  pain in her neck and low back.  She was ambulatory, however. The prior cervical fusion was

23  noted. A CT scan of the cervical spine and x-ray of the lumbar spine were taken. *The diagnoses*

24  *were cervical and lumbosacral sprain/strain*.  See Emergency Physician Record MVA from

25  Hoag dated 11/7/14, attached as Ex. 32.

26       Significantly, the CT scan of the cervical spine taken on the date of the accident shows no

27  acute bony injury; solid fusion of C2 through T1; and *no prevertebral soft tissue swelling*.  See

28  CT scan report from Hoag Hospital dated 11/7/14, attached as Ex. 33.  The absence of tissue

Selman Breitman LLP
ATTORNEYS AT LAW

11

swelling and bony injury shows that the subject accident did not cause a change in the structure of Ms. Kobashi's spine.  The total amount paid for this visit to Hoag on the date of the accident is **$863.56.**  See billing from Hoag, attached as Ex. 34.

Ms. Kobashi was examined by Richard J. Claveria, M.D., board-certified orthopedic surgeon, on November 25, 2014.  Dr. Claveria noted that the accident "much aggravated her baseline cervical condition where she has baseline neck pain."  The prior neck surgeries were noted, along with the history with Dr. Grabow.  Dr. Claveria reviewed the cervical CT scan from the date of the accident *which showed no acute changes.  Dr. Claveria's diagnosis was cervical strain.*  See report from Dr. Claveria dated 11/25/14, attached as Ex. 35.

Ms. Kobashi had one post-accident acupuncture session at West Star Physical Therapy on December 15, 2014.  The total charges for this one visit are $436, which appear to be excessive. See billing from West Star, attached as Ex. 36.  The reasonable cost of one acupuncture session is in the neighborhood of **$150**, per Dr. Alexander.

Dr. Claveria re-examined Ms. Kobashi on December 16, 2014.  She reported pain at the junction of her left trapezius, shoulder and side of neck, but physical therapy was making "a small early difference."  There was minimal restriction within the limits of her fusion.  Cervical compression was painless.  Dr. Claveria recommended basic physical therapy, ice and heat, and continued pain management.  50 mg of Norco was prescribed. See report from Dr. Claveria dated 12/16/14, attached as Ex. 37.

On January 6, 2015, Ms. Kobashi visited a different orthopedic surgeon, Robert C. Ahearn, M.D. of Pacifica Orthopedics.  She was complaining of neck pain and stiffness, left greater than right, and radicular symptoms into the left arm, including numbness and tingling to the small and ring fingers.  Ms. Kobashi reported that the neck complaints were 90% of the problem, while the radicular symptoms were 10%.  She noted that the physical therapy program she started was "beneficial."  At that time, she was taking morphine, 30 mg daily, Percocet, and venlafaxine, *the exact medications and dosages she was taking before the accident.*

The physical examination by Dr. Ahearn was largely normal, given the extensive pre-accident cervical fusion.  Range of motion in the neck was limited, as expected.  Importantly, the

Selman Breitman LLP
ATTORNEYS AT LAW

12

133890.1  138.42072

1   Spurling's Test was negative; this test is designed to assess cervical radicular symptoms.

2   Likewise, the Lhermitte's Sign was negative.  Dr. Ahearn's diagnosis was cervical sprain / strain,

3   and "mild" left arm radiculopathy.  He administered a paracervical trigger point injection, and

4   "Ms. Kobashi noted significant relief of symptomology following the injection."  She was

5   advised to continue physical therapy, and a home exercise program.  She was to continue to try

6   to wean off morphine, and he prescribed meloxicam, a nonsteroidal anti-inflammatory, typically

7   used to treat arthritis.  See report from Dr. Ahearn dated 1/6/15, attached as Ex. 38.

8   Ms. Kobashi's first post-accident visit to Dr. Aish was on January 12, 2015.  Her neck

9   pain was described as "mild."  Dr. Aish's assessment was degenerative disc disease.  Ms.

10   Kobashi was taking the same medications, at the same dosages, that she was taking before the

11   accident:  venlafaxine; morphine, 30 mg, daily; and aromasin.  See progress notes from Dr. Aish

12   dated 1/12/15, attached as Ex. 39.  The total amount paid for this visit with Dr. Aish is **$20.23**.

13   See billing from Dr. Aish, attached as Ex. 40.

14   The next day, Dr. Claveria noted that Ms. Kobashi was generally feeling better with

15   physical therapy.  She exhibited intact strength from C5 to T1, and seemed to be "in better

16   spirits."  Dr. Claveria's assessment was "improved acute cervical strain."  See report from Dr.

17   Claveria dated 1/13/15, attached as Ex. 41.

18   Ms. Kobashi returned for a second and final examination by Dr. Ahearn on January 27,

19   2015, and reported improvement since the initial visit.  She noted benefit from the trigger point

20   injection, physical therapy, and home exercises.  An increased ability to look to the left was

21   noted.  On physical examination, Dr. Ahearn noted less guarding of the neck and upper back.

22   There were no abnormal nerve tension signs.  There was "continued, but much diminished

23   tenderness in the left paracervical tissues."  Range of motion was improved.  See report from Dr.

24   Ahearn dated 1/27/15, attached as Ex. 42.  The total amount paid for Dr. Ahearn's treatment is

25   **$400**.  See billing from Dr. Ahearn, attached as Ex. 43.

26   Ms. Kobashi began seeing a new pain management specialist, Marc B. Cheng, M.D. of

27   Elite Pain Managment, on January 29, 2015.  At that time, she was complaining of cervical pain

28   radiating to her left arm.  She admitted that she had "been experiencing this pain for 5 years."

Selman Breitman LLP
ATTORNEYS AT LAW

13

Her average pain level was 7 of 10 at this time.  Prior medications included cymbalta, Flexeril, ibuprofen, lyrica, morphine, Neurontin (gabapentin), Norco, and Tylenol. She had also tried Oxycodone. Her *current* medications were listed as morphine, venlafaxine, and meloxicam. Further, *a history of arthritis was noted.*  Ms. Kobashi was to continue 30 mg of morphine, daily. See report from Dr. Cheng dated 1/29/15, attached as Ex. 44.  Ms. Kobashi continued seeing Dr. Cheng through October 1, 2015.  The total amount paid for Dr. Cheng's treatment through July 31, 2015 is **$656.75**.  See billing from Dr. Cheng (Elite Pain), attached as Ex. 45.

On February 24, 2015, Dr. Claveria noted that the physical therapy made her "increased pain settle down and [Ms. Kobashi] is pleased with that."  On physical examination, her gait was normal, and she had "some residual cervical tenderness.  See report from Dr. Claveria dated 2/24/15, attached as Ex. 46.

As of April 13, 2015, Ms. Kobashi was taking morphine (30 mg daily) and venlaflexine (150 mg daily), *the same medications, at the same dosages, that she was taking prior to the subject accident.*  She was also on meloxicam, which had been prescribed by Dr. Ahearn. During this visit, Ms. Kobashi told Dr. Claveria that her pre-accident baseline of pain in her neck was a 4 of 10, which is consistent with the pre-accident medical records and her own deposition testimony.  She also told Dr. Claveria that her pain had gone up to a 6 after the accident, and was back to "4 to 5, closer to 5."  The diagnosis was again improved cervical strain.  She was to continue with pain management, and was discharged from Dr. Claveria's treatment.  See report from Dr. Claveria dated 4/13/15, attached as Ex. 47.

The total amount charged and outstanding for Dr. Claveria's treatment is **$3,289.**

Between December 2014 and July 2015, concurrently with Ms. Kobashi's visits with Drs. Claveria and Aheran, she completed 34 physical therapy sessions at Huntington Beach Physical Therapy Specialists.

On April 2, 2015, Ms. Kobashi reported to the therapist at H.B. Physical Therapy that she had "*minimal pain* and reduced tightness to cervical spine, upper traps and rhomboids."  The assessment was that Ms. Kobashi was responding well to treatments and developing strength. Her rehab potential was described as "good."  See Daily Note from H.B. Physical Therapy dated

14

4/2/15, attached as Ex. 48.

Ms. Kobashi was "feeling pretty good overall,..." as of her physical therapy visit on April 16, 2015. See Daily Note from H.B. Physical Therapy dated 4/16/15, attached as Ex. 49. This corresponds to Dr. Claveria's observation on 4/13/15 that Ms. Kobashi was essentially back to the pre-accident baseline condition of her neck.

Therefore, as of mid-April 2015, about five months after the accident, Ms. Kobashi was essentially back to her baseline level of pain, a 4 or 5 of 10, and the cervical strain related to this subject accident was objectively improved, if not resolved altogether.

During a physical therapy session on June 9, 2015, Ms. Kobashi reported "an *improvement in her overall symptoms up until a month ago*." At that time, she started having increased symptoms in her upper traps and her cervical spine. Her pain management physician gave her gabapentin for nerve pain. A gradual return of her left upper extremity symptoms was noted. Ms. Kobashi was advised to return to her spine surgeon. See Daily Note from H.B. Physical Therapy dated 6/9/15, attached as Ex. 50.

Ms. Kobashi's last physical therapy visit at H.B. Physical Therapy was on July 21, 2015. She stated that increased gabapentin had helped resolve the tingling in her left hand. See Daily Note from H.B. Physical Therapy dated 7/21/15, attached as Ex. 51.

The total amount paid for this treatment at H.B. Physical Therapy is **$8,376.** See billing from H.B. Physical Therapy, attached as Ex. 52.

Ms. Kobashi is entitled to recover the reasonable amount of reasonably necessary medical care *that is related to the subject accident*. She is not entitled to recover for medical treatment beyond approximately July 2015, after she completed her physical therapy program at H.B. Physical Therapy when she had returned to her pre-accident baseline condition. As more fully explained below, any treatment after approximately July 2015 is related to her well-documented, pre-accident cervical spine pathology.

Therefore, the total amount attributable to past medical treatment related to the subject accident is **$13,755.54.** Respondent Sentry agrees that this is a reasonable amount for past medical expenses.

Selman Breitman LLP
ATTORNEYS AT LAW

15

133890.1 138.42072

Selman Breitman LLP
ATTORNEYS AT LAW

## B.   ALL FURTHER TREATMENT IS RELATED TO PROGRESSION OF PRE-EXISTING CERVICAL SPINE DISEASE

### (1)   Anticipated Testimony of Gerald Alexander, M.D.

Dr. Alexander is a board-certified orthopedic surgeon with an active cervical spine surgical practices.  He was retained to review pre- and post-accident medical and billing records and films pertaining to Ms. Kobashi, and to perform an independent medical examination ("IME") on behalf of Sentry.  Dr. Alexander will testify in-person at the arbitration.  A brief summary of his anticipated testimony is provided.

Ms. Kobashi was examined by Dr. Alexander on September 27, 2017.  She told Dr. Alexander that despite implantation of a spinal cord stimulator, she continued to have neck pain and headaches.  She also complained of "pain into the bilateral shoulders and rarely into the left arm area … [and] tingling into the left ring finger."  Ms. Kobashi's current medications were reported to be Effexor [venlafaxine]; Percocet, twice per day; morphine, 15 mg three times per day; and over-the-counter lidocaine.  It should be noted that the dosages of Percocet and morphine that Ms. Kobashi reported to Dr. Alexander do not correspond to the documented medical records, as explained below.  The dosages she reported, in fact, are higher than what is reported in the records.

After Dr. Alexander's review of extensive pre- and post-accident medical and billing records and films, and his examination of Ms. Kobashi, Dr. Alexander, in his IME report, states as follows:

> "[Ms. Kobashi]'s "initial workup and treatment after the 11/7/14 motor vehicle was reasonable and appropriate secondary to the injury.  This included the diagnostic studies including x-rays and a CT, as well as medication, physical therapy and physician visits.  In my opinion, however, [Ms. Kobashi] returned to her baseline of symptoms within 3-6 months after this injury, and I believe further care beyond that six month mark would have been secondary to progression of preexisting disease and not the 11/7/14 accident.
>
> She had a known chronic pain history requiring pain management with multilevel prior anterior and posterior cervicothoracic decompression and fusion, and while she likely had a strain / sprain injury of the cervicothoracic spine as a result of the motor vehicle accident, I do not believe there was any change long term in her condition.  I would therefore deem the placement of the spinal cord stimulator as secondary to progression of chronic disease and unrelated to the 11/7/14 injury.

16

Future medical care, while appropriate for her chronic condition, is unrelated to that motor vehicle accident." See Dr. Alexander's IME report dated 9/27/17, p. 11, attached as Ex. 53.

Dr. Alexander was also deposed in this matter. Based on his deposition testimony, in addition to the opinions expressed in his 9/27/17 IME report, as set forth above, it is anticipated that Dr. Alexander will offer the following opinions: 1). Ms. Kobashi was suffering radicular symptoms all the way up until the time of the accident; 2). The items stated in the Life Care Plan ("LCP") prepared by Ms. Kobashi's retained expert, Liz Holakiewicz, R.N., would have been necessary to the same degree even without the 11/7/14 accident. In other words, Ms. Kobashi's overall life requirements did not change as a result of the accident; 3). Inasmuch as the spinal cord stimulator has reduced Ms. Kobashi's symptoms, that would also proportionately reduce the need for other future medical care, including the items called for in the LCP; and 4). Both Ms. Kobashi's overall life expectancy and work-life expectancy were reduced by about 5 to 10 years due to extensive pre-extensive chronic neck conditions, and co-morbidities such as prior breast cancer, hypertension, etc. The subject accident did not have an impact on Ms. Kobashi's overall life expectancy and work-life expectancy, one way or another.

Dr. Alexander will provide further details and clarification at the arbitration, as needed.

### (2)   Treatment from Approximately July 2015 Forward is Unrelated to Subject Accident

On August 26, 2015, Ms. Kobashi received a cervical epidural injection at Hoag Hospital. See procedure note from Hoag dated 8/26/15, attached as Ex. 54. Based on the medical evidence, and per Dr. Alexander, this epidural injection is related to pre-existing cervical spine pathology.

Ms. Kobashi went back to see Dr. Aish on August 28, 2015, more than seven months after her last visit to him. The purpose of this August visit was a blood pressure check. Her medication regimen was the same as it was back in January 2015. It appears that there was no treatment for any neck issues on this date. See progress notes from Dr. Aish dated 8/28/15, attached as Ex. 55.

Selman Breitman LLP
ATTORNEYS AT LAW

17

133890.1 138.42072

1    Ms. Kobashi continued to follow-up with Dr. Aish through November 2015 for non-
2    orthopedic issues such as hypertension, high blood pressure, and chest pain.  On November 11,
3    2015, she had a follow-up visit for hypertension and neck pain.  She appeared to be stable, with
4    her medications remaining the same as before.  See progress notes from Dr. Aish dated 11/11/15,
5    attached as Ex. 56.

6    A repeat cervical CT scan was performed on November 20, 2015.  See CT scan report
7    dated 11/20/16, attached as Exhibit 57.

8    Sometime in late 2015, Ms. Kobashi moved to Arizona.  Between November 2015 and
9    February 2016, Ms. Kobashi completed 20 physical therapy sessions at Exclusively Spine
10   Physical Therapy in Arizona.  On January 8, 2016, Ms. Kobashi reported "continuing to feel
11   better after flare up, but still not great."  It was noted that she was continuing "to make slow but
12   steady progress with therapy."   See Daily Note from Exclusively Spine P.T. dated 1/8/16,
13   attached as Ex. 58.

14   On February 23, 2016, Ms. Kobashi established pain management care at Arizona Pain.
15   She was complaining of radiating symptoms to the third and fourth fingers of her left hand,
16   weakness in the left arm, and limited range of motion in her neck.  Spinal cord stimulation was
17   discussed.  At this time, Ms. Kobashi was taking 30 mg morphine daily, and Percocet.  The level
18   of pain in her neck was a 6 of 10.  See report from Arizona Pain dated 2/23/16, attached as Ex.
19   59.

20   On February 25, 2016, Dr. Dobkin reviewed the repeat CT scan, noting "*progressive*
21   *degeneration of the level below her fusion*.  This could be consistent with her symptoms as it is
22   causing foraminal stenosis." He mentioned possible transforaminal nerve block and epidural
23   injections at C7-T1.  See report from Dr. Dobkin dated 2/25/16, attached as Exhibit 60.

24   As of her last visit to Exclusively Spine on February 26, 2016, Ms. Kobashi noted slight
25   improvement of her symptoms since starting physical therapy, but noted continuing significant
26   pain in her neck.  See Daily Note from Exclusively Spine P.T. dated 2/26/16, attached as Ex. 61.

27   On March 24, 2016, Ms. Kobashi had a follow-up visit at Arizona Pain.  She described
28   neck pain radiating into her left shoulder, at a level 6 of 10.  See Follow-up Visit Intake

18

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

Selman Breitman LLP
ATTORNEYS AT LAW

Paperwork dated 3/24/16, attached as Exhibit 62.

On or about May 11, 2016, Dr. Aish examined Ms. Kobashi, who was complaining of constant, mild pain in her neck.  It was noted that "[t]he problem has improved."  See progress notes from Dr. Aish dated 5/11/16, attached as Ex. 63.  That same date, Dr. Aish completed a disability claim form, citing subjective symptoms / complaints of bilateral upper extremity radiculopathy and weakness.   He noted cervical spinal stenosis. See Physician Statement completed by Dr. Aish, dated 5/11/16, attached as Ex. 64.  Dr. Dobkin previously observed that this stenosis resulted from "progressive degeneration."

On June 6, 2016, Ms. Kobashi completed a "Medical History" form for orthopedist John Ehteshami, M.D. of Cervical Spine Centers in Arizona, in which she was asked, among other things, to list her current medications.  She noted morphine, 30 mg per day.  **This was the same dosage of morphine that she was taking before the accident.**

Ms. Kobashi also noted Percocet, 10-325, as needed.  **This was the same dosage of Percocet that she was taking before the accident.**

She was also taking Effexor [venlafaxine], 150 mg, once per day.  **This was the same dosage of venlafaxine that she was taking before the accident.**

In addition, Ms. Kobashi was taking Flexiril [cyclobenzaprine], a muscle relaxant; Senna, an over-the-counter laxative; Super Melatonin, an over-the-counter supplement; Evening Primrose oil, an over-the-counter herbal remedy; and Black Cohosh, another over-the-counter herbal remedy.  Finally, Ms. Kobashi stated a pain level of 9 of 10.  See Medical History form dated 6/6/16, attached as Ex. 65.

The next day, June 7, 2016, Dr. Ehteshami examined Ms. Kobashi.  He had reviewed cervical imaging, and noted that Ms. Kobashi is "very much prone to arthritic changes…"  He recommended additional physical therapy.  See Dr. Ehteshami's report dated 6/7/16, attached as Ex. 66.

Ms. Kobashi underwent a temporary spinal cord stimulator implantation at Mountain View Surgery Center in Glendale, Arizona on July 15, 2016. See Operative Note from MVSC dated 7/15/16, attached as Ex. 67. Subsequently, Ms. Kobashi reported 50% relief of neck pain,

19

Selman Breitman LLP
ATTORNEYS AT LAW

and "significant improvement of quality of life and ADLs [activities of daily living]."  She reported needing to take less medication during this procedure, and expressed that she was "very happy with the results."  See Visit Note from Arizona Pain dated 7/19/16, attached as Ex. 68.

It appears that Ms. Kobashi established care with primary care physicians at Arizona Family Care on July 28, 2016.  Her chief complaint was hypertension.  She also reported "multiple arthralgias, stating she has arthritis in multiple joints including bilateral knees.  She is on morphine for chronic cervical pain *but feels that this is not covering her arthritis pain*."  Ms. Kobashi was on the exact same medications and dosages that she was on when she saw Dr. Ehteshami in June 2016.  She was advised to continue on the same medication regimen.  See Progress Notes from Arizona Family Care dated 7/28/16, attached as Ex. 69.

As of September 1, 2016, Ms. Kobashi's hypertension was under control.  She reported to the treating physician that her "long term disability was denied so she is trying to get a functional capacity hearing *due to complete cervical fusion.*"  Her medications remained unchanged.  See Progress Notes from Arizona Family Care dated 9/1/16, attached as Ex. 70.

On October 10, 2016, Ms. Kobashi had a neurological consultation with Randall W. Porter, M.D., at Barrow Brain and Spine.  The purpose of the consultation was to discuss possible implantation of the permanent stimulator.  Ms. Kobashi reported a "9 year history of cervicalgia."  After the temporary stimulator, she "experienced a 40%-50% pain relief."  The stimulator reduced her pain from a 7-8 of 10 to 4-5 of 10.  She reported taking morphine, 30 mg, Percocet, and baclofen (muscle relaxer).  Dr. Porter recommended proceeding with the permanent stimulator. See report from Barrow dated 10/10/16, attached as Ex. 71.  At the risk of beating a dead horse, Ms. Kobashi was taking the same dosages of morphine and Percocet immediately before the accident.

However, at her deposition, Ms. Kobashi denied that the temporary stimulator actually provided relief.  She testified that she noted no improvement during the temporary stimulator, but also stated that she told the physicians that she had 40% relief, and ultimately, she could not remember whether the stimulator provided an improvement in her level of pain. Essentially, she admitted to telling her doctors what they wanted to hear, so that she could proceed with the

Selman Breitman LLP
ATTORNEYS AT LAW

20

permanent stimulator.  Kobashi transcript, p. 161, line 13 to p. 164, line 14, attached as Ex. 72.

In any event, the permanent spinal cord stimulator was implanted on October 31, 2016.  See Operative Note from St. Joseph's Outpatient Surgery Center dated 10/31/16, attached as Ex. 73.

On December 9, 2016, Ms. Kobashi reported to Arizona Pain that she had "significant relief" following implantation of the permanent stimulator, and was ready to decrease her pain medications.  See report from Arizona Pain dated 12/9/16, attached as Ex. 74.

Ms. Kobashi returned to Barrow Brain and Spine on December 14, 2016.  She rated her postoperative pain as 4-6 of 10, with the pain being "more controlled at this visit."  Ms. Kobashi was pleased with her status and recovery, including decrease in dosage of morphine from 30 mg to 15 mg, daily.  See report from Barrow dated 12/14/16, attached as Ex. 75.

Ms. Kobashi testified that the permanent stimulator reduced her pain level, that on her first follow-up visit following the implantation of the permanent stimulator, she was "happy with the results," and she reported "maybe 50, 60 percent improvement."  Further, the permanent stimulator helped ease the pain of her daily activities, and helped with her sleeping.  Kobashi transcript, p. 165, line 19 to p. 166, line 8, attached as Ex. 76.

Ms. Kobashi's responses to form interrogatories, dated February 3, 2017, state that as of that date she was taking "Morphine 30 mg, Percocet 10-325, Baclofen [muscle relaxer], Amlodapine [high blood pressure], and Losartan [high blood pressure]."  Again, no change in dosages of morphine or Percocet from before the accident.

However, while she admitted that she took morphine before the accident, she denied taking Percocet before the accident  See Responses to Form Interrogatories, Set One, dated 2/3/17, response to no. 6.5, attached as Ex. 77.  The statement that she did not take Percocet prior to the accident is demonstrably incorrect, as she was taking Percocet 10/325 mg, twice per day under the treatment of Dr. Grabow prior to the accident.  Ms. Kobashi also confirmed in her deposition that she took Percocet in the year before the accident, *and in fact was taking Percocet at the time of the accident.*  Kobashi transcript, p. 51, line 25 p. 52, line 2, and p. 54, line 23 to p. 55, line 2, attached collectively as Ex. 78.

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

Selman Breitman LLP
ATTORNEYS AT LAW

As of February 8, 2017, Ms. Kobashi continued to experience "significant relief" from the stimulator.  Her goal was to be off medications as soon as possible.  At that time, her medications were 30 mg morphine per day, and 10 mg Percocet once per day. See report from Arizona Pain dated 2/8/17, attached as Ex. 79.

At different time periods, however, Ms. Kobashi has indicated differing things about the level of relief provided by the permanent stimulator, as more fully explained below.

Following implantation of the permanent stimulator, Ms. Kobashi had infrequent visits at Arizona Family Care in 2017 and 2018.  These visits were largely unrelated to any neck problems.

On June 7, 2017, Ms. Kobashi reported to Arizona Family Care that she was taking venlafaxine, Percocet 10-325 once per day, and morphine 30 mg once per day, among other over-the-counter supplements and blood pressure medications, etc.  See Progress Notes from Arizona Family Care dated 6/7/18, attached as Ex. 80.

On August 3, 2018, the last documented visit to Arizona Family Care, the only issue addressed was Ms. Kobashi's hypertension.  Her blood pressure at that time was normal.  Her medications were the same as before.  Overall, Ms. Kobashi's physical condition appeared to be stable.  See Progress Notes from Arizona Family Care dated 8/3/18, attached as Ex. 81.

## V.    MS. KOBASHI'S RETAINED MEDICAL EXPERTS

### A.    Standiford Helm, M.D. (pain management)

Ms. Kobashi's attorneys retained Standiford Helm, M.D. as a pain management expert to review records and examine Ms. Kobashi for purposes of this litigation.  Dr. Helm is not a spine surgeon.  See Dr. Helm testimony, 10/24/18, p. 10, lines 1 to 6, attached as Ex. 82.

He was deposed on October 24, 2018 and again on January 29, 2019, after re-examining Ms. Kobashi. Crucially, Dr. Helm has never reviewed any pre-accident medical records (Dr. Helm testimony, 10/24/18, p. 30, line 17 to p. 31, line 9; and 1/29/19, p. 13, lines 1 to 6 attached collectively as Ex. 83), nor did he review any films whatsoever, either pre- or post-accident.  Dr. Helm testimony, 10/24/18, p. 12, line 22 to p. 13, line 11; and 1/29/19, p. 6, lines 8 to 11, attached collectively as Ex. 84.

133890.1  138.42072

1       Despite Dr. Helm's failure to review pre-accident medical records, or any films at all, he

2   opines that 50% of Ms. Kobashi's current complaints are related to the subject accident, and 50%

3   are related to pre-existing neck problems and surgery. Likewise, he apportions 50% of the past

4   medical treatment to the accident, and 50% to pre-existing issues.   Dr. Helm testimony,

5   10/24/18, p. 82, lines 7 to 10, attached as Ex. 85.

6       Dr. Helm bases this apportionment on his belief that: 1).  Ms. Kobashi's opioid use

7   "doubled" since the accident, and 2).  Her subjective pain level increased.  Dr. Helm testimony,

8   10/28/18, p. 76, lines 10 to 25, attached as Ex. 86.  Dr. Helm admits that if, in fact, her opioid

9   medication did not double following the accident, this "might" change his apportionment.  *Id.*

10      As set forth above, the objective medical records demonstrate that Ms. Kobashi's opioid

11  medication did not, in fact, double after the accident.  Her medications essentially remained

12  unchanged, according to the records.  As seen, Ms. Kobashi *reported* increased dosages of

13  morphine to both Drs. Alexander and Helm, but an increased dosage is not corroborated by the

14  records themselves.

15      Further, Dr. Helm has not seen pre-accident medical records, so he has no basis to say

16  that the opioid medication has doubled.  It is also known that Ms. Kobashi's reported subjective

17  pain level increased for a few months following the accident, but she returned to a baseline of 4

18  to 5 in April 2015.

19      It is significant that at least part of Dr. Helm's understanding of Ms. Kobashi's pre- and

20  post-accident condition derives from a prejudicial email dated 6/14/17 from Ms. Kobashi's

21  attorney, William D. Burger, Esq., who set forth his interpretation of Ms. Kobashi's condition.

22  Mr. Burger states:  "[Ms. Kobashi] also had had two cervical spinal fusion procedures performed

23  on her in 2010 and 2012. Despite those procedures and the need for daily morphine, *Ms. Kobashi*

24  *was largely without pain between 2012 and the date of her accident*." (Emphasis added.) This

25  statement, made by counsel before his retained expert had reviewed any materials or examined

26  Ms. Kobashi, is demonstrably incorrect.  Ms. Kobashi was not "largely without pain" until the

27  date of the accident, as seen from her treatment records up until the day before the accident.  Mr.

28  Burger also told Dr. Helm that "[s]ince the time of the accident, Ms. Kobashi's health has

133890.1 138.42072

deteriorated dramatically."   See email dated 6/14/17 email from Mr. Burger to Dr. Helm, attached as Ex. 87.

This email from Mr. Burger shows that Dr. Helm's opinions and conclusions were not arrived at independently.  Mr. Burger communicated his "spin" regarding Ms. Kobashi's medical history, and essentially told Dr. Helm what the results of his analysis should be.

Dr. Helm's 50% apportionment is not supported by the objective evidence, and was arrived at through undue influence by the attorney who paid him.  This should be contrasted with the analysis performed by Dr. Alexander, who testified at deposition as follows:

> "I don't believe I was given a specific assignment. I believe it's assumed when I do both defense and plaintiff examinations. I understand that I'm to take a history, perform a physical examination, review records, review diagnostic imaging, come to conclusions and make  recommendations, typically, about the appropriateness of prior treatment, as well as the need for future medical care and usually also the appropriateness of cost of that care."  See deposition testimony of Dr. Alexander, 2/7/19, p. 56 line 20 to p. 57, line 3, attached as Ex. 88.

Other salient points regarding Dr. Helm's analysis, as expressed in both sessions of his deposition, are as follows:

- Dr. Helm first examined Ms. Kobashi on August 24, 2017 – see Dr. Helm testimony, 10/24/18, p. 7, lines 7 to 15, attached as Ex. 89;

- Dr. Alexander has a "very fine reputation" within the southern California medical community – see Dr. Helm testimony, 10/24/18, p. 13, lines 19 to 23, attached as Ex. 90;

- Dr. Helm did not have any contact with Ms. Kobashi from 8/24/17 up until the date of his first deposition on 10/24/18, and had no knowledge of any treatment received between 8/24/17 to 10/24/18, as he had not reviewed any records that post-dated his examination of 8/24/17 – see Dr. Helm testimony, 10/24/18, p. 17, lines 20 to 23 and p. 18, lines 4 to 11, attached collectively as Ex. 91;

- The degenerative changes seen on the cervical CT scan at Hoag immediately following the accident are not related to the subject accident, and other imaging studies support that same finding – see Dr. Helm testimony, 10/24/18, p. 23, line 12 to p. 24, line 14, attached as Ex. 92;

- Dr. Helm believes that a left medial branch injection at C2-5 administered on 1/18/18 and a facet injection at C2-5 on 2/10/18 are not reasonable, as a fused

Selman Breitman LLP
ATTORNEYS AT LAW

24

joint should not be the source of pain – see Dr. Helm testimony, 10/24/18, p. 27, lines 8 to 25, attached as Ex. 93;

- Dr. Helm does not believe that any left shoulder complaints are related to the subject accident – see Dr. Helm testimony, 10/24/18, p. 28, lines 1 to 25, attached as Ex. 94;

- As of 10/24/18, Dr. Helm had not reviewed any Life Care Plan – see Dr. Helm testimony, 10/24/18, p. 36, lines 17 to 18, attached as Ex. 95;

- Dr. Helm does not believe that Ms. Kobashi needs future surgery or other "interventional procedure" – see Dr. Helm testimony, 10/24/18, p. 42, lines 3 to 10, attached as Ex. 96;

- **Dr. Helm opines that Ms. Kobashi "can continue to work an eight-hour day with accommodation of her restrictions" –** see Dr. Helm testimony, 10/24/18, p. 43, lines 6 to 15, attached as Ex. 97;

- Dr. Helm believes that Ms. Kobashi will need to stop working at age 60, rather than age 65 – see Dr. Helm testimony, 10/24/18, p. 44, lines 2 to 23, attached as Ex. 98;

- The need to stop working at age 60, rather than age 65, is attributed 50% to the accident, and 50% to pre-existing conditions, according to Dr. Helm – see Dr. Helm testimony, 10/24/18, p. 48, line 18 to p. 49, line 6, attached as Ex. 99;

- On 8/24/17, Ms. Kobashi reported to Dr. Helm that she has not getting relief from the spinal cord stimulator – see Dr. Helm testimony, 10/24/18, p. 51, line 23 to p. 52, line 8, attached as Ex. 100;

- It is Dr. Helm's understanding that prior to the accident, Ms. Kobashi required pain medication in order to work – see Dr. Helm testimony, 10/24/18, p. 78, line 25 to p. 79, line 5, attached as Ex. 101;

- Dr. Helm's physical examination of Ms. Kobashi on 8/24/17 had "similar exam findings" to Dr. Alexander, with different conclusions – see Dr. Helm testimony, 10/24/18, p. 79, line 7 to p. 80, line 6, attached as Ex. 102;

- Dr. Helm re-examined Ms. Kobashi on 1/8/19 in order to determine if there had been any changes in her condition since 8/24/17 – see Dr. Helm testimony, 1/29/19, p. 7, lines 1 to 6, attached as Ex. 103;

- As of 1/29/19, Dr. Helm had not talked to any other experts, including Life Care Planner Liz Holakiewicz – see Dr. Helm testimony, 1/29/19, p. 13, line 10 to p. 14, line 2, attached as Ex. 104;

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

133890.1 138.42072

Selman Breitman LLP
ATTORNEYS AT LAW

- Dr. Helm observed somewhat different findings on the second physical examination versus the first:  pain at the upper portion on the left side of the neck, which was not present at the initial examination; and muscle testing was weaker on the right side that it had been previously.  The range of motion in the neck, however, was the same – see Dr. Helm testimony, 1/29/19, p. 16, line 21 to p. 17, line 9, attached as Ex. 105;

- In essence, Ms. Kobashi's physical condition had not significantly worsened between 8/24/17 and 1/8/19 – see Dr. Helm testimony, 1/29/19, p. 17, lines 10 to 12, attached as Ex. 106;

- As of 1/8/19, Ms. Kobashi was experiencing 75% pain relief from the spinal cord stimulator, as an issue with the stimulator had been repaired sometime in November 2018 – see Dr. Helm testimony, 1/29/19, p. 23, lines 2 to 16, attached as Ex. 107;

- Other than the 75% pain relief, Dr. Helm found that there was no significant change from his prior examination of Ms. Kobashi – see Dr. Helm testimony, 1/29/19, p. 25, lines 1 to 16, attached as Ex. 108;

- Dr. Helm's apportionment as to causation of Ms. Kobashi's physical condition did not change following his reexamination of Ms. Kobashi – see Dr. Helm testimony, 1/29/19, p. 28, lines 5 to 13, attached as Ex. 109;

- Ms. Kobashi's subjective pain level of 8 of 10 at the time of the reexamination by Dr. Helm does not match the reporting of 75% of relief from the spinal cord stimulator, per Dr. Helm – see Dr. Helm testimony, 1/29/19, p. 32, line 10 to p. 33, line 4, attached as Ex. 110;

- As of 1/29/19, Dr. Helm still had not seen the Life Care Plan – see Dr. Helm testimony, 1/29/19, p. 34, line 24 to p. 35, line 1, attached as Ex. 111.

**B.    Michael Lobatz, M.D. (neurologist)**

Dr. Lobatz holds himself out to be an expert in neurology.  He is not a pain management expert, and is not board-certified in orthopedic surgery or spinal surgery. Dr. Lobatz testimony, 1/17/19, p. 79, lines 13 to 20, attached as Ex. 112.

Dr. Lobatz was initially retained in July 2018.  As with Dr. Helm, Mr. Burger sent an initial email to Dr. Lobatz's office clearly seeking to influence Dr. Lobatz's ultimate conclusions. In an email dated July 30, 2018, Mr. Burger states that "[t]he case involves a rear-end accident … at a moderate rate of speed (approximately $2,000 in property damage to Ms. Kobashi's car)." Mr. Burger references the pre-accident surgeries, but tells Dr. Lobatz that "her condition was

Selman Breitman LLP
ATTORNEYS AT LAW

26

1   seemingly improving at the time of the accident.  Her use of pain killers was decreasing rapidly

2   and her activity level was relatively high.  In the weeks and months after the accident, Ms.

3   Kobashi's condition deteriorated rapidly … Now, Ms. Kobashi's life is ravaged by the pain and

4   the pain killers she has to take just to get through the day.  The major topic that we would like

5   Dr. Lobatz's assistance with is causation, which is a significant issue in the case given the prior

6   fusions."  See email from Mr. Burger dated 7/30/19, attached as Ex. 113.

7          The statement that Ms. Kobashi's "use of pain killers was decreasing rapidly" is

8   contradicted by the medical records.  In addition, Mr. Burger neglected to inform Dr. Lobatz that

9   while Ms. Kobashi's pain level increased following the subject accident, her pain level

10  essentially returned to baseline about five months after the accident.  Mr. Burger rightly advised

11  Dr. Lobatz that causation is a significant issue, and clearly signaled which way he wanted Dr.

12  Lobatz to fall on the issue.  These initial, biased communications to Dr. Lobatz are designed to

13  influence Dr. Lobatz to shade his opinions in favor of Ms. Kobashi, subconsciously or otherwise,

14  and are not designed to elicit Dr. Lobatz's intellectually honest opinions.

15         Dr. Lobatz talked to Ms. Kobashi once, on September 24, 2018, for 25 minutes, but he

16  has never met with her in person, and, importantly, has never physically examined Ms. Kobashi.

17  Dr. Lobatz admits that an in-person meeting is better than a telephone discussion, and a physical

18  examination is even better than an in-person discussion.  Dr. Lobatz testimony, 1/17/19, p. 32,

19  line 21 to p. 34, line 13, attached as Ex. 114.

20         In his review of medical records pertaining to Ms. Kobashi, Dr. Lobatz noted the visit

21  with Dr. Dobkin on 2/25/16, discussed above, following a new round of CT scans, which showed

22  "progressive degeneration of the level below her fusion.  This could be consistent with her

23  symptoms as it is causing foraminal stenosis." Dr. Lobatz admits that the progressive

24  degeneration, which is causing the radicular symptoms into the left arm, *is not related to the*

25  *subject accident, but more likely related to the surgery that was performed.*  Further, Dr. Lobatz

26  cannot opine, one way or another, whether the accident worsened the degeneration. Dr. Lobatz

27  testimony, 1/17/19, p. 65, line 8 to p. 65, line 25, and p. 66, lines 23 to 25, attached as Ex. 115.

28         Dr. Lobatz apportions 20% of the need for pain management follow-up, including

Selman Breitman LLP
ATTORNEYS AT LAW

27

medication management, behavioral pain management program, and ergonomic evaluation of her

work station at home to the accident, and 80% to pre-existing conditions, though he, perhaps

conveniently, testified that he would defer to Dr. Helm with respect to apportionment.  Dr.

Lobatz testimony, 1/17/19, p. 64, line 10 to p. 65, line 3, attached as Ex. 116.

     Other significant deposition testimony offered by Dr. Lobatz includes the following:

- Dr. Lobatz will not be offering biomechanical or accident reconstruction opinions – Dr. Lobatz testimony, 1/17/19, p. 12, line 14 to p. 13, line 15, attached as Ex. 117;

- Dr. Lobatz's understanding is that Ms. Kobashi was "essentially pain free" prior to the 2012 accident; after the 2012 accident, her pain level was noted to be 3 to 4 of 10 – Dr. Lobatz testimony, 1/17/19, p. 25, lines 5 to 19, attached as Ex. 118;

- Dr. Lobatz acknowledges the visit by Ms. Kobashi to Dr. Grabow on 5/28/13, in which she reported increased pain with increased activity, difficulty with pain control, and expressed a desire for increased morphine.  She felt like she needed long-acting morphine – Dr. Lobatz testimony, 1/17/19, p. 17, lines 2 to 24, attached as Ex. 119;

- Ms. Kobashi reported a pain level of 4 of 10 to Dr. Grabow on July 16, 2014 – Dr. Lobatz testimony, 1/17/19, p. 26, lines 11 to 18, attached as Ex. 120;

- There is no indication in the medical records that Ms. Kobashi's pain medications, or the dosages of medications, changed in the six months prior to the subject accident – Dr. Lobatz testimony, 1/17/19, p. 28, line 5 to p. 29, line 7, attached as Ex. 121;

- **Ms. Kobashi told Dr. Lobatz that she is able to work full-time, but has to take breaks due to increased pain and fatigue when using a keyboard** – Dr. Lobatz testimony, 1/17/19, p. 31, line 16 to p. 32, line 10, attached as Ex. 122;

- Ms. Kobashi told Dr. Lobatz that she disputes statements in some of the medical records; in particular, she disputes post-accident records which indicated she was doing much better than she was when the subject accident first happened – Dr. Lobatz testimony, 1/17/19, p. 35, lines 10 to 21, and p. 36, line 23 to p. 37, line 6, attached collectively as Ex. 123;

- Nonetheless, Dr. Lobatz believes that medical records reliably document what occurs at a particular visit, the majority of medical records are reliable in that respect, and he cannot pick and choose which records he believes are reliable and which he believes are unreliable – Dr. Lobatz testimony, 1/17/19, p. 36, lines 9 to 15 and p. 38, lines 2 to 18, attached collectively as Ex. 124;

- On 9/14/18, Ms. Kobashi told Dr. Lobatz that the spinal cord stimulator had

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

Selman Breitman LLP
ATTORNEYS AT LAW

reduced her pain by about 30% – Dr. Lobatz testimony, 1/17/19, p. 39, lines 4 to 18, attached as Ex. 125;

- On 9/14/18, Ms. Kobashi told Dr. Lobatz that she was not depressed, and not taking any medications for depression – Dr. Lobatz testimony, 1/17/19, p. 42, line 14 to p. 43, line 4, attached as Ex. 126;

- **Dr. Lobatz believes that there has not been a "dramatic increase" in dosage of Percocet and morphine since the subject accident – Dr. Lobatz testimony, 1/17/19, p. 46, lines 16 to 24, attached as Ex. 127;**

- Ms. Kobashi has suffered from arthritis for many years, which is unrelated to the subject accident – Dr. Lobatz testimony, 1/17/19, p. 68, lines 7 to 17, attached as Ex. 128;

- Osteoarthritis typically worsens with age; it does not improve.  The osteoarthritis that was noted in Ms. Kobashi's cervical spine in 2011 contributes to her ongoing complaints of pain – Dr. Lobatz testimony, 1/17/19, p. 54, line 25 to p., 55, line 11, attached as Ex. 129;

- Dr. Lobatz has not seen any pre-accident films pertaining to Ms. Kobashi – Dr. Lobatz testimony, 1/17/19, p. 56, lines 12 to 14, attached as Ex. 130;

- The cervical CT scan from the date of the subject accident shows no obvious injury from the accident – Dr. Lobatz testimony, 1/17/19, p. 59, lines 4 to 14, attached as Ex. 131;

- The last medical record from a treating doctor reviewed by Dr. Lobatz is dated 12/14/16; he is not aware of any treatment in 2017 or 2018, other than what may be contained in Dr. Helm's notes – Dr. Lobatz testimony, 1/17/19, p. 68, line 18 to p. 69, line 8, attached as Ex. 132.

C.     **Elizabeth Holakiewicz, R.N. (life care planner)**

Ms. Holakiewicz, like Dr. Helm, did not review pre-accident medical records (Holakiewicz testimony, 2/5/19, p. 19, lines 7 to 23, attached as Ex. 133), and she does not apportion the need for any items in the LCP to pre-accident conditions versus the accident, as this is "outside [her] scope."  Holakiewicz testimony, 2/5/19, p. 19, lines 7 to 23, attached as Ex. 134.

On August 24, 2017, Ms. Kobashi told Ms. Holakiewicz that she was experiencing a pain level 9 of 10.  Holakiewicz testimony, 2/5/19, p. 14, line 17 to p. 15, line 8, attached as Ex. 135.

On August 13, 2018, Ms. Kobashi told Ms. Holakiewicz that she was getting about 40%

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

Selman Breitman LLP
ATTORNEYS AT LAW

relief from the stimulator.  Holakiewicz testimony, 2/5/19, p. 13, lines 10 to 23, attached as Ex. 136.

There are two versions of Ms. Holakiewicz's Life Care Plan ("LCP"):  one dated 9/26/18, and updated on 2/4/19.  Holakiewicz testimony, 2/5/19, p. 8, lines 3 to 13, attached as Ex. 137. The revisions to the LCP were relatively minor, including reduced costs of certain medication, and revised the frequency with which an ergonomic chair would be replaced.  Holakiewicz testimony, 2/5/19, p. 36, line 3 to p. 37, line 9, attached as Ex. 138.

Even with Ms. Kobashi reporting to Dr. Helm in January 2019 that she was getting 75% relief from the stimulator, Ms. Holakiewicz would not reduce the medication recommendations contained in her LCP.  Holakiewicz testimony, 2/5/19, p. 65, line 21 to p. 67, line 8, attached as Ex 139.

Finally, Ms. Holakiewicz does not have any opinions as to whether this accident caused Ms. Kobashi to have to retire early.  Holakiewicz testimony, 2/5/19, p. 7, lines 10 to 13, attached as Ex 140.

It is Sentry's position that, per the medical evidence as previously set forth, and Dr. Alexander's analysis, that all of the proposed treatment in the Holakiewicz's LCP was necessitated by pre-accident spinal pathology, including the degenerative stenosis noted by Dr. Dobkin, which even Dr. Lobatz admits is not related to the subject accident.  Further, per Dr. Alexander, the items outlined in the LCP would have been necessary to the same degree even without the subject accident.

## VI.    LOST EARNINGS CLAIM

### A.    Past Lost Earnings

Ms. Kobashi started as a Special Investigator for Sentry Insurance Company on June 9, 2014.  Her salary at Sentry was $6,134 per month ($73,608 per year).  Ms. Kobashi did not miss an extended period of time from work immediately following the accident, as she returned to work three days after the accident. See Responses to Form Interrogatories, Set One, dated 2/3/17, response to no.'s 8.2 through 8.5, attached as Ex. 77.

Ms. Kobashi missed three days of work immediately following the accident.  Thus, her

30

1    total lost earnings related to the accident are **$613.41** ($204.47 per day, times three days).

2          Otherwise, this accident did not negatively impact her job performance.  Vanessa Gillis,

3    who was Ms. Kobashi's immediate supervisor while she was employed at Sentry, is expected to

4    testify that before the accident, Ms. Gillis noted Ms. Kobashi struggling to keep up with work.

5          On the date of the subject accident, Ms. Kobashi called Ms. Gillis to report the accident.

6    The discussion was short.  In 2015, Ms. Gillis does not recall Ms. Kobashi complaining of any

7    neck or shoulder problems.  However, Ms. Kobashi frequently confided in her about her mother's

8    issues with Alzheimer's.  Ms. Kobashi indicated that her mom was getting worse, and she had a

9    lot of guilt about not being there to take care of her mom.  At one point, close to the time that she

10   went on temporary disability, Ms. Kobashi requested a transfer to Scottsdale, AZ, where her

11   mom was living.  However, the request was denied because there was no opening for

12   investigators in that area.  This denial of her transfer request seemed to upset Ms. Kobashi.  She

13   went on disability shortly thereafter.

14         In any event, overall in 2015, Ms. Kobashi's work performance actually *improved*,

15   compared to her performance before the accident.  This improvement is documented in Ms.

16   Kobashi's performance evaluations from 2014 and 2015, which have been produced to Ms.

17   Kobashi's attorneys.

18         **B.     No Future Lost Earnings or Loss of Future Earning Capacity Related to this**

19              **Accident**

20         Ms. Kobashi ultimately went on short-term disability on October 1, 2015, almost one

21   year after the subject accident, and ceased her employment with Sentry on August 22, 2016. See

22   Responses to Form Interrogatories, Set One, dated 2/3/17, response to no. 8.5, attached as Ex.

23   77.  Her employment with Sentry ceased when her long-term disability claim was denied due to

24   lack of medical documentation.  Kobashi transcript, p. 67, lines 2 to 16, attached as Ex. 141.

25         Given the progression of Ms. Kobashi's degenerative disease, as evidenced by the

26   available medical records and Dr. Alexander's analysis, it appears that the disability claim was

27   related to pre-accident conditions, and had nothing to do with this accident.  Likewise, her

28   leaving the employment at Sentry in August 2016 was unrelated to any injuries sustained in this

31

accident.

Fortunately, Ms. Kobashi was able to restart her career at Great American Insurance in a full-time Special Investigation position on February 20, 2017.  Her duties as a special investigator include investigating suspected fraudulent claims.

Ms. Kobashi works from home, but performs investigations in the field two to three times per month.  On occasion, Ms. Kobashi has traveled to Florida, Texas, California and Nevada for work.  There have been no occasions while working for Great American on which she has been unable to travel because of her physical condition.  Kobashi transcript, p. 48, lines 9 to 10; p. 35, lines 20 to 25; p. 38, line 22 to p. 39, line 19; p. 40, lines 12 to 17, attached as Ex. 142.  Her starting salary at Great American was $72,500.  See letter from Great American to Ms. Kobashi dated 1/31/17, attached as Ex. 143.

It is anticipated that Ms. Kobashi will testify that she struggles to perform her work duties, and thus her future earning capacity is impacted.  However, this is not supported by the evidence.  First of all, Ms. Kobashi's own vocational rehabilitation expert, Mark Remas, testified at deposition that he talked to Ms. Kobashi on February 7, 2019, for about 10 minutes, to obtain an update about her status.  Ms. Kobashi told Mr. Remas that she was still working, but continued to have pain.  Remas testimony, 2/14/19, p. 8, lines 8 to 20, attached as Ex. 144.

Nonetheless, Mr. Remas was told by Ms. Kobashi that she was performing her usual and customary work duties, *her most recent review was good, and she was meeting her job performance standards.*  Remas testimony, 2/14/19, p. 9, lines 15 to 24; and p. 11, line 9 to p. 12, line 21, attached collectively as Ex. 145.  Any breaks that Ms. Kobashi takes throughout the day are not affecting her job performance.  Remas testimony, 2/14/19, p. 16, lines 9 to 14, attached as Ex. 146.

It is does not appear that Ms. Kobashi's physical condition, which she contends is related to the accident, interferes with her ability to complete work tasks, when her most recent performance review at Great American was satisfactory.

Any claim that Ms. Kobashi will have to retire sooner than she planned to because of this accident is contradicted by the testimony of Dr. Helm and Ms. Kobashi herself.  Recall that Dr.

32

Helm testified that Dr. Helm believes that Ms. Kobashi will need to stop working at age 60, rather than age 65, even with accommodations.  See Dr. Helm testimony, 10/24/18, p. 44, lines 2 to 23, attached as Ex. 98.  Ms. Kobashi testified that assuming the subject accident had not happened, she would have retired at age 60.  Kobashi transcript, p. 178, line 19 to p. 179, line 5, attached as Ex. 147.  Mr. Remas, Ms. Kobashi's own vocational expert, admits that if Ms. Kobashi testified that she was planning on working until the age of 60, and Dr. Helm testified that she can work until age 60, and in fact Ms. Kobashi ultimately works until age 60, there are no lost future earnings even potentially attributable to the subject accident.  Remas testimony, 2/14/19, p. 76, line 22 to p. 77, line 10, attached as Ex. 148.

Finally, per Dr. Alexander, Ms. Kobashi's work expectancy is reduced by 5 to 10 years even absent this accident. Thus, even if Ms. Kobashi retires within the next couple of years, such early retirement cannot be correctly attributed to this accident.

## VII.   SENTRY'S RETAINED EXPERTS

### A.   Steve Molina, Ph.D. (vocational rehabilitation)

Dr. Molina has reviewed extensive pre- and post-accident medical records pertaining to Ms. Kobashi, her deposition testimony and written discovery responses, and deposition testimony and reports from the parties' respective medical experts, among other materials detailed in his extensive Rehabilitation Summary report dated February 6, 2019.  A copy of Dr. Molina's report is attached as Ex. 149.

Dr. Molina's conclusions begin on page 65 of his report.  Dr. Molina believes that Ms. Kobashi would benefit from a vocational rehabilitation program including vocational rehabilitation counseling services and Rehabilitative Assistive Technology, which is for ergonomic and workstation assessments.  The cost of this program is $4,000 (see p. 70 of Dr. Molina's report).  The subject accident did not cause or contribute to the need for the vocational rehabilitation program recommended by Dr. Molina, per Dr. Alexander.

### B.   Rhonda Renteria, R.N. (life care planner)

Ms. Renteria did not prepare a life care plan, per se.  Instead, she prepared a "comparison matrix" addressing Ms. Holakiewicz's LCP.  A copy of Ms. Renteria's comparison matrix is

Selman Breitman LLP
ATTORNEYS AT LAW

33

1   attached as Ex. 150.  It was Ms. Renteria's understanding that the Holakiewicz LCP identifies the

2   future care needs that Ms. Kobashi's experts identified to be necessary.  Ms. Renteria did not

3   eliminate any of the items in the LCP.  She merely indicated Dr. Alexander's responses to each

4   item in the LCP, and the cost of each item was also addressed.  Renteria testimony, 2/28/19, p.

5   14, line 11 to p. 15, line 1, attached as Ex. 151.

6          As stated in her comparison matrix, Ms. Renteria relies on Dr. Alexander's opinion that

7   the majority of the items in the LCP are "reasonable" but "not medically necessary related to the

8   subject incident."  Likewise, the costs set forth in the LCP are reasonable, but again, not related

9   to the accident.

10         However, some items, such as the Flector patch and lidocaine patch, are not indicated if

11   Ms. Kobashi has 75% relief from the spinal cord stimulator.

12   **VIII.   CONCLUSION**

13         No one will dispute that Ms. Kobashi is an amiable, likable woman, who likely truly

14   believes that most, if not all, of her ongoing physical complaints are related to the subject

15   accident. However, based on the enormous weight of the evidence, this is not the case.

16         Instead, Ms. Kobashi is entitled to recover **$13,755.54** for past medical damages, for

17   treatment through July 2015.  In addition, Ms. Kobashi only missed three days of work following

18   the accident, for a total amount of past lost earnings of **$613.41.**

19         Thus, Ms. Kobashi's past economic damages total **$14,368.95**.

20         While Ms. Kobashi, in reality, only missed three days of work, Dr. Alexander believes

21   that a reasonable time for Ms. Kobashi to have missed is two to three months.   For past

22   noneconomic damages attributable to the cervical sprain / strain during this initial, acute three-

23   month period, it is believed that $5,000 per month is reasonable, for total noneconomic damages

24   during this period of $15,000.

25         During the further five months through July 2015, when she completed her physical

26   therapy following the accident, it is believed that an average of $2,000 per month, for a total of

27   $10,000, is appropriate.  Thus, total past noneconomic damages are **$25,000**.

28         Based on the fact that Ms. Kobashi returned to pre-accident baseline in about April 2015,

Selman Breitman LLP
ATTORNEYS AT LAW

34

1  there are no future economic or noneconomic damages caused by the accident.  The total

2  economic and noneconomic damages attributable to this accident, therefore, are **$39,368.95**.

3         We look forward to submitting this matter to arbitration.

4

5  DATED:  August ___, 2019                    SELMAN BREITMAN LLP

6

7

8                                        By: _____
                                             N. ASIR FIOLA
9                                        Attorneys for Respondent SENTRY
                                         INSURANCE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RESPONDENT SENTRY INSURANCE'S ARBITRATION BRIEF

133890.1  138.42072

EXHIBIT "6"

1  Darrell A. Forgey, State Bar No. 055638
   E-Mail: dforgey@judicatewest.com
2  JUDICATE WEST
   601 S. Figueroa Street, Suite 4000
3  Los Angeles, California 90017
   Telephone: (213) 223-1113
4  Facsimile: (213) 223-1114

5

6

7

8              IN THE MATTER OF THE UNINSURED MOTORIST

9                      ARBITRATION BETWEEN

10

11 KIMI KOBASHI,                        CASE NO: A243442-46

12              Claimant,               **STATEMENT OF DECISION AND
                                        ARBITRATION AWARD**
13         v.

14 SENTRY INSURANCE, A MUTUAL
   COMPANY, a Wisconsin corporation,
15
                Respondent.
16

17 **INTRODUCTION**:

18         This matter proceeded to Binding Uninsured Motorist Arbitration Hearing on August 19

19 and 20, 2019 before Neutral Arbitrator Darrell A. Forgey, Esq., at the offices of Judicate West in

20 Santa Ana, California.  The hearing lasted two full days.

21         The parties were represented by two veteran legal professionals with Eric Strongin,

22 assisted by paralegal Linda Berger, for the claimant and Asir Fiola for respondent.  Claimant's

23 partner Mary Pat Wallace also attended the hearing, but did not testify.

24         The case was presented in a very professional manner by both counsel and, in point of fact,

25 in my 40 years of presiding over several hundred arbitration hearings, rarely have I seen a case

26 presented in a more thorough and competent fashion.

27         Liability was admitted and the case was submitted on the issues of causation and damages.

28 There are also issues of proof, severity of impact and mitigation.

STATEMENT OF DECISION AND ARBITRATION AWARD

1   Witnesses testifying at the hearing included the claimant; John Elser (the Huntington
2   Beach police officer who investigated the accident); Bill Hill (a friend of claimant); Tracy Remas
3   (claimant's vocational rehabilitation expert); Michael Lobatz, M.D. (claimant's neurological
4   expert); and Liz Holakiewcz (claimant's life care planner). I also reviewed the briefs of the parties
5   with multiple exhibits including medical records and reports, photographs, repair estimates, billing
6   records, discovery responses, economic reports, life care plans, and the deposition testimony of
7   various physicians. I also considered the reports of Drs. Alexander, Helm, and Lobatz, among
8   others.

9   **FACTS, EVIDENCE AND TESTIMONY**:

10   This FIRST PARTY claim arises out of a three-car motor vehicle accident occurring on
11   November 7, 2014 in Huntington Beach, California. Claimant Kobashi, then 49 years of age, was
12   in her way to Los Angeles International Airport to drop off two friends. While her Ford Fusion
13   was stopped at a red light, she was impacted in the rear by the Lydon Malibu which had been rear-
14   ended by an Acura driven by the uninsured motorist Winson Do. Do claimed his brakes
15   "malfunctioned" precipitating the accident. Claimant was employed by respondent as an SIU
16   investigator and was driving a company vehicle. The Sentry UM policy had $1 million in
17   benefits.

18   Prior to the accident, claimant had a long history of chronic neck and back pain and
19   underwent spinal fusion surgeries in 2010 and 2011. Claimant testified at the hearing and I found
20   her to be credible with an element of "overstatement". There is no question that she continues to
21   experience chronic neck pain. As a result of the accident, she has seen a veritable odyssey of
22   health care providers including Drs. Aish, Grabow, Ahern, Aflatoon, Carlson, Dobkin, Claveria
23   and other physicians in Arizona where she now resides.

24   Police Officer Elser testified at the hearing and stated that there was "no damage to the
25   Kobashi vehicle" in the accident. A repair estimate in evidence indicates damage of $1,433.70.

26   Ultimately, claimant required the use of a spinal cord stimulator (SCS) to control her
27   chronic pain. This device was implanted in Arizona and Dr. Lobatz, claimant's neurological
28   expert, testified that the subject accident caused the need for the stimulator. He apportioned the

-2-

1    claimant's pain 80/20 to preexisting conditions versus injuries suffered in the accident. However,

2    he also testified that the need for the SCS was "100% related" to the accident. Dr. Helm

3    previously indicated an apportionment analysis of 50/50.

4         At the request of respondent, claimant was examined by Gerald Alexander, M.D., a well-

5    known local orthopedic surgeon on September 27, 2017. Dr. Alexander did not testify at the

6    hearing, but his report and deposition testimony were submitted into evidence. It was Dr.

7    Alexander's opinion that the accident was minor and any treatment beyond the six month mark

8    would have been "secondary to the progression of preexisting disease and not the November 17,

9    2014 accident".

10        Various economic and life care plan reports were reviewed and claimant's expert

11   Holakiewicz testified that there is a total loss of $466,651.98. This does not include a loss of

12   earnings claim testified to by claimant expert Remas.

13        Claimant seeks significant economic and non-economic damages and requests an award of

14   the $1 million in UM policy limits.

15   **ANALYSIS AND CONCLUSION**:

16        I have evaluated this claim from every angle; up, down and sideways. I have reviewed, re-

17   reviewed, analyzed and re-analyzed all of the testimony and evidence presented including the

18   voluminous exhibits and deposition testimony submitted.

19        Based thereon, along with a healthy dose of common sense, I conclude that claimant is

20   entitled to damages for her economic losses and for pain and suffering.

21        The seminal issue appears to be the relationship of the spinal cord stimulator to the subject

22   accident. Was the implantation of the stimulator a result of the accident or her chronic, preexisting

23   degenerative pain? After much reflection and soul searching, I conclude that this question must be

24   answered in the negative. I acknowledge the testimony of Dr. Lobatz, but he never examined

25   claimant.

26        However, this saga does not end there. Claimant was clearly an "eggshell" by any

27   definition and is entitled to compensation for additional injury suffered in the subject accident. On

28   the state of the record before me, claimant experienced trauma superimposed on preexisting

-3-
STATEMENT OF DECISION AND ARBITRATION AWARD

1  degenerative, longstanding conditions which are multifactorial.  I also conclude that she is sincere

2  in her testimony that the accident caused her additional pain and discomfort.

3      For past medical expenses incurred, a figure of $56,774.84 is indicated.  For future medical

4  expenses I award her $30,000.  This totals $86,774.84.

5      I also conclude that she is entitled to an award for past and future loss of earnings and here,

6  a figure of S100,000 is indicated.

7      This leaves the issue of general damages for past and future pain and suffering.  Again,

8  from a review of all of the testimony and evidence presented, a figure of $200,000 is fair, just and

9  reasonable.

10      Combining the aforementioned figures results in a total award of $386,774.84 and said

11  amount is hereby awarded to claimant.

12      In closing, I would like to thank the parties and counsel for letting me hear this most

13  interesting matter and for their professionalism and civility.

14      If any post-arbitration issues need to be addressed or considered, I would ask that they be

15  brought to my attention within ten (10) business days or by Friday, September 20, 2019.

16

17  DATED: September 5, 2019

18

19

20  By:   _____
      DARRELL A. FORGEY

21        Neutral Arbitrator

22

23

24

25

26  2019.0905 Stmt of dec & arb awards.doc

27

28

-4-

STATEMENT OF DECISION AND ARBITRATION AWARD

# EXHIBIT "7"

## Gerald J. Alexander, M.D., F.A.A.O.S.
### *Orthopaedic Spinal Surgery*
1010 W. La Veta Avenue, Suite 775
Orange, CA 92868
(714) 486-1071

September 27, 2017

Asir Fiola, Esq.
Selman Breitman
6 Hutton Centre Drive, Suite 1100
Santa Ana, CA 92707

**RE: KOBASHI, KIMI**

### DEFENSE MEDICAL EXAMINATION

To Whom It May Concern:

**HISTORY:**
The patient is a 52-year-old female who was involved in a rear-ended motor vehicle accident which occurred 11/7/14. She was at a complete stop when she was struck by another automobile and had the acute onset of neck and midback pain. She was taken by ambulance to Hoag where she was evaluated and released after workup and treatment. She had a significant prior history of multiple cervical spine operations, with a history of an anterior cervical fusion from C5-T1 and a subsequent multilevel posterior cervical fusion from C2-C7. She also sustained a motor vehicle accident in 2012 after her initial surgeries with a temporary flare up of pain. She had ongoing chronic neck pain prior to the 2104 injury. She states, however, that her symptoms increased as a result of this injury and a further workup was performed.

Because of her ongoing symptoms she was sent for physical therapy, was given increased pain medication, and eventually pain management pursued implantation of a dorsal column spinal cord stimulator. While this helped her initially, she continues to have ongoing neck pain and headaches. She complains of pain into the bilateral shoulders and rarely into the left arm area. She complains of tingling into the left ring finger. She started working again in February of this year as an insurance fraud investigator, and her increased sitting and travel have exacerbated her symptoms. She has had to hire additional help around the house because of her difficulty performing activities such as housework and gardening. She at times has difficulty concentrating.

**MEDICATIONS:**
Her current medications include Percocet twice per day, Effexor once per day, and over-the-counter topical agents such as lidocaine. She takes morphine and has increased this to 15 mg three times per day.

**PAST MEDICAL HISTORY:**
As above. Please see subsequent record review.

RE: KOBASHI, KIMI
September 27, 2017
Page 2

**PHYSICAL EXAMINATION:**
Examination of the cervical spine reveals a well-healed left anterior neck scar as well as two well-healed posterior neck scars. She has decreased cervical range of motion which I would rate as 50% of normal. Strength testing is 5/5 throughout the bilateral upper extremities. There is decreased sensation to the left ring and small fingers, with sensation otherwise being intact. Deep tendon reflexes are 1+ and symmetrical. Long tract signs including Hoffmann's are negative.

**REVIEW OF RECORDS:**

Records from Hoag Memorial Hospital, volumes I through VII were reviewed. The majority of these records pertain to treatment for breast cancer.

Multiple follow up office visits from Bassil Aish, M.D., Beach Physicians Medical Group, Huntington Beach from 07/21/08 through 2016 indicates patient was seen for neck and low back pain, chest pain, and BP checks. Morphine was prescribed.

**An x-ray report of the cervical spine from Beach Physicians Medical Group, dated 07/21/08** revealed discovertebral degenerative changes at C5-67, C6-7 and with less severity at C7-T1, represented by decreased intervertebral space sclerosis of endplates, and prominent osteophyte. There was narrowing of the neural foramina in both sides at C5-6 and C6-7 because of degenerative osteophyte detected.

**MRI scan of the cervical spine without contrast, dated 07/25/08 from Huntington Beach Diagnostic Imaging & Breast Center** is reviewed. Patient had right sided upper extremity motor and sensory deficit with clinical possibility of canal/neural foraminal abnormalities. The study revealed large disc extrusion in the right side of the canal at C7-T1 causing severe neural foraminal stenosis. Generalized discovertebral degenerative changes with bulging annulus of the discs and vertebral osteophyte formation were noted. Stenosis of canal and neural foramina with different severities at different levels were noted. Facet joint degeneration from C2-3 down to lower cervical spine was detected. The study was negative for intrathecal mass lesion, myelopathy, cord atrophy or myelomalacia.

**A Procedure Report, dated 11/01/08 by John L. Brazill, M.D., JD,** Sunflower Surgical Institute is reviewed. C/ESI, Right and left C3-4 facet injections were performed.

An Orthopedic F/U Report by Nitin N. Bhatia, M.D., dated 01/06/09 notes patient was seen for DDD of the cervical spine with neck pain and left shoulder rotator cuff tear. She was to f/u with Dr. Gupta for her left shoulder pain. Physical therapy was prescribed.

**There is an Operative Report by Michele Carpenter, M.D., dated 01/13/09, St. Joseph Hospital.** Patient underwent right breast partial mastectomy and oncoplastic reconstruction due to right breast ductal carcinoma in situ.

**A Second Opinion Spine Surgical Evaluation dated 02/22/10, by Gregory D. Carlson, M.D.,** noted patient had 2 years of unremitting neck pain, and recent fight with

RE: KOBASHI, KIMI
September 27, 2017
Page 3

breast cancer. She had numbness and tingling in her left arm. She continued to work as an insurance investigator. She was diagnosed with cervical spondylitic stenosis, C5-6, C6-7, C7-T1, cervical radiculopathy. History of breast cancer with ongoing breast reconstructive procedure. Treatment recommendation consisted of a three level anterior cervical fusion at C5-6, C6-7 and C7-T1, involving an anterior approach with complete uncinate process resection, far lateral foraminotomies at each level, and anterior reconstruction with anterior plating.

**Reviewed is an Operative Report by Gregory Carlson, M.D., dated 03/09/10, St. Joseph Hospital.** Pre/postoperative Diagnoses were cervical spondylitic stenosis, C5-6, C6-7 and C7-T1 and cervical myeloradiculopathy. The surgical procedures included an anterior vertebrectomy with spinal cord decompression at C5-6, C6-7 and C7-T1. Anterior discectomy with bilateral foraminotomy and neural decompression under high powered microscopy, C5-6, C6-7 and C7-T1. Anterior interbody fusion at C5-6, C6-7, C7-T1. Insertion of anterior body cage device C5-6, C6-7, C7-T1. Anterior spinal fixation C5-6, C7-T1. Local autogenous bone graft/Actifuse bone graft extender insertion. Continuous monitoring, somatosensory evoked potentials, motor evoked potentials and electromyography.

A Doctor's First Report of Occupational Injury or Illness, dated 08/25/10 from Bassil Aish, M.D. noted the DOI as 08/10/10. Patient was employed by Liberty Mutual a senior field investigator. Her right thumb became painful while writing at work. She was diagnosed with a right 1st trigger finger. Injection and splint was recommended. Multiple follow up visits were provided.

**Reviewed was Jeffrey M. Dembner, M.D.'s Neurosurgery Evaluation dated 03/28/11.** Patient was seen for cervical spine pain. Dr. Dembner noted that Dr. Carlson recommended an anterior and posterior approach with an arthrodesis at C4-5 and redo arthrodesis at C7-T1. Dr. Dembner recommended ESI's, flexion/extension XR's of the cervical spine, EMG/CNV studies, trial of a hard cervical collar. He favored a posterior stabilization across the already operated levels before redoing anything anteriorly or adding additional levels unless there was convincing evidence of a pseudoarthrosis or an additional level of symptomatic disease.

**A Neurosurgery Evaluation by William R. Dobkin, M.D., dated 04/04/11** was addressed to Greg Carlson, M.D. Patient began to have symptoms a couple of years ago, and had cervical spondylitic changes at multiple levels. She had a discography. She had C5 to T1 anterior cervical decompression and fusion, and had some increasing symptoms in her upper extremities, as well as painful paresthesias in her right arm, decreased strength in her right hand more recently, and tremulousness in her left upper extremity. Imaging studies were noted. Her current medications were morphine, Percocet, Soma, trazodone, Aromasin, evening Primrose and nutritional supplements. Her diagnoses included persistent radiculopathy, R/O myelopathy, R/O paraneoplastic syndrome, R/o central nervous system involvement with breast cancer/less likely, R/O pseudoarthrosis, S/P treatment of breast cancer with mastectomy and XR therapy, S/p bilateral salpingo-oophorectomy, chronic opioid management, and allergy to prednisone. Treatment recommendations included myelogram CT scan, EMG/NCV studies, MRI scan of the brain and dynamic x-rays of the spine.

RE: KOBASHI, KIMI
September 27, 2017
Page 4

**X-rays of the cervical spine dated 04/05/11 from Hoag Memorial Hospital** revealed postoperative fixation without obvious loosening or infection.  Limited ROM without evidence of instability or offset.

A Progress Note dated 04/06/11 by Dr. Aish is reviewed.  **On 04/06/11, patient had neck pain after she stepped in a pothole, snapping her neck while she was conducting an interview.** She had neck surgery and fusion in March 2010.  She was still having pain prior to the current incident. Diagnosis was cervical DDD. She was to f/u with spine surgery.

**CT myelogram of the cervical spine with contrast, dated 04/14/11 from Hoag Memorial Hospital** notes clinical history of bilateral hand numbness and weakness, and cervical fusion. The study revealed S/p C5-T1 anterior cervical discectomies and fusion. The C5-6 and C7-T1 anterior interbody grafts project posterior to the posterior vertebral body cortex by 0.3 and 0.4 cm, effacing the ventral subarachnoid space without causing significant spinal stenosis.  There was moderate to severe facet arthropathy in the upper cervical spine associated with minimal C2-3 and C3-4 anterolisthesis and bilateral C3-4 neural foraminal narrowing, severe on the left and mild to moderate on the right.  C7-T1 showed left uncovertebral osteophyte projecting into the left neural foramen and may contact the exiting left C8 nerve root.

**A follow up Neurosurgery Progress Note, dated 08/23/11 by Dr. Dobkin** indicated patient was in downtown L.A. in April when she experienced marked increased in neck pain when she had a severe twisting incident while getting out of her car in an area where they were doing construction.  Dr. Dobkin recommended an anterior decompression and fusion at C3-4 and C4-5 as it would probably give her the best chance of recovering with the least impact from surgery. He also indicated that she might require further surgery from the back and removal of instrumentation at the lower levels.

**An Operative Report dated 09/21/11, by William R. Dobkin, M.D., from Hoag Memorial Hospital** noted pre/postoperative diagnoses of severe neck pain, severe osteoarthritis at multiple levels, S/p anterior cervical fusion at multiple levels, nonunion at C5-6 and extensive interbody fusion at C5-6 with compression of spinal cord. The surgical procedures included posterior spinal fusion of C2, C3, C4, C5, C6 and C7 and T1 bilaterally, utilizing Infuse, Actifuse and Ossimend strips.  Songer cable fixation of C2, C3 and C4. Lateral mass screws at C3, C4, C5, C6 and C7 bilaterally.  Partial correction of kyphosis was performed.

**An intraoperative X-ray of the cervical spine, dated 09/21/11 from Hoag Memorial Hospital** revealed pedicle screws with laminectomy at L3, L4, L5 and L6 (sic.) Cerclage wires identified overlying the C2 spinous process with extension down to the level of the C4 pedicle screws was noted.  Anterior fixation plate with screws at the C5 and lower levels were incompletely imaged on this radiograph.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 5

**X-rays of the cervical spine dated 10/31/11 from Hoag Memorial Hospital** was compared with the studies of 04/05/11 and 09/21/11.  There was evidence of prior ACDF from C5 to T1.  There was interval posterior cervical fusion from C3 to C7 with bilateral pedicle screws and paired rods.  Cerclage wire was seen involving the spinous process of C4-7. Satisfactory alignment was seen.  Mild spondylosis at C4-5 was noted.  No hardware complication was seen.

**X-rays of the cervical spine, dated 12/27/11 from Hoag Memorial Hospital** was compared with the study of 10/31/11. Patient was S/p fusion of the C/S C3-T1. A posterior pedicle screw and rod device at C3-7, and an anterior plate and screw device at C5-T1 were noted. There was no significant motion seen at C3-T1 with flexion and extension.

**A Neurosurgery Follow-Up Report, dated 12/29/11 by William R. Dobkin, M.D.** was addressed to Bassil Aish, M.D.  Dr. Dobkin stated patient underwent further extension of her fusion posteriorly in the areas where she had significant arthritis, which resulted in resolution of almost all of her previous pain  Se was to begin physical therapy.

**X-rays of the cervical spine dated 02/07/12 from Hoag Memorial Hospital** was compared with the study of 12/27/11.  There were postsurgical changes of an anterior posterior cervical fusion without change.  Posterior spinal screws and rod extending from C3 to C7 and anterior plate and screws extend from C5 to T1. Disc prosthesis was at C5-6 and C6-7. Cerclage wires involved the posterior elements from C2 to C4. NO spondylolisthesis was seen.

**ER records dated 04/06/12 from Hoag Memorial Hospital noted patient was seen for 6/10 neck pain S/p traffic collision on 04/05/12.** She was the restrained driver of a vehicle that was rear-ended. XR of the cervical spine was taken. She was diagnosed with cervical sprain/strain; MVA. Flexeril was provided. She was to f/u with Dr. William Dobkin.

**X-rays of the cervical spine dated 04/06/12 from Hoag Memorial Hospital** was compared with the prior 02/07/12 study. There was reversal of normal cervical lordosis. There were extensive anterior ends posterior cervical fusion changes.  Anterior plate and screw fixation was seen at C5-T1.   Posterior pedicle screw fixation was seen at C3-7. Cerclage wire was seen over the spinous processes from C2 to C4. No definite fracture was seen

**X-rays of the cervical spine, dated 08/24/12 from Hoag Memorial Hospital was compared with the 04/06/12 exam.** There was redemonstration of reversal of the normal cervical lordosis with mild kyphosis centered at C4-5, Extensive post-surgical changes S/p anterior and posterior fusion was again seen.  Anterior plate and screw fixation from C5 through T1 was noted. There was posterior pedicle screw fixation from C3 to C7. Cerclage wires over the spinous processes from C2 through C4 were noted.   There orthopedic hardware appeared intact and stable. There was minimal anterolisthesis at C2-3 that was without change.  Spurring and disc space narrowing at C3-4 and C4-5 was again noted.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 6

An Office Visit Report by Dr. Aish, dated 01/22/13 notes patient was seen for left knee pain. Her knee was aspirated.

Acupuncture Reports from Bien Physical Therapy/West Star from 09/13/13 through 12/15/14 notes patient had acupuncture for neck pain. The total charges were $3,389 for 10 sessions.

**An ER Report dated 11/07/14, David Christy, M.D. from Hoag Memorial Hospital** notes 8/10 neck and back pain S/p traffic collision. Patient was the restrained driver of a vehicle that was rear-ended by another vehicle. She was ambulatory at the scene of the accident. CT of the cervical spine and XR of the L/S were taken.  Diagnoses were cervical and lumbosacral sprain/strain, MVA. Ibuprofen and ice were recommended.

**A CT of the cervical spine, dated 11/07/14 from Hoag Memorial Hospital** revealed no evidence of acute bony injury.  S/p C2-7 posterior and C5-T1 anterior spinal fusion with no evidence of hardware loosening.

**Reviewed is an X-rays of the lumbar spine dated 11/07/14 from Hoag Memorial Hospital.** Partial socialization of L5 with disc space degenerative change at the L5-S1 level was noted.

There were 20 physical therapy visit Progress Notes from 11/24/15 through 02/26/16 from Exclusively Spine Physical Therapy per the referral of William Dobkin, M.D.  Patient had physical therapy for the cervical spine and left shoulder.  She was discharged from care on 02/26/16 noting patient's condition improved but she continued to have constant neck pain. The total charges were $6,428.

**An Initial Orthopedic Personal Injury Evaluation by Richard J. Claveria, M.D., dated 11/25/14** notes the DOI as 11/07/14.  Patient was involved in a MVA when was rear-ended by another vehicle, which aggravated her baseline neck pain. Her past medical history noted and ACDF in 2010 by Dr. Carlson, a redo anterior and posterior fusion C3 to T1 by Dr. Dobkin in 2011. She was seeing Dr. Grabow for pain management.  She had continued neck and left upper extremity pain. She was seen at Hoag Hospital for CT of the neck with no acute changes. Low back films were unrevealing. Her diagnoses included cervical strain, and S/P 2010 and 2011 anterior/posterior fusion from C3 to C7.  Physical therapy and acupuncture were prescribed. The charge for this visit was $160.

Reviewed is a History of Work Related Accident/Injury form from Dr. Claveria's office dated 11/25/14 that was signed by the patient.  Patient indicated that she injured her neck, mid back and shoulder on 11/07/14 when she was at a complete stop and was rear-ended. She felt immediate 8/10 severe pain in her neck, mid and low back. Her past medical history noted MVA's in 2001 and April 2012.  She was employed by Sentry Insurance that involved conducting a WC and liability investigations in the field.

An Orthopedic Progress Note, dated 12/16/14 from Dr. Claveria indicates patient still had  pain mainly at the junction of the left trapezius, shoulder and side of the neck.  Treatment

**RE: KOBASHI, KIMI**
September 27, 2017
Page 7

recommendations included physical therapy, ice, heat, f/u with Dr. Dobkin. She was switching her pain management physician to Dr. Mata. Norco was prescribed.

Physical therapy reports dated 12/30/14 through 07/21/15 from Huntington Beach P.T. Specialists indicates patient was referred by Dr. Claveria for patient's 11/07/14 injury. She had 34 sessions of therapy for the cervical spine and upper trapezius region. The total charges were $8,590.

An Orthopedic Report, dated 01/06/15 by Robert C. Ahearn, M.D. with Pacifica Orthopedics indicated patient had left greater than right neck pain, stiffness in the neck and occasional radicular symptoms in the left arm, as well as numbness and tingling in the small and ring finger, and frequently in the middle finger. Her neck pain was 90% of her problem. Her past history regarding her cervical spine and surgeries were noted. She did relatively well following the surgery in 2011. Thereafter, she involved in two MVA's, one in 2012 that caused a set back and another MVA in November 2014 when she was rear-ended by another vehicle. X-rays of the were taken showing extensive fusion instrumentation including anterior cervical decompression and fusion with interbody spaces and plate C5-6, C6-7 and C7-T1, i.e. spanning C5 to T1. There was posterior fusion including lateral mass screws and wiring of C2 to C3 with lateral mass screws C3 to C7. Flexion and extension views showed no evidence of instability. There was mild kyphotic movement of approximately 5 degrees above C5. She was diagnosed with recent MVA with whiplash syndrome, chronic cervical sprain/strain, particularly left paracervical, S/P C2 to T1 anterior and posterior cervical fusions, stable, and left arm radiculopathy. An injection of xylocaine/Marcaine/Celestone was administered into the left paracervical trigger point with significant relief. Treatment recommendations included physical therapy, a home exercise program, gradual weaning from morphine, Meloxicam. Charges for the office visit was $390, injection fee was $165, XR of the spine fee $125.

Reviewed is Dr. Claveria's Progress Note, dated 01/13/15. Patient was feeling better with physical therapy and medications. She was to f/u with her doctors.

A Progress Note dated 01/27/15 by Robert Ahearn, M.D. noted patient's neck pain improved with the trigger point injection, Meloxicam and her home exercise program. Page two of this report is missing which contained her treatment plan. The fee for this visit was $200.

A Pain Management Evaluation dated 01/29/15 by Marc B. Cheng, M.D. with Elite Pain Management notes pain in the cervical spine radiating to the left arm for five years. Her past surgeries were noted as well as ESI's, physical therapy, tens, trigger point injection and Ultrasound therapy. Morphine was prescribed. The fee for this visit was $432.

Reviewed were multiple Pain Management Progress Notes by Dr. Cheng, with dates stemming from 02/26/15 through 02/02/16. Morphine, Percocet, Gabapentin was prescribed. The fee per visit was $280.50. She had trigger point injections on 12/02/15 with fees of $140.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 8

A Progress Note dated 02/24/15 by Dr. Claveria notes patient was seen by a new doctor, Dr. Brian Chang for pain management of her medications.  Patient had no interest in further neck surgery.

There is a Physical Therapy Note from Huntington Beach Physical Therapy Specialists, dated 02/26/15. This was visit #15 for injuries from the MVA of 11/07/14.  She had 40% improvement overall in her neck and shoulders.

An Orthopedic Progress Note by Dr. Claveria, dated 04/13/15 notes patient was taking Meloxicam, morphine an Effexor daily.  **Patient stated that she thinks her baseline pain related to her chronic neck disorder was about 4, then increased to 6 after the MVA, and now settled to 4 to 5, controlled by medications, neck brace, careful neck hygiene, and being careful at her computer station.**  She was to f/u with Dr. Dr. Mark Chang.  Dr. Claveria stated there was nothing further for him to offer at that time.

An Authorization to Disclose Health Information Form was signed by Ms. Kobashi and dated 05/28/15. Her medical providers included Dr. Claveria, Robert C. Ahearn, M.D., with dates of service on 12/06/14 and 01/27/15, Huntington Beach P.T., Hoag Memorial Hospital with date of service 11/07/14, and Elite Pain Management/Marc Chang, M.D. with dates of service 01/29/15, 02/26/15 and 04/13/15.

**A Progress Note, dated 07/07/15 by William R. Dobkin, M.D.** notes patient was seen in follow up of her cervical spine.  She was involved in a MVA in November 2014. She had numbness throughout her hands, more on the left side in the 2-5 digits, and tightness in the biceps.  Patient reported that treatments did not really help her.  It appeared that her symptom were probably an aggravation of her underlying disease, the scarring that occurred in the cervical spine, degenerative changes below her fusion, all aggravated by her accident. It was unclear why she had neurological symptoms in her left upper extremity.  EMG/NCV studies of the upper extremities and an ESI at T1 was recommended. Her low back was to be monitored as well.

**A Procedure Report dated 08/26/15 by Richard Rhee, M.D.,** Hoag Memorial Hospital indicated a C7-T1 interlaminar ESI was performed.

A Progress Note by Dr. Dobkin, dated 11/12/15 noted patient had increased symptoms in her left hand, 4th and 5th digits, left shoulder and left arm.  CT and MRI scans of the cervical and thoracic spine, and EMG/NCV studies were recommended.

**A CT of the cervical spine without contrast, and with 3D reconstruction from Simon Med, dated 11/20/15** demonstrated postoperative changes of ACDF at C5-6 through C7-T1, posterior fusion of the C3-7 vertebral bodies and a wire extending around C2-4 spinous processes. Osseous fusion across the C5-6 through C7-T1 interspaces and along the C3-7 posterior elements were noted.  There was intact spinal instrumentation without evidence of loosening.  There were multilevel uncovertebral joint spondylosis with mild left neural foraminal narrowing at C2-3 and C7-T1, mild right neural foraminal narrowing at C5-6 and C6-7 and mild to moderate right neural foraminal narrowing at C3-4.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 9

**Reviewed is an MRI scan of the cervical spine w/o contrast with 3D reconstructions from Simon Med, dated 11/20/15** revealed postoperative changes of ACDF at C5-6 through C7-T1, posterior fusion of the C3-7 vertebral bodies and a wire extending around C2-4 spinous processes. There was osseous fusion across the C5-6 through C7-T1 interspaces and along the C3-7 posterior elements. Intact spinal instrumentation without evidence of loosening was noted. There were multilevel uncovertebral joint spondylosis with mild left neural foraminal narrowing at C2-3 and C7-T1, mild right neural foraminal narrowing at C5-6 and C6- and mild to moderate right neural foraminal narrowing at C3-4.

**MRI scan of the thoracic spine without contrast and 3D reconstruction dated 11/20/15 from Simon Med** demonstrated mild multilevel ventral spondylosis. Small peripherally calcified disc protrusions at T4-5 and T5-6. Mild costovertebral spondylosis at T3-4 through T8-9 resulted in mild bilateral neural foraminal narrowing at T4-5 through T8-9 and on the left at T3-4. Mild bilateral neural foraminal narrowing at T1-2 related to posterior lateral osseous ridging.

**Reviewed is a patient ledger from Arizona Pain Specialists with dates stemming from 02/23/16 to 03/09/17 totaling $19,484.80.**

Multiple drug test reports from Arizona Pain Specialists from 02/23/16 through 12/09/16 were positive for MS Contin and Percocet.

An Office Visit Note dated 02/23/16 by Ryan Gilbreth, PA with Arizona Pain Specialists indicates patient had very limited ROM of the cervical spine, significant radicular component to the left hand especially the third and fourth fingers, neck pain radiating to the left arm and pinky/ring fingers. She had ESI's and radiofrequency ablation of the cervical spine without relief. She also failed medication management including MS Contin, Percocet and anti-inflammatory medications. She had prior C2-T1 posterior fusion and C5-T1 anterior fusion in 2011-2011 by Dr. Dobkin in California. Her pain improved after surgery in 2011 until her MVA in November 2014 that occurred in Huntington Beach when her symptoms worsened. CT scans of the cervical spine and thoracic spine dated 11/20/15 was reviewed. She had breast cancer in 2010 and was in remission. She was taking Percocet, Gabapentin, Amlodipine, Effexor and morphine. A trial of Flexeril was prescribed, as well as MS Contin and Percocet. Spinal cord stimulator was ordered.

**A memo dated 02/25/16 by William Dobkin, M.D.** indicated he was unable to open a CD of 01/05/16. He reviewed a new copy of a CAT scan of the cervical spine and lumbar spine, which showed progressive degeneration of the level below her fusion. Dr. Dobkin stated that this could be consistent with her symptoms as it was causing foraminal stenosis. Transforaminal nerve block and epidural blocks at the lower levels, as well as surgical decompression down the road were recommended. A voice mail was left for patient to set up C7-T1 transformational nerve block or epidural.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 10

Reviewed is an Office Visit note, dated 03/24/16 by Adam Wuollet, M.D., Arizona Pain Specialists.  Patient was ready to move forward with the spinal cord stimulator. She was provided with refill of her current medications.

There is a Progress Note by Jacob Amrani, M.D., dated 03/24/16 from Arizona Pain.  MRI of the left shoulder was ordered.

**MRI scan of the left shoulder without contrast, dated 04/13/16 from Simon Med** revealed mild AC arthritis. Moderate inferior glenohumeral arthritis. Small  joint effusion extending into the bicipital tendon sheath. Suspect an 8 x 3 mm chondral loose body in the bicipital tendon sheath.  Infraspinatus tendinopathy.  Severe  supraspinatus tendinopathy with intermediate grade partial thickness tear of the articular surface fibers distally, and interstitial tearing dissecting medially to the myotendinous junction.  Vertical split in the extra articular segment of the long head of the biceps.

Dr. Wuollet's Progress Note, dated 04/21/16 indicates that the MRI of the left shoulder was reviewed. Treatment recommendations included a left shoulder subacromial steroid injection and spinal cord stimulator.

Reviewed is an Office Visit Report by Bassil Aish, M.D., Beach Physician's Medical Group, Huntington Beach.  She was seen in follow up for neck pain and BP check. She was to follow up with pain and spine specialist.

**A Physician Statement from Sentry Insurance was signed by Bassil Aish, M.D. on 05/11/16.** Patient was pending spine surgery and pain management procedures due to bilateral upper extremity radiculopathy, spinal stenosis, cervical spine weakness, motor and sensory radiculopathy.  She was placed off work from 05/11/16 for 3 to 6 months.

A Procedure Report, dated 05/17/16 by Jonathan Carlson, M.D., Mountain View Surgery Center of Glendale is reviewed. A left shoulder steroid injection under fluoroscopy was performed.

Progress Notes from Arizona Pain, dated 05/19/16 and 07/01/16 indicates patient continued to experience neck pain radiating to the left arm to the pinky and ring fingers. MS Contin, Percocet, Flexeril was refilled.

**An Orthopedic Spine Report by John R. Ehteshami, M.D., dated 06/07/16** notes patient had pain in the neck and scapula region. Imaging of the cervical spine showed cervical degenerative changes, prior ACDF surgery C5-6, posterior cervical surgery at C3-7. MRI of the left shoulder demonstrated loose body in the biceps tendon and tendinopathy. She was prone to arthritic changes. Physical therapy was recommended. $495 was billed for this visit.

**A Procedure Report, dated 07/15/16 by Dr. Wuollet, Mountain view Surgery Center of Glendale.** Trial placement of one percutaneous neurostimulator electrode was performed.

**RE: KOBASHI, KIMI**
September 27, 2017
Page 11


A Follow Up Report dated 07/19/16 by Dr. Wuollet noted patient had significant relief from the spinal cord stimulator trial. A permanent spinal cord stim placement was scheduled.

A Follow Up Report dated 08/15/16 by Bassil Aish, M.D. noted patient had constant mild neck pain, unchanged. She was also seen in f/u for her BP. She was under the care of a neurosurgeon in Phoenix, and pain management in Arizona. She had not worked since October. She also had history of lumbar and thoracic DDD.

Reviewed were Progress Notes from Arizona Pain dated 08/30/16, 10/05/16, 11/03/16, 12/09/16, 01/05/17, 02/08/17. Patient had significant relief of pain S/P SCS permanent implant on 10/31/16 with Dr. Porter. MS Contin and Percocet were decreased.

(Approximately 3,000 pages, 8 hours)


**DIAGNOSIS:**
1.    History of anterior cervical decompression and fusion from C5-T1 with subsequent posterior cervical fusion from C2-C7.

2.    History of subsequent rear-end motor vehicle accident which occurred 11/25/14.

3.    History of prior injuries including motor vehicle accident in 2012 which occurred after the cervical spine surgeries.

4.    Subsequent placement of dorsal column spinal cord stimulator in 2016.

5.    Persistent neck pain and headaches with intermittent left cervical radiculopathy.

**DISCUSSION:**
In my opinion, the patient's initial workup and treatment after the 11/7/14 motor vehicle accident was reasonable and appropriate and secondary to the injury. This included the diagnostic studies including x-rays and a CT, as well as medication, physical therapy, and physician visits. In my opinion, however, the patient returned to her baseline of symptoms within 3-6 months after this injury, and I believe further care beyond that six month mark would have been secondary to progression of preexisting disease and not the 11/7/14 accident.

She had a known chronic pain history requiring pain management with multilevel prior anterior and posterior cervicothoracic decompression and fusion, and while she likely had a strain/sprain injury of the cervicothoracic spine as a result of the motor vehicle accident, I do not believe there was any change long term in her condition. I would therefore deem the placement of the spinal cord stimulator as secondary to progression of chronic disease and unrelated to the 11/7/14 injury. Future medical care, while appropriate for her chronic condition, is unrelated to that motor vehicle accident.

**RE:  KOBASHI, KIMI**
September 27, 2017
Page 12


Please do not hesitate to contact me with additional questions regarding this matter.

Sincerely,

**Gerald J. Alexander, M.D.**
Fellow, American Academy of Orthopaedic Surgeons
Diplomate, American Board of Orthopaedic Surgery
Fellowship-Trained Spinal Surgeon
QME, State of California

111317:jec

**AFFIDAVIT AND DECLARATION OF PROOF OF SERVICE**

I, the undersigned, hereby declare:

I am employed in the County of Orange, State of California, in the office of a member of the bar of this court at whose direction the following service was made. I am over the age of 18 and not a party to the within action. My business address is: Berger Kahn, A Law Corporation, 1 Park Plaza, Suite 340, Irvine, California 92614 ("the firm"). I am personally and readily familiar with the business practice of Berger Kahn, A Law Corporation.

On April 17, 2020, I served the document described as: **DEFENDANT SENTRY INSURANCE'S ANSWER TO PLAINTIFF KIMI KOBASHI'S COMPLAINT** on the interested party in this action addressed in the service list:

☒ **BY MAIL** (Cal. Civ. Proc. Code § 1013a(3)) – I placed the ☐ original ☒ true copy(ies) enclosed in a sealed envelope(s) addressed to the parties served above, placing such envelope(s) in the USPS receptacle outside 1 Park Plaza, Suite 340, Irvine, California 92614. It was deposited with the U.S. Postal Service on the same day with postage fully prepaid at Irvine, California, in the ordinary course of business. I am aware that on motion of a party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☒ **CM/ECF ELECTRONIC FILING** – I caused the above document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth above in accordance with the rules governing the electronic filing of documents in the United States District Court for the Central District of California. "A Notice of Electronic Filing (NEF) is generated automatically by the ECF system upon completion of the electronic filing. The NEF, when e-mailed to the e-mail address of record in the case shall constitute the proof of service as required by Fed.R.Civ.P5(d)(1).

☒ I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 17, 2020, at Irvine, California.

_____
HANNAH HONG

1
2

**SERVICE LIST**
*Kobashi vs. Sentry Insurance*
Case No. 8:20-cv-718

| | |
|---|---|
| Eric B. Strongin, Esq.<br>Smith \| Hall \| Strongin LLP<br>999 Corporate Drive, Suite 220,<br>Ladera Ranch, CA 92694 | Attorney for Kimi Kobashi |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BERGER KAHN
*A Law Corporation*

2